**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| EXXON MOBIL CORPORATION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:16-cv-2921-N |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Defendant. | § | |

**PLAINTIFF EXXON MOBIL CORPORATION'S APPENDIX TO
MOTION FOR PROTECTIVE ORDER, BRIEF IN SUPPORT,
<u>AND REQUEST FOR ORAL ARGUMENT</u>**

| Tab | Description | Appendix Pages |
|:---:|---|:---:|
| 1 | Declaration of William M. Katz, Jr. (Oct. 9, 2017) | App. 5–10 |
| 2 | Letter from Cory Johnson, Senior Litigation Counsel, Department of Justice, to Emily Parker, Attorney, Thompson & Knight LLP (Sept. 27, 2017) (Exhibit 1-A, attached to Declaration of William M. Katz) | App. 11–12 |
| 3 | Letter from Cory Johnson, Senior Litigation Counsel, Department of Justice, to Emily Parker, Attorney, Thompson & Knight LLP (June 23, 2017) (Exhibit 1-B, attached to Declaration of William M. Katz) | App. 13 |
| 4 | Letter from Emily Parker, Attorney, Thompson & Knight LLP, to Jonathan Blacker and Joshua David Smeltzer, Counsel, Department of Justice (Jan. 26, 2017) (Exhibit 1-C, attached to Declaration of William M. Katz) | App. 14–16 |
| 5 | Email from Bill Katz, Attorney, Thompson & Knight LLP, to Cory Johnson, Senior Litigation Counsel, Department of Justice (June 30, 2017) (Exhibit 1-D, attached to Declaration of William M. Katz) | App. 17–20 |
| 6 | Email from Bill Katz, Attorney, Thompson & Knight LLP, to Cory Johnson, Senior Litigation Counsel, Department of Justice (July 19, 2017) (Exhibit 1-E, attached to Declaration of William M. Katz) | App. 21 |

| Tab | Description | Appendix Pages |
|-----|------------|----------------|
| 7 | Letter from Jonathan Blacker, Trial Attorney, Department of Justice, to Emily Parker, Attorney, Thompson & Knight LLP (Aug. 25, 2017) (Exhibit 1-F, attached to Declaration of William M. Katz) | App. 22–35 |
| 8 | Letter from Emily Parker, Attorney, Thompson & Knight LLP, to Cory Johnson, Senior Litigation Counsel, Department of Justice (Sept. 25, 2017) (Exhibit 1-G, attached to Declaration of William M. Katz) | App. 36–39 |
| 9 | Letter from Emily Parker, Attorney, Thompson & Knight LLP, to Cory Johnson, Senior Litigation Counsel, Department of Justice (Oct. 6, 2017) (Exhibit 1-H, attached to Declaration of William M. Katz) | App. 40–41 |
| 10 | Email from Cory Johnson, Senior Litigation Counsel, Department of Justice, to Emily Parker, Attorney, Thompson & Knight LLP, (Oct. 6, 2017) (Exhibit 1-I, attached to Declaration of William M. Katz) | App. 42–43 |
| 11 | Declaration of Robert F. Ylagan (Oct. 9, 2017) | App. 44–54 |

Respectfully submitted,

THOMPSON & KNIGHT LLP

By:            /s/ *Emily A. Parker*
Emily A. Parker
State Bar No. 15482500
emily.parker@tklaw.com
Mary A. McNulty
State Bar No. 13839680
mary.mcnulty@tklaw.com
William M. Katz, Jr.
State Bar No. 00791003
william.katz@tklaw.com
J. Meghan Nylin
State Bar No. 24070083
meghan.nylin@tklaw.com
Leonora S. Meyercord
State Bar No. 24074711
lee.meyercord@tklaw.com

1722 Routh Street, Suite 1500
Dallas, Texas  75201
(214) 969-1700
(214) 969-1751 (Fax)

MILLER & CHEVALIER, CHARTERED

Kevin L. Kenworthy
D.C. Bar No. 414887
kkenworthy@milchev.com
George A. Hani
D.C. Bar No. 451945
ghani@milchev.com

900 16th Street NW
Washington, D.C.  20006
(202) 626-5800
(202) 626-5801 (Fax)

**ATTORNEYS FOR PLAINTIFF
EXXON MOBIL CORPORATION**

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the foregoing document was filed and served electronically through ECF on October 9, 2017, on all counsel of record.

/s/ *William M. Katz, Jr.*
William M. Katz, Jr.

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

EXXON MOBIL CORPORATION,

      Plaintiff,

v.

      CIVIL ACTION NO. 3:16-cv-2921-N

UNITED STATES OF AMERICA,

      Defendant.

## <u>DECLARATION OF WILLIAM M. KATZ, JR.</u>

1.      My name is William M. Katz, Jr.  I am of legal age and otherwise competent to make this declaration.  I am a partner at Thompson & Knight LLP ("T&K"), and I am counsel of record in this case for Plaintiff Exxon Mobil Corporation ("ExxonMobil").  I am submitting this declaration in support of ExxonMobil's Motion for Protective Order (the "Motion").

2.      All of the facts stated in this declaration are true and correct and are based on my personal knowledge, unless stated otherwise.  I acquired my personal knowledge during the course and scope of my work as counsel of record for ExxonMobil, including through my review of various ExxonMobil documents related to this lawsuit and my participation in the written and oral communications discussed herein.

3.      I have personal knowledge of communications between ExxonMobil and the United States of America ("Defendant") in this lawsuit, including letters and emails exchanged between T&K and the Department of Justice ("DOJ"), which I have received and reviewed.

4.      I have also participated in several telephone calls and email exchanges with Defendant's counsel at the DOJ—Cory Johnson, Jonathan Blacker, and Joshua Smeltzer.  During these communications, we have discussed the following topics, among others:  (a) the entry of a

protective order in this lawsuit; (b) the Protective Order that has been entered in this lawsuit; (c) issues related to discovery requests and responses served by both ExxonMobil and Defendant; and (d) issues related to ExxonMobil's desire to protect its confidential information from public disclosure.

5.      Attached to this declaration are true and correct copies of the following documents:

**Exhibit 1-A**:     Letter from Cory Johnson, Senior Litigation Counsel, DOJ, to Emily Parker, Attorney, T&K (Sept. 27, 2017)

**Exhibit 1-B**:     Letter from Cory Johnson, Senior Litigation Counsel, DOJ, to Emily Parker, Attorney, T&K (June 23, 2017)

**Exhibit 1-C**:     Letter from Emily Parker, Attorney, T&K, to Jonathan Blacker and Joshua David Smeltzer, Counsel, DOJ (Jan. 26, 2017)

**Exhibit 1-D**:     Email from Bill Katz, Attorney, T&K, to Cory Johnson, Senior Litigation Counsel, DOJ (June 30, 2017)

**Exhibit 1-E**:     Email from Bill Katz, Attorney, T&K, to Cory Johnson, Senior Litigation Counsel, DOJ (July 19, 2017)

**Exhibit 1-F**:     Letter from Jonathan Blacker, Trial Attorney, DOJ, to Emily Parker, Attorney, T&K (Aug. 25, 2017)

**Exhibit 1-G**:     Letter from Emily Parker, Attorney, T&K, to Cory Johnson, Senior Litigation Counsel, DOJ (Sept. 25, 2017)

**Exhibit 1-H**:     Letter from Emily Parker, Attorney, T&K, to Cory Johnson, Senior Litigation Counsel, DOJ (Oct. 6, 2017)

**Exhibit 1-I**:     Email from Cory Johnson, Senior Litigation Counsel, DOJ, to Emily Parker, Attorney, T&K (Oct. 6, 2017)

6.      On September 21, 2017, ExxonMobil produced 462 documents to Defendant and designated 436 of them as Confidential Information under the Protective Order that was issued on June 20, 2017.   These 436 documents include some of ExxonMobil's most confidential, sensitive, and proprietary documents.   Although ExxonMobil produced some of these 436 documents to the Internal Revenue Service ("IRS") during audit as return or return information

**DECLARATION OF WILLIAM M. KATZ, JR. — Page 2**

under 26 U.S.C. § 6103(a), none of the 436 documents was produced by ExxonMobil to Defendant or the DOJ before this lawsuit was filed on October 18, 2016. ExxonMobil did not produce any documents in this lawsuit to Defendant or the DOJ until April 21, 2017.

7.    After ExxonMobil produced documents to Defendant on September 21, 2017, I participated in a conference call later that day with Defendant's counsel at the DOJ—Cory Johnson, Jonathan Blacker, and Joshua Smeltzer—and ExxonMobil's counsel at T&K and Miller & Chevalier. During this conference call, Defendant's counsel—I believe it was either Mr. Smeltzer or Mr. Johnson—threatened to file publicly some of the 436 documents that ExxonMobil has designated as Confidential Information under the Protective Order by attaching them to a motion to compel to be filed with the Court. Defendant's counsel explained that, notwithstanding ExxonMobil's designation of these 436 documents as Confidential Information under the Protective Order, Defendant does not believe that ExxonMobil can designate any document as Confidential Information under the Protective Order if the document was previously produced by ExxonMobil to the IRS during audit. I explained to Defendant's counsel that paragraph 2 of the Protective Order does not focus on what was produced to the IRS during audit, but instead focuses on "information that is already in the knowledge or possession of the party to whom disclosure is made," and I explained that the IRS is not a "party" to this lawsuit. At the end of the conference call, I offered to send a letter explaining ExxonMobil's interpretation of the Protective Order and providing legal authority showing that the IRS is not a "party" to this lawsuit. Defendant's counsel agreed to consider the letter. The September 25, 2017 letter is attached as Exhibit 1-G.

8.    During the September 21 conference call, I also asked Defendant's counsel to identify which of the 436 documents designated as Confidential Information and produced by

**DECLARATION OF WILLIAM M. KATZ, JR. — Page 3**

ExxonMobil on September 21, 2017, were alleged to be in Defendant's possession.  Defendant's counsel did not respond to my request to identify the specific documents alleged to be in Defendant's possession, and Defendant has not identified any specific document as of the date of this declaration.  Instead, Defendant has made only general claims that some of the 436 documents are in Defendant's possession, without identifying any specific document or when Defendant allegedly obtained possession of such document.

9.    During the September 21 conference call, the parties' counsel also discussed paragraph 8 of the Protective Order, which requires Defendant to obtain ExxonMobil's approval before disclosing any Confidential Information to Defendant's proposed experts.  Mr. Johnson asked if it was ExxonMobil's position that paragraph 8 applied to the 436 documents designated as Confidential Information, such that Defendant would need to comply with paragraph 8 before disclosing any of those documents to a proposed expert.  Emily Parker of T&K explained that, yes, it was ExxonMobil's position that paragraph 8 of the Protective Order applied to the 436 documents, but that ExxonMobil was willing to consider a potential agreement that would allow Defendant to disclose to potential experts documents designated as Confidential Information without obtaining ExxonMobil's pre-approval, so long as Defendant and the experts otherwise complied with the Protective Order.  In response to Ms. Parker's comments, Mr. Johnson said that Defendant was not interested in entering into any agreement with ExxonMobil regarding the Protective Order and that Defendant is prepared to live with the Protective Order.

10.    Mr. Johnson's comment on September 21, 2017, about Defendant being prepared to live with the Protective Order is similar to what he told me during a telephone call on September 12, 2017.  During our September 12 telephone call, he told me that Defendant is prepared to live with the Protective Order and was not interested in reaching an agreement that

**DECLARATION OF WILLIAM M. KATZ, JR. — Page 4**

would have resolved Defendant's objection to paragraph 8 of the Protective Order and ExxonMobil's objection to paragraph 2 of the Protective Order. Our September 12 call resulted from me contacting Mr. Johnson to discuss a potential agreement about the Protective Order, after the Court overruled both parties' objections to the Protective Order on September 5, 2017.

11.     I also participated in telephone calls with Mr. Johnson on June 29 and July 20, 2017, during which I proposed entering into an agreement that would have resolved Defendant's objection to paragraph 8 of the Protective Order and ExxonMobil's objection to paragraph 2 of the Protective Order. Mr. Johnson did not accept either of my proposals to enter into an agreement regarding the Protective Order. My June 29 and July 20 telephone calls with Mr. Johnson are referenced, either directly or indirectly, in Exhibits 1-D and 1-E.

12.     In preparation for filing the Motion, ExxonMobil re-reviewed the 436 documents produced to Defendant on September 21 and designated as Confidential Information under the Protective Order. Based on this review, ExxonMobil determined that the confidentiality designation for 20 of the 436 documents should be changed because those 20 documents do not meet the definition of Confidential Information in paragraph 2 of the Protective Order. Accordingly, by letter dated October 6, 2017, ExxonMobil notified Defendant that it was withdrawing its confidentiality designation for 20 of the 436 documents produced on September 21 and identified those 20 documents by bates number. This letter is attached as Exhibit 1-H.

13.     Mr. Johnson responded to ExxonMobil's October 6, 2017 letter in an email sent later that same day. In his email, Mr. Johnson alleges, among other things, that ExxonMobil's October 6 letter mischaracterizes Defendant's position. To avoid any misunderstanding about Defendant's position, a copy of Mr. Johnson's email is attached as Exhibit 1-I.

9

**DECLARATION OF WILLIAM M. KATZ, JR. — Page 5**

14.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Dallas, Texas, on October 9, 2017.

_____
William M. Katz, Jr.

**DECLARATION OF WILLIAM M. KATZ, JR. — Page 6**



**U.S. Department of Justice**

**Tax Division**

| | |
|---|---|
| *717 N. Harwood* | *Main Line: 214-880-9721* |
| *Dallas, Texas 75201* | *Attorney's Direct Line: 214-880-9735* |
| *Suite 400* | *Fax: 214-880-9741/9774* |

DAH:CM:CAJohnson
DJ 5-73-22415
CMN 2017100142

September 27, 2016

*Via* Email

Emily Parker
Thompson & Knight LLP
One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, TX 75201

        Re:    <u>Exxon Mobil Corporation v. United States</u>
                Case No. 3:16-cv-02921-N US DC ND Texas, Dallas Div.

Dear Ms. Parker:

      We received your September 25, 2017, letter providing a written version of the same argument that you made during our September 21, 2017, telephone call for being able to mark documents Exxon previously provided to the IRS during administrative proceedings as, nevertheless, confidential here. According to Mr. Katz's recent email, 436 of the 462 documents recently produced by you in this case are marked confidential. Those documents marked "confidential" included copies of documents previously provided to the IRS at the administrative level and already independently in our possession. As Mr. Katz told us on the telephone, despite the protective order's terms, you have made *no effort* to differentiate documents previously given to the IRS from others in designating these documents confidential.

      Nothing in your letter has changed our opinion that the intentional marking of documents previously provided to the IRS as confidential under the protective order is a clear violation and willful contravention of the plain language of the protective order, the six months of briefing on the issue, and the Court's repeated rejections of your requested changes to that order.

      We also disagree with your assertion that paragraph 5 of the protective order is the "only procedure" for challenging your "designations" – since these designations should never have been made in the first place. This is not a case of a disagreement over a particular document designation. This is a case of Exxon trying—for the fourth time—to rewrite, and object to the terms of, the protective order. Indeed, Exxon's marking of these documents as "confidential" is *exactly what Exxon itself told the Court would be prohibited under the protective order,* if not modified. The Court rejected Exxon's request for a modification. Thus, it cannot be disputed that

1

**Exhibit 1-A**

we may provide documents previously provided to the IRS to our experts so they may begin their review. And, because these documents are not confidential under the plain language of the protective order, we do not need to provide any of the disclosures in paragraph 8 – because they are also not required. Instead, your procedural argument seems designed simply to further delay our efforts to develop our case, and to avoid the prohibition against Exxon belatedly raising new (and baseless) arguments regarding the protective order. *See, e.g.,* FRCP 72(a).

However, if you wish to present your previously rejected argument to the Court, and try once again to get the terms of the order changed, please do so by October 9th. Of course, we do not concede that any such motion/objection would be timely or procedurally or substantively proper. We do not think it would be. *See, e.g.*, FRCP 72(a). While paragraph 5 of the protective order clearly does not apply here, we are willing to provide Exxon a limited amount of time to seek whatever relief it deems available, and will not preempt the Court's ability to consider or reject again Exxon's arguments. If Exxon does not do so, we will conclude that you have reconsidered your position.

This matter was discussed, briefed and decided by both the Magistrate Judge and the Presiding Judge, and we consider your disregard for the procedural history of this issue very troubling. The discovery schedule currently in place cannot accommodate such gamesmanship and unnecessary road-blocks to the United States' defense against your $1.3 billion tax refund claims.

Sincerely,

*s/ Cory A. Johnson*

Cory A. Johnson
Senior Litigation Counsel

cc: Joshua Smeltzer, Jonathan Blacker, Bill Katz, Kevin Kenworthy



**U.S. Department of Justice**

**Tax Division**

*717 N. Harwood*     *Main Line: 214-880-9721*
*Dallas, Texas 75201*   *Attorney's Direct Line: 202-307-3046*
*Suite 400*          *Fax: 214-880-9741/9774*

DAH:GH:CAJohnson
DJ 5-73-22415
CMN 2017100142

June 23, 2017

*Via* Email and U.S. Mail

Emily A. Parker
Thompson & Knight LLP
One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, TX 75201

        Re:     *Exxon v. United States*
                 <u>No. 3:16-cv-02921; N.D. Tx.</u>

Dear Emily:

     Enclosed is the United States' Second Request for Production of Documents.

     We still have not received the bulk of the documents responsive to our first production request, served on March 22, 2017. Those documents—Exxon's initial disclosures—should be produced immediately. And, pursuant to the protective order, they should be produced to us without any confidentiality designation if they were previously provided to the IRS during the audit, or have been otherwise disclosed.

     As you know, we have already produced documents responsive to your requests. Once we have your response as well, a discussion about document discovery may then be appropriate.

     Please call me if you have any questions, or wish to discuss anything. Thank you.

                    Sincerely yours,

                    *s/ Cory A. Johnson*

                    CORY A. JOHNSON
                    Senior Litigation Counsel

**Exhibit 1-B**

# THOMPSON & KNIGHT LLP

ATTORNEYS AND COUNSELORS

ONE ARTS PLAZA
1722 ROUTH STREET ● SUITE 1500
DALLAS, TEXAS 75201-2533
214.969.1700
FAX 214.969.1751
www.tklaw.com

EMILY A. PARKER
DIRECT DIAL: (214) 969-1502
EMAIL:  emily.parker@tklaw.com

AUSTIN
DALLAS
DETROIT
FORT WORTH
HOUSTON
LOS ANGELES
NEW YORK

ALGIERS
LONDON
MONTERREY
PARIS

January 26, 2017

*Via E-Mail*
Jonathan L. Blacker
US Department of Justice - Tax Division
717 N Harwood Street, Suite 400
Dallas, TX 75201
Jonathan.Blacker2@usdoj.gov

Joshua David Smeltzer
US Department of Justice - Tax Division
717 N Harwood Street, Suite 400
Dallas, TX 75201
joshua.d.smeltzer@usdoj.gov

   Re: Entry of Protective Order in No. 3:16-cv-02921, *Exxon Mobil Corp. v. United States of America*, United States District Court for the Northern District of Texas

Counsel:

  On behalf of ExxonMobil Corporation and Affiliated Companies (collectively, "ExxonMobil"), I am writing (a) to confer with you regarding the entry of a protective order in this case and (b) to propose a procedure for addressing the potential use and disclosure of information provided by ExxonMobil during the course of the Internal Revenue Service's audit of its 2006-2009 income tax years (collectively, the "Audit File").

  Because this case involves information that is competitively sensitive or constitutes ExxonMobil's confidential tax and financial information, we believe that it would be appropriate for the Court to enter a protective order under Federal Rule of Civil Procedure 26(c). Accordingly, we have prepared the enclosed order based on the Court's standard form, which you may find at: http://www.txnd.uscourts.gov/sites/default/files/documents/Protective Order.pdf).

  We have modified the Court's standard order in certain respects.  Accordingly, we are also enclosing a redline that shows the specific changes that we have made, as compared to the Court's standard form.  After you have had time to review the enclosed order and redline, please let us know if you have any comments or questions, and if the government will agree to the entry of a protective order in this case.

**Exhibit 1-C**

14

Jonathan L. Blacker
Joshua David Smeltzer
January 26, 2017
Page 2

Please note that the enclosed order protects from disclosure return and return information, as defined by 26 U.S.C. § 6103(b)(1) and (2). The documents in the Audit File contain confidential information under 26 U.S.C. § 6103, and as contemplated in paragraph 3 of the enclosed order, ExxonMobil intends to designate them as confidential to continue to maintain their status as confidential when used by the Department of Justice in this case. Until we have agreed on or otherwise resolved the protective order, we would appreciate your not disclosing any Audit File documents.

We further propose that, if the government intends to use in this case a document from the Audit File that has not already been produced in discovery, the parties should follow this procedure:

1. The government will first notify ExxonMobil's counsel and provide sufficient information to identify the document that it wants to use.

2. ExxonMobil's counsel will then confirm whether the document contains confidential information.

   a. If so, ExxonMobil will Bates label the document, designate it as "Confidential" under the protective order, and reproduce it to the government.

   b. If not, ExxonMobil will Bates label the document and reproduce it to the government.

3. If the government intends to use a document for impeachment at any hearing or trial in this case, the government will provide sufficient advance notice to ExxonMobil, so that it can determine if the document contains confidential information and should be designated as "Confidential" under the protective order, before being used.

In light of the current answer date of February 6, 2017, I would appreciate a response about the enclosed order and the procedure described above no later than February 1, 2017. Thank you.

Very truly yours,

*/s/ Emily A. Parker*

Emily A. Parker

EAP/mn
Enclosures

Jonathan L. Blacker
Joshua David Smeltzer
January 26, 2017
Page 3

Cc:   Mary A. McNulty        (***All Via E-Mail***)
        William M. Katz, Jr.
        J. Meghan Nylin
        George A. Hani
        Kevin L. Kenworthy

**Katz, Bill**

| | |
|---|---|
| **From:** | Katz, Bill |
| **Sent:** | Friday, June 30, 2017 4:23 PM |
| **To:** | Johnson, Cory A. (TAX); Parker, Emily A.; Kenworthy, Kevin (kkenworthy@milchev.com) |
| **Cc:** | Nylin, Meghan; McNulty, Mary A.; Smeltzer, Joshua D. (TAX); Blacker, Jonathan (TAX); Hani, George (GHani@milchev.com) |
| **Subject:** | RE: Exxon v US |

Cory,

Based on our call yesterday, we were expecting to hear back from you today about two things: (1) a proposed time to discuss the discovery issues raised in Emily's June 21 letter, and (2) whether there's any possibility of negotiating a potential agreement on the protective order. If you haven't already left the office for your vacation next week, can you please let us know when you'll be responding? On the other hand, if you've already left, perhaps Joshua can respond since he was also on yesterday's call. Thanks.

Regards,

Bill

**William M. Katz, Jr. | Thompson & Knight LLP**
Partner

One Arts Plaza, 1722 Routh Street, Suite 1500, Dallas, Texas 75201
214.969.1330 (direct) | 214.880.3279 (fax) | william.katz@tklaw.com
vCard | Bio | www.tklaw.com

This message may be confidential and attorney-client privileged. If received in error, please do not read. Instead, reply to me that you have received it in error and delete the message.

---

**From:** Katz, Bill
**Sent:** Wednesday, June 28, 2017 11:12 AM
**To:** 'Johnson, Cory A. (TAX)'; Parker, Emily A.; Kenworthy, Kevin (kkenworthy@milchev.com)
**Cc:** Nylin, Meghan; McNulty, Mary A.; Smeltzer, Joshua D. (TAX); Blacker, Jonathan (TAX); Hani, George (GHani@milchev.com)
**Subject:** RE: Exxon v US

Corey,

Let's talk tomorrow at 130 pm Central / 230 pm Eastern. I can explain our plans with respect to both a motion and an objection. We can use the following dial-in information:

Dial-in: 1.888.857.4030
Passcode: 800742#

Regards,

Bill

**William M. Katz, Jr. | Thompson & Knight LLP**

**Exhibit 1-D**

Partner

One Arts Plaza, 1722 Routh Street, Suite 1500, Dallas, Texas 75201
214.969.1330 (direct) | 214.880.3279 (fax) | william.katz@tklaw.com
vCard | Bio | www.tklaw.com

This message may be confidential and attorney-client privileged. If received in error, please do not read. Instead, reply to me that you have received it in error and delete the message.

---

**From:** Johnson, Cory A. (TAX) [mailto:Cory.A.Johnson@usdoj.gov]
**Sent:** Wednesday, June 28, 2017 8:36 AM
**To:** Katz, Bill; Parker, Emily A.; Kenworthy, Kevin (kkenworthy@milchev.com)
**Cc:** Nylin, Meghan; McNulty, Mary A.; Smeltzer, Joshua D. (TAX); Blacker, Jonathan (TAX); Hani, George (GHani@milchev.com)
**Subject:** RE: Exxon v US

Bill –

We understood from Emily's email that Exxon would be objecting to the order under FRCP 72. I'm not sure there is a conference requirement for such objections, but we are available tomorrow any time after 10 eastern to talk. We intend to file an objection also.

Cory

---

**From:** Katz, Bill [mailto:William.Katz@tklaw.com]
**Sent:** Tuesday, June 27, 2017 5:14 PM
**To:** Parker, Emily A. <Emily.Parker@tklaw.com>; Johnson, Cory A. (TAX) <Cory.A.Johnson@tax.USDOJ.gov>; Kenworthy, Kevin (kkenworthy@milchev.com) <kkenworthy@milchev.com>
**Cc:** Nylin, Meghan <Meghan.Nylin@tklaw.com>; McNulty, Mary A. <Mary.McNulty@tklaw.com>; Smeltzer, Joshua D. (TAX) <Joshua.D.Smeltzer@tax.USDOJ.gov>; Blacker, Jonathan (TAX) <Jonathan.Blacker@tax.USDOJ.gov>; Hani, George (GHani@milchev.com) <GHani@milchev.com>
**Subject:** RE: Exxon v US

Cory,

Following up on Emily's email below, we will be filing later this week a motion for clarification that asks the Court to clarify that return or return information within the meaning of 26 USC 6103 (b)(1) and (2) may be designated as "Confidential Information" under the Protective Order. Because you haven't responded to Emily's email and told us when you're available for a conference call, I'm sending this email to satisfy our conference requirements for purposes of the motion for clarification. Please let me know what your position is on our motion. Thank you.

Regards,

Bill

**William M. Katz, Jr. | Thompson & Knight LLP**
Partner

One Arts Plaza, 1722 Routh Street, Suite 1500, Dallas, Texas 75201
214.969.1330 (direct) | 214.880.3279 (fax) | william.katz@tklaw.com

vCard | Bio | www.tklaw.com

This message may be confidential and attorney-client privileged. If received in error, please do not read. Instead, reply to me that you have received it in error and delete the message.

---

**From:** Parker, Emily A.
**Sent:** Friday, June 23, 2017 4:42 PM
**To:** Johnson, Cory A. (TAX); Kenworthy, Kevin (kkenworthy@milchev.com)
**Cc:** Nylin, Meghan; Katz, Bill; McNulty, Mary A.; Smeltzer, Joshua D. (TAX); Blacker, Jonathan (TAX); Hani, George (GHani@milchev.com)
**Subject:** RE: Exxon v US

Cory,

We have read your letter and disagree with your interpretation of the Protective Order. Based on our disagreement, we will be objecting to the order under FRCP 72 and seeking clarification from the Court, and we will need to confer with you on those objections before we file them. Because we have to confer with you on these objections, we would also like to discuss with you the discovery issues identified in my June 21 letter, so I would once again propose a call on June 26, 27, or 28. Please let me know when you're available. Thanks.

Regards,

Emily

**Emily A. Parker | Thompson & Knight LLP**
Partner

One Arts Plaza, 1722 Routh Street, Suite 1500, Dallas, TX 75201
214.969.1502 (direct) | 214.880.3184 (fax) | 214.803.4310 (cell) | Emily.Parker@tklaw.com
vCard | www.tklaw.com/emily-parker

This message may be confidential and attorney-client privileged. If received in error, please do not read. Instead, reply to me that you have received it in error and delete the message.

---

**From:** Johnson, Cory A. (TAX) [mailto:Cory.A.Johnson@usdoj.gov]
**Sent:** Friday, June 23, 2017 10:01 AM
**To:** Parker, Emily A.; Kenworthy, Kevin (kkenworthy@milchev.com)
**Cc:** Nylin, Meghan; Katz, Bill; McNulty, Mary A.; Smeltzer, Joshua D. (TAX); Blacker, Jonathan (TAX); Hani, George (GHani@milchev.com)
**Subject:** Exxon v US

Emily –

Please see attached document request and letter.

Cory

_____
Cory A. Johnson
Senior Litigation Counsel
Office of Assistant Attorney General

U.S. Department of Justice, Tax Division
P.O. Box 26, Ben Franklin Station
Washington D.C. 20044
202-307-3046

4

**Katz, Bill**

| | |
|---|---|
| **From:** | Katz, Bill <William.Katz@tklaw.com> |
| **Sent:** | Wednesday, July 19, 2017 1:17 PM |
| **To:** | Johnson, Cory A. (TAX) |
| **Cc:** | Smeltzer, Joshua D. (TAX) |
| **Subject:** | Re: |

Thanks. We will plan to have our tech person on the call. Last time we spoke before your vacation, you were going to get back to us about whether there was room for agreement on the protective order. Any response on that?

Regards,

Bill

**William M. Katz, Jr. | Thompson & Knight LLP**
Partner

One Arts Plaza, 1722 Routh Street, Suite 1500, Dallas, Texas 75201
214.969.1330 (direct) | 214.880.3279 (fax) |william.katz@tklaw.com
vCard | Bio | www.tklaw.com

This message may be confidential and attorney-client privileged.  If received in error, please do not read.  Instead, reply to me that you have received it in error and delete the message.

On Jul 19, 2017, at 12:59 PM, Johnson, Cory A. (TAX) <Cory.A.Johnson@usdoj.gov> wrote:

> Bill
>
> I have been and am in Houston for deposition and hearing. But saw you called again.  If about having tech person on phone I think we can do that tomorrow. Joshua will correct me if I'm wrong.
>
>
> Cory

**Exhibit 1-E**



**U.S. Department of Justice**

**Tax Division**

| | |
|---|---|
| *717 N. Harwood* | *Main Line: 214-880-9721* |
| *Dallas, Texas 75201* | *Attorney's Direct Line: 214-880-9765* |
| *Suite 400* | *Fax: 214-880-9741/9774* |

DAH:CM:JLBlacker
DJ 5-73-22415
CMN 2017100142

August 25, 2017

*Sent Via Email*

Emily A. Parker
Thompson & Knight LLP
1722 Routh Street, Suite 1500
Dallas, Texas 75201

      Re:    <u>Exxon Mobil Corporation v. United States</u>
               Case No. 3:16-cv-02921-N US DC ND Texas, Dallas Div.

Dear Ms. Parker:

      We were disappointed in the meager responses to the United States' Second Request for Production of Documents. The repeated assertion of objections such as "overly broad," "unduly burdensome," "vague and ambiguous," lack of proportionality, "work product," and "attorney-client privilege" rather than providing documents was equally disappointing. We are determined to receive the documents due to us under the rules for discovery, and if we do not receive a supplemental and complete response, we will be forced to go to the Court for relief. In an effort to resolve these matters, without the need for Court intervention, we are providing you with an explanation of our concerns.

**Some General Problems with Exxon's Responses**

      We observe that you objected to our instructions and definitions on one or more of the following grounds: (i) the instructions seek to impose obligations the exceed the requirements under the Federal Rules of Civil Procedure, (ii) the instructions and definitions are "overly broad" and "unduly burdensome," (iii) the production of "certain metadata" seeks information that "may be protected by the work product doctrine," and (iv) the instructions exceed "the requirements of Federal Rule of Civil Procedure 34(b)(2)(E)."

      Exxon's general objections amount to nothing more than unsupported boilerplate. Exxon asserts that the instructions and requests seek to impose obligations that exceed the requirements under the Federal Rules of Civil Procedure, yet the only "obligation" Exxon cites relates to the production of metadata. We previously requested information on the time and expense of

**Exhibit 1-F**

- 2 -

producing the requested metadata during our conversation regarding our objections to your discovery requests. We reiterate that request so we can determine what the actual objections are and whether the alleged time an expense justifies narrowing our requested metadata. Absent that, we expect Exxon to produce electronic documents in their native format with all available metadata, pursuant to our specifications. Exxon also complains that the production of "certain metadata" seeks information that "may be protected by the work product doctrine." Beyond this naked assertion, Exxon provides no information as to the specific metadata it believes violate the work product doctrine or privilege log of any documents effected by the request.

Exxon next states that the instructions and definitions are "overly broad" and "unduly burdensome" and that the instructions exceed "the requirements of Federal Rule of Civil Procedure 34(b)(2)(E)." Exxon provides no explanation as to how the instructions and definitions are overly broad or unduly burdensome, or how the instructions exceed Rule 34(b)(2)(E).[1]

It is well-established that parties cannot make general or boilerplate objections to discovery requests. The Federal rules require "specificity" when a party objects to discovery. Rule 34 requires that a response to a request for production "must either state that inspection and related activities will be permitted as requested or state an objection to the request, including the reasons." Fed. R. Civ. P. 34(b)(2)(B). The party resisting discovery "must show specifically ... how each [request] is not relevant or how each question is overly broad, burdensome or oppressive." *McLeod, Alexander, Powel & Apffel, P.C. v. Quarles*, 894 F.2d 1482, 1485 (5th Cir.1990) (quoting *Josephs v. Harris Corp.*, 677 F.2d 985, 991–92 (3d Cir. 1982)). Thus, Exxon must show how the requested discovery was overly broad, unduly burdensome, or oppressive by submitting affidavits or offering evidence revealing the nature of the burden. See *Merrill v. Waffle House, Inc.*, 227 F.R.D. 467, 477 (N.D. Tex. 2005); accord *S.E.C. v. Brady*, 238 F.R.D. 429, 437–38 (N.D. Tex. 2006). Failing to do so, as a general matter, makes such an unsupported objection nothing more than unsustainable boilerplate.

Exxon also lodges an overarching objection to virtually *every* document request ("Objection No. 4") based on Exxon's view of "the parties' relative access to relevant information," asserting that many of the requested documents are already in our possession, custody, or control. In its "Objection No. 4," Exxon declares that its production of documents is dependent on whether the Court sustains its objections to paragraph 2 of the Protective Order. Apparently, Exxon will only produce certain unidentified but requested documents if the Court sustains its argument as to what documents may be marked confidential. If the Court does not sustain its argument, Exxon will not produce those documents, because, it asserts, it has already "produced over 470,000 pages of documents to the IRS." That is nonsensical and contrary to the rules. It also seems intended simply to impede our discovery and thwart an efficient exchange of

---

[1] Rule 34(b)(2)(E)(i) requires that a "party must produce documents as they are kept in the usual course of business or must organize and label them to correspond to the categories the request."

- 3 -

relevant information.[2]  The obligation to produce documents does not turn on whether they may be marked confidential.  And, of course, Exxon's willingness to produce the documents, if they may be marked confidential, belies any claim that it is burdensome to produce them even if not eligible to be marked confidential.[3]

We strongly disagree with Exxon's characterization of its duties under the Federal rules in responding to our discovery requests.  Regardless of whether the Court sustains Exxon's objection to the Protective Order, we believe Exxon's duty is to fully respond to our requests. It is indisputable that Rule 34 requires a party producing documents for inspection to either produce them as they are kept in the ordinary course of business or organize and label them to correspond to the categories in the requests (*see* Rule 34(b)(2)(E)(i) cited above).  Courts have uniformly held that producing documents in no particular order or merely referencing previously produced documents does not comply with a party's obligation under Rule 34. A contention that, sometime in the past, Exxon purportedly gave a mass of unidentified documents to the IRS is clearly insufficient. Here, in response to our requests, Exxon must identify and produce the documents responsive to each of our requests in discovery in this case, whether or not they may have been provided to another government agency in the past.  *See, e.g., Wagner v. Dryvit Systems, Inc.*, 208 F.R.D. 606, 610 (D. Neb. 2001); *Stiller v. Arnold*, 167 F.R.D. 68, 71 (N.D. Ind. 1996); *Glover v. Board of Education of Rockford*, 2004 WL 785270 (N.D. Ill. 2004) *Ferrito v. IKON Office Solutions, Inc.*, 2000 WL 1477188 (D.Kan.2000); *In re Adelphia Comm. Corp.*, 338 B.R. 546, 551 (Bkty. S.D.N.Y. 2005); *Compagnie Francaise d'Assurance Pour le Commerce Exterieur v. Phillips Petroleum Co.*, 105 F.R.D. 16 at *44 (S.D.N.Y. 1984); *Reddy v. Precyse Solutions, LLC*, 2015 WL 3797297 (E.D. Ca. 2015); *Allianz Ins. Co. v. Surface Specialties, Inc.*, 2005 WL 44534 (D. Kan. 2015).  Moreover, it should be obvious that Exxon's obstructive approach is ultimately shortsighted and self-defeating.  Exxon will not be able to use as evidence any document it refuses to produce to us in discovery in response to our requests and under its obligation to make initial and supplemental disclosures.

In sum, refusal to identify documents in any way (*i.e.* the Bates numbers or description(s) of responsive documents) is inappropriate and violates the production requirements of the Federal Rules.  Nevertheless, as a seemingly as a knee-jerk reaction, Exxon repeats "Objection No. 4" in virtually every response.  Responding to our discovery requests by asserting that Exxon produced over 470,000 pages to the IRS without any further identification or explanation of which documents and information are responsive to our requests fails to

---

[2] Would Exxon rather we conduct a FRCP 30(b)(6) deposition of it, going through every document we have, and asking whether there are any others responsive to each of our requests? Fortunately, the rules do not compel such an inefficient and time-consuming exercise.

[3] It also should be noted that you contend—without citation—that we have "acknowledged in this lawsuit" that we have all 470,000 pages of documents that you claim Exxon previously gave the IRS.  We do not recall acknowledging that.  Nevertheless, while we have some documents given to the IRS by Exxon, that does not mean we have everything Exxon believes (without identifying it here) that it gave to the IRS at some point in the past.  Nor does it mean that Exxon need not fully respond to our specific discovery requests here in this *de novo* proceeding.

- 4 -

comply with Rule 34. We are not in a position to determine which requests the vast majority documents and information allegedly previously provided to the IRS relate to, nor are we required to under the rules. *Cf. CFS Forming Structures, Co., Inc. v. Flintco, Inc.*, 2009 WL 10669429 at *3 (W.D. Tex. 2009). Indeed, one of the purposes of discovery from the opposing party is to learn which documents from a larger universe of documents that party will be using to support its claims. This "you can find the needle in the haystack approach" is simply unacceptable under the rules and we request prompt supplementation to correct the mistake. You must provide copies of responsive documents and identify them by Bates numbers or other identification so that they can be easily identified.

Exxon also weaves objections based on "attorney-client privilege, the attorney work-product doctrine, and the tax-practitioner privilege" throughout virtually all of its responses to our document requests. With respect to these claims, we note initially that, based on the statements in the responses, it is difficult to decipher whether Exxon has privileged documents and is withholding them because they are privileged or whether Exxon does not have any privileged documents whatsoever. Exxon provided no explanation, documentation, or other information that would allow us to determine whether to challenge the privilege assertions (which would require Exxon to produce a privilege log).[4] What is clear is that boilerplate objections or blanket refusals inserted into a response to a request for production of documents are insufficient to assert a privilege. We will not repeat our problem with Exxon's assertion of these privileges in the discussion below, other than to request that Exxon indicate whether it is withholding documents based on the grounds of privilege and if so to provide the required privilege log.

Additionally, while Exxon states in response to a handful of requests (Nos. 12, 29, 34, 36) that it is withholding documents based on its objections, it does not state that it is withholding documents responsive to the other requests. *See* FRCP 34(b)(2)(C). Accordingly, we assume all responsive documents will be produced.

Exxon also fails to specify when the responsive documents will be produced, as required by the rules. FRCP 34(b)(2)(B). We understand that it may take some time for Exxon to produce all the requested documents, and that it may be difficult to specify exactly when Exxon's search, review and production will be completed. Nevertheless, we request that you provide a schedule for a rolling production and a target completion date.

Finally, we request that you expressly state the entities and custodians you are including in your search for and retrieval of documents, whether domestic or foreign, and also identify entities that you are excluding, if any. Given the number of entities involved in the relevant transactions, we need to know the scope of Exxon's search to determine whether it is sufficient, and what third-party discovery to conduct. For example, we presume that you are able to retrieve documents from the Qatari joint stock companies. But this needs to be made explicit.

---

[4] We received your discovery responses over four weeks ago and have not received a privilege log disclosing the privileged documents Exxon is withholding.

- 5 -

### Exxon's Specific Responses to Requests for the Production

**Request No. 1.** We requested documentation relating to the allegation Exxon made in its Complaint that the "Alcohol Fuel Credit is excluded from gross income." It is difficult to see how asking for *documents* supporting an allegation Exxon made is objectionable as a statement of the ultimate legal issue in this case. To the extent Exxon needs clarification, we are not asking for Exxon's legal position (as we would, for example, in a contention interrogatory) but rather we are merely asking for documents supporting an allegation Exxon made in its Complaint regarding the Alcohol Fuel Credit.

**Request No. 2.** We requested the quarterly Forms 720 for 2008-09 referenced by Exxon in its Complaint and all related workpapers. While Exxon is providing the Forms 720 for 2008-2009, Exxon objects to providing related workpapers because the request is "overly broad," unduly burdensome," "vague and ambiguous," and "not proportional to the needs of the case."

These objections amount to nothing more than generic boilerplate which, as noted above, the Federal rules prohibit. For starters, how a request for workpapers showing how the ultimate figures in the Forms 720 were computed could be overly broad is a mystery. Further, a party may not "refuse discovery simply by making a boilerplate objection that it is not proportional." Fed. R. Civ. P. 26(b)(1), advisory committee note (2015). This is because "[i]n the face of [general] objections, it is impossible to know whether information has been withheld and, if so, why." *Heller v. City of Dallas*, 303 F.R.D. 466, 483 (N.D. Tex. 2014). Simply put, Exxon's boilerplate objections (made throughout its responses to our requests) do not "state with specificity" the grounds for the objections.

We reiterate our request for specific information regarding the proportionality objection beyond the bald assertion that it is "not proportional." Exxon agrees that it will produce the documents if it wins its version of the protective order, which appears to indicate that the time and expense of reproducing the documents is not an issue. If so, there should be no argument regarding the proportionality of the request. If there is a time or cost burden that you have failed to specify, please provide that explanation and we will consider it.

**Request No. 3.** We requested all workpapers and schedules relating to the determination of Exxon's cost of goods sold as reported on its 2008-2009 corporate income tax returns, which Exxon referenced in its Complaint. Exxon asserts the same generic boilerplate objections and states that our request would "encompass workpapers that relate to cost of goods sold that have nothing to do with the Fuel Excise Tax or the Alcohol Fuel Credit."

To be clear, we are not seeking workpapers that relate to "cost of goods sold that have nothing to do with the Fuel Excise Tax or the Alcohol Fuel Credit." Rather, by referencing the allegations in Exxon's Complaint, we limited our request to the "cost of goods sold" as Exxon used such term in its Complaint. Accordingly, unless Exxon referenced "cost of goods sold that have nothing to do with the Fuel Excise Tax or the Alcohol Fuel Credit" in its Complaint, we believe our request is sufficiently narrow and specific and we request that Exxon produce the

- 6 -

requested documents (in addition to the PowerPoints Exxon states it will produce at the end of its response to this request).

**Request No. 4.**  We requested documents reflecting the alleged reversal of the cost of goods sold reduction and the decrease in gross income and tax refund claimed for in 2008 and 2009 tax years.  This request seeks documents underlying the allegations Exxon made in its Complaint; specifically, we are requesting the "tax returns" Exxon mentions in its Complaint for 2008-09.  Additionally, we request that Exxon produce all documents that substantiate the lengthy explanation provided in response to this request. The workpapers underlying Exxon's computation of its refund claim cannot be withheld and kept secret.

**Request Nos. 5-7.**  Exxon objects to these requests as "overly broad and unduly burdensome" and not "proportional to the needs of the case."  Yet Exxon does not explain with the required specificity why the requests are objectionable.  We referenced specific allegations Exxon made in its Complaint and we are seeking documents supporting those allegations.

To be clear, with respect to Exxon's objection relating to "cost of goods sold," by referencing the allegations in Exxon's Complaint, we limited our request to the "cost of goods sold" as such term is used in the Complaint.  Further, we are not requesting "hundreds of thousands of invoices," but we are requesting that Exxon produce more than the one sample invoice Exxon references in its response. And, of course, an unverified narrative in response to a document production request is not a substitute. We are happy to discuss how to address this.

As to Exxon's position that additional invoices would not be "relevant to any party's claims or defense," under Rule 26 of the Federal Rules of Civil Procedure, materials are discoverable if they are relevant to claims or defenses of the parties.  The purpose of discovery is therefore to allow a ***broad*** search for facts or any other matters that may aid a party in the preparation or presentation of his case.

**Request No. 8.**  Exxon objects to this request on the grounds of "attorney-client privilege," the "attorney work-product doctrine," or the "tax-practitioner privilege."  As noted above, with respect to these claims, please indicate whether Exxon has privileged documents (and is withholding them because of privilege) or whether Exxon does not have any privileged documents whatsoever.  Exxon provided no explanation, documentation, or other information that would allow us to determine whether to challenge the privilege assertions (which would require Exxon to produce a privilege log).  Boilerplate objections or blanket refusals inserted into a response to a request for production of documents are insufficient to assert a privilege.

**Request Nos. 10.**  We requested documentation related to the formation, ownership structure, and managerial rights of the "joint stock companies" referenced in the Complaint. Exxon objects to this request on the grounds that the term "related to" is vague and ambiguous, thus rendering the request "overly broad and unduly burdensome."  Specifically, Exxon is concerned that this request would require it to search documents "belonging to hundreds of custodians" and therefore, based on Exxon's interpretation, this request is not "proportional to the needs of the case."

- 7 -

These objections amount to nothing more than the same boilerplate objections Exxon asserts throughout its responses. Without any specificity, simply saying that there may be documents "belonging to hundreds of custodians" is meaningless. Indeed, such a search may be required in certain circumstances. Rather, we are seeking documents in Exxon's possession (or documents to which Exxon would have a right to obtain as an owner, participant, or member of the "joint stock companies," as Exxon used the term in its Complaint). Further, to the extent Exxon believes that "hundreds" of custodians are implicated, please provide the list of custodians, the official title they hold, and quantify the time and expense associated with them conducting a requested search so we can evaluate the proportionality claims.

Moreover, in our document request, the terms "relate to" and "relates to" mean consist of, refer to, pertain to, reflect, evidence, or be in any way logically or factually connected with the matter discussed. We believe this definition is clear and unambiguous, especially when combined with our clarification regarding the documents we are seeking.

Exxon also objected to this request "to the extent" it seeks documents "protected by the "attorney-client privilege, tax practitioner privilege, or work-product doctrine." We refer Exxon to the previous discussion regarding these objections and its failure to provide any privilege log in response to the request.

**Request Nos. 11-12.** We requested the "Development and Fiscal Agreements" ("DFA") referenced in the Complaint and the contracts and agreements relating to the deferred-purchase-price payments to Qatar. Exxon objected to producing "drafts" of the agreements on the grounds of relevance and also due to the fact that the documents "may" be protected by "attorney-client privilege" or the "tax-practitioner privilege."

To be clear, we did not request "drafts" of these agreements and documents so Exxon's reference to the term "drafts" is unclear. Further, with respect to the assertion that the documents "may" be privileged, we refer Exxon to the previous discussion regarding these privilege objections and its failure to provide any privilege log in response to the request.

**Request No. 13.** We requested documents supporting Exxon's allegation that the DFAs were "purchases" and that the State of Qatar did not retain an economic interest in the minerals in place. Exxon objected on the grounds of "attorney-client privilege," the "attorney work-product doctrine," and the "tax-practitioner privilege."

To be clear, Exxon asserted in its Complaint that the *transactions under the DFAs, under all the facts and circumstances, are purchases because the State of Qatar did not retain an economic interest in the minerals in place.* This request seeks documents that Exxon contends support this assertion. This is the precise function of discovery and it is time for Exxon to provide these documents. We are not asking Exxon to marshal its evidence but rather to comply with its obligations under the Federal rules and provide the support it used to make the allegations in its complaint.

- 8 -

**Request No. 14.**  Exxon objects to this request "[t]o the extent the request seeks documents that are protected by the attorney-client or tax practitioner privileges or the work-product doctrine."  We refer Exxon to the previous discussion regarding these objections and its failure to provide any privilege log in response to the request.

**Request No. 15.**  We requested financial statements and "books of account" for the joint stock companies.  Exxon objects to this request because the phrase "books of account" is vague and ambiguous, thus rendering the request "overly broad and unduly burdensome."  This is curious since some of the Qatari agreements reference a requirement to keep "books of account."  Exxon also professes to be concerned that the term "books of account" could include every accounting document from the joint stock companies.

To be clear, we are not seeking "every accounting document" for the joint stock companies.  We note that, notwithstanding Exxon's objections, we understand that Exxon will produce the financial statements and the books of account "in Exxon's possession, custody, or control."  Given Exxon's ownership interest in the joint stock companies, we believe Exxon has a duty to provide the requested documents for the joint stock companies that Exxon mentions in its Complaint.  Further, to the extent Exxon believes that too many entities and custodians are implicated, please provide the list of entities and custodians, the official names or titles, and quantify the time and expense associated with them conducting a requested search so we can evaluate the proportionality claims.

**Request No. 16.**  We requested documents relating to the ownership, purchase, or sale of the interests or properties Exxon alleges were purchased under the DFAs.  Exxon again objects to this request on the grounds that the term "related to the ownership, purchase, or sale" is vague and ambiguous, thus rendering the request "overly broad and unduly burdensome."  Specifically, Exxon is concerned that the term "all documents" could require it to search documents "belonging to hundreds of custodians" and therefore, based on Exxon's interpretation, this request is not "proportional to the needs of the case."

These objections again amount to nothing more than the same boilerplate objections Exxon asserts throughout its responses.  Without any specificity, simply saying that there may be documents "belonging to hundreds of custodians" is meaningless.  Indeed, such a search may be required in certain circumstances.  Rather, we are seeking documents in Exxon's possession (or documents to which Exxon would have a right to obtain as an owner, participant, or member of the "joint stock companies," as Exxon used the term in its Complaint), and we request that Exxon provide the list of entities and custodians, the official names or titles, and quantify the time and expense associated with them conducting a requested search so we can evaluate the proportionality claims.  Finally, as previously noted, we defined the terms "relate to" and "relates to" in a clear and unambiguous way.

Exxon also objected on the grounds of the "attorney-client privilege," the "attorney work-product doctrine," or the "tax-practitioner privilege."  We will refer Exxon to the previous discussion of these objections.

- 9 -

**Request No. 17.**  We requested documents reflecting the relevant "published foreign crude oil and gas prices" as the term is used in Exxon's Complaint.  Strangely, notwithstanding Exxon's use of the term in its Complaint, Exxon objects to this request as "overly broad" and "unduly burdensome."  We asked for documents reflecting the *relevant* "published foreign crude oil and gas prices" so we are unsure of Exxon's relevance objection.

Exxon objected on the grounds of "attorney-client privilege," the "attorney work-product doctrine," and the "tax-practitioner privilege." We refer Exxon to the previous discussion of these objections and its failure to provide any privilege log in response to the request.

**Request No. 18.**  We requested documents reflecting and describing (a) the production, manufacturing, and marketing activities of the joint stock companies alleged in paragraph 17 of the Complaint during 2004 – 2010; and (b) the "non-extraction activities" alleged in paragraph 19 of the Complaint during 2004 – 2010.  Exxon lodges the same litany of objections described above, including "overly broad," "attorney-client privilege," the "attorney work-product doctrine," the "tax-practitioner privilege," and its Objection No. 4.

In its Complaint, Exxon alleges the joint stock companies engaged in production, manufacturing, and marketing activities, and it used the term "non-extraction activities."  As noted above, we are seeking documents that Exxon contends support these assertions.  This is the precise function of discovery and it is time for Exxon to provide these documents.  Exxon cannot choose to "read" our request "broadly" for the sole purpose of objecting to such request because it is too broad.  We are seeking documents underlying specific assertions and allegations Exxon is making in its Complaint and we are entitled to those documents.

Exxon also objects on the grounds of "attorney-client privilege," the "attorney work-product doctrine," and the "tax-practitioner privilege." We refer Exxon to the previous discussion of these objections and its failure to provide any privilege log in response to the request.

**Request No. 19.**  We requested documents reflecting (a) the computation and payment of the amounts paid to Qatar under the DFAs from their effective dates to today; and (b) communications with Qatar about the payments to Qatar under the DFAs.  Exxon again makes an "overly broad" argument by "reading" our request so "broadly" that it could include payments for "office supplies."  Further, Exxon unilaterally limits our request to the year 2012 (despite our request for documents through "today").

As noted above, Exxon is not permitted to unilaterally decide what may, or may not, be relevant to the United States in this matter.  Thus, we reiterate our request for the requested documents through "today," not 2012.  Further, Exxon cannot choose to "read" our request "broadly" for the sole purpose of objecting to such request because it is too broad.  We are seeking documents underlying specific assertions and allegations Exxon is making in its Complaint and we are entitled to those documents.  Thus, we reiterate our initial request and ask that Exxon provide the requested documents.

- 10 -

**Request No. 20.**  We requested documents reflecting "value of the natural gas at the point of extraction" as "alleged in paragraph 20." Exxon objects on the grounds of "attorney-client privilege, the attorney work-product doctrine, or the tax-practitioner privilege." We refer Exxon to our previous discussion of these objections and its failure to provide any privilege log in response to the request.

**Request No. 21.**  Exxon objects to this request, asserting that "the financial and accounting treatment of the DFAs and of the payments thereunder" is vague and ambiguous, thus rendering the request overly broad, unduly burdensome, and not relevant. The lack of specificity in Exxon's objections renders these objections nothing more than boilerplate that are prohibited by the Federal rules.

To be clear, we are not seeking "every accounting document related to the DFAs." If there are documents, however, relating to the "financial and accounting treatment of the DFAs and of the payments thereunder" (which is clearly an issue in this case), we expect Exxon to produce these documents. Thus, while Exxon agreed to produce the "financial statements" of both Exxon and the joint-stock companies, we expect to receive the documents underlying those financial statements as well. The relevant workpapers, communications, policies and memoranda should be produced. We also request that Exxon provide the list of entities and custodians, the official names or titles, and quantify the time and expense associated with them conducting a requested search so we can evaluate the proportionality claims.

**Request Nos. 22-23.**  We requested the "Production Sharing Contracts" ("PSC") referenced in the Complaint and the contracts and agreements relating to the deferred-purchase-price payments to Malaysia. Exxon objected to producing "drafts" of the agreements on the grounds of relevance and also due to the fact that the documents "may" be protected by "attorney-client privilege" or the "tax-practitioner privilege."

To be clear, we did not request "drafts" of these agreements and documents so Exxon's reference to the term "drafts" is unclear. Further, with respect to the assertion that the documents "may" be privileged, we refer Exxon to the previous discussion regarding these objections and its failure to provide any privilege log in response to the request.

**Request No. 24.**  We requested documents supporting Exxon's assertion that the PSCs were "purchases" and that MNOC did not retain an economic interest in the minerals in place. Exxon objected on the grounds of "attorney-client privilege," the "attorney work-product doctrine," and the "tax-practitioner privilege" and asserted its Objection No. 4.

To be clear, Exxon asserted in its Complaint that "transactions under the PSCs, under all the facts and circumstances, are purchases because the MNOC did not retain an economic interest in the minerals in place." This request seeks documents that Exxon contends support this assertion. We are not asking Exxon to marshal its evidence but rather to comply with its obligations under the Federal rules.

- 11 -

**Request No. 25.**  Exxon objects to this request "[t]o the extent the request seeks documents that are protected by the attorney-client or tax practitioner privileges or the work-product doctrine."  We refer Exxon to the previous discussion regarding these objections and its failure to provide any privilege log in response to the request.

**Request No. 26.**  We requested financial statements and "books of account" for EMEMPI for 2004-2010.  Exxon objects to this request because the phrase "books of account" is vague and ambiguous, thus rendering the request "overly broad and unduly burdensome."  Specifically, Exxon is concerned that the term "books of account" could include every accounting document from EMEMPI.

To be clear, we are not seeking "every accounting document" for EMEMPI.  We also note that, notwithstanding Exxon's objections, we understand that Exxon will produce the financial statements and the "books of account" supporting the financial statements.  To the extent there are documents from entities other than EMEMPI that are responsive to this request, we ask that Exxon produce those documents as well and we also request that Exxon provide the list of entities and custodians, the official names or titles, and quantify the time and expense associated with them conducting a requested search so we can evaluate the proportionality claims.

**Request No. 27.**  We requested documents that describe or reflect the alleged "investments" under the PSCs, as referenced in paragraph 27 of the Complaint.  Exxon objects to the term "investments" as being overly broad" and "unduly burdensome."

To be clear, we are seeking documents describing or reflecting the "investments" Exxon references in paragraph 27 of the Complaint.  In other words, we are seeking documents that Exxon contends supports the allegations it made in this paragraph.  Further, we are using the term "investments" in an identical way Exxon uses it in paragraph 27 of the Complaint.  We are entitled to these documents and request that Exxon produce them, in addition to the documents Exxon states it will produce at the end of this request.

**Request No. 28.**  We requested documents relating to the ownership, purchase, or sale of the interests or properties Exxon alleges were purchased under the PSCs.  Exxon again objects to this request on the grounds that the term "related to the ownership, purchase, or sale" is vague and ambiguous, thus rendering the request "overly broad and unduly burdensome."  Specifically, Exxon is concerned that the term "all documents" could require it to search documents "belonging to hundreds of custodians" and therefore, based on Exxon's interpretation, this request is not "proportional to the needs of the case."

These objections again amount to nothing more than the same boilerplate objections Exxon asserts throughout its responses.  Without any specificity, simply saying that there may be documents "belonging to hundreds of custodians" is meaningless.  Indeed, such a search may be required in certain circumstances.  Rather, we are seeking documents in Exxon's possession (or documents to which Exxon would have a right to obtain as an owner, participant, or member of its Malaysian affiliate), and we also request that Exxon provide the list of entities and custodians,

- 12 -

the official names or titles, and quantify the time and expense associated with them conducting a requested search so we can evaluate the proportionality claims. Finally, as previously noted, we defined the terms "relate to" and "relates to" in a clear and unambiguous way.

**Request Nos. 29-30.** We requested documents that describe the "Petroleum Operations" referenced in paragraph 27 of the Complaint and documents that describe, refer to, reflect, or otherwise relate to the computation, determination, amount, and payment of the "PSC payments" referenced in paragraphs 26 -27 of the Complaint. Exxon objects to this request as being overly broad" and "unduly burdensome."

To be clear, we are seeking documents describing, referring to, reflecting, or otherwise relating to the "Petroleum Operations" and the computation, determination, amount, and payment "PSC Payments" as Exxon used these terms in its Complaint. In other words, we are seeking documents that Exxon contends supports the allegations it made in paragraphs 26-27. We are using these term in an identical way Exxon uses them. As we have explained, Exxon is not permitted to unilaterally decide what may, or may not, be relevant to the United States in this matter, and Exxon may not decide what the United States "needs" in terms of its discovery requests. We are entitled to these documents and request that Exxon produce them, in addition to the documents Exxon states it will produce at the end of these requests.

**Request Nos. 31-32.** Exxon objects to these requests, asserting its "Objection No. 4," as well as the "attorney-client privilege," "the attorney work-product doctrine," or the "tax-practitioner privilege." We refer Exxon to the previous discussion of this objection the privileges.

Further, we used the terms "non-extraction" activities and "value of the crude oil and natural gas at the point of extraction" precisely as Exxon used these terms in paragraphs 27 and 28 of the Complaint. We are entitled to the documents supporting the contentions Exxon made in these paragraphs and as well as the documents relating to these terms.

**Request No. 33.** Exxon objects to this request, asserting that "the financial and accounting treatment of the PSCs and of the payments to MNOC" is vague and ambiguous, thus rendering the request overly broad, unduly burdensome, and not relevant. The lack of specificity in Exxon's objections renders these objections nothing more than boilerplate that are prohibited by the Federal rules.

To be clear, we are not seeking "every accounting document related to the PSCs." If there are documents, however, relating to the "financial and accounting treatment of the PSCs and of the payments to the MNOC" (which is clearly an issue in this case), we expect Exxon to produce these documents. Thus, while Exxon agreed to produce the "financial statements" of both Exxon and its Malaysian affiliate, we expect to receive the documents underlying those financial statements as well. Further, to the extent Exxon believes that too many entities and custodians are implicated, please provide the list of entities and custodians, the official names or titles, and quantify the time and expense associated with them conducting a requested search so we can evaluate the proportionality claims.

- 13 -

**Request No. 34.** We requested communications "related to the considerations of changing and decision to change the federal tax treatment of the DFAs and PSCs to 'purchases,' including any whitepapers or presentations to the board." Exxon objects to this request on the grounds that the term "related to" is vague and ambiguous. Specifically, Exxon is concerned that this request would require it to search "the files of a number of custodians." Given that "a number of custodians" could be two, this boilerplate objection is insufficient.

These objections amount to nothing more than the same boilerplate objections Exxon asserts throughout its responses. Without any specificity, simply saying that Exxon may be required to search "the files of a number of custodians" is meaningless. Indeed, such a search may be required in certain circumstances. Rather, we are seeking documents in Exxon's possession (or documents to which Exxon would have a right to obtain as an owner, participant, or member of the "joint stock companies," or its Malaysian affiliate), and we ask Exxon to provide the list of entities and custodians, the official names or titles, and quantify the time and expense associated with them conducting a requested search so we can evaluate the proportionality claims. Moreover, we believe the definition of "relate to" and "relates to" is clear and unambiguous.

**Request No. 36.** Exxon objects to the phrase "documents relating to the origin of Exxon's consideration of seeking to account for the DFAs and PSCs as purchases." Exxon again asserts that the term "related to" would require it to search "the files of a number of custodians."

This objection again amounts to nothing more than the same boilerplate objections Exxon asserts throughout its responses. As we have stated, we are entitled to documents in Exxon's possession and documents Exxon can request from others. To the extent you intend to rely on a proportionality objection, we ask Exxon to provide the list of entities and custodians, the official names or titles, and quantify the time and expense associated with them conducting a requested search so we can evaluate the proportionality claims.

Exxon states that it will produce documents "regarding the reason for" its proposed change in treatment. The request is not so limited, however, and Exxon cannot limit its response by fiat. Exxon must produce all the documents requested, not just those setting forth its self-serving reasons.

**Request Nos. 37-39, 41.** The United States is not asking for "every" document reflecting or referring to foreign tax credits. However, to the extent that calculations were used to determine amounts, or potential amounts, used to generate the alleged refund they are responsive and should be provided. There can be no dispute that calculations used to determine Exxon's claim at issue in this lawsuit are relevant and responsive. Further, Exxon objects to these requests on the grounds of "attorney-client privilege, tax-practitioner privilege, or the attorney work-product doctrine." We refer Exxon to our previous discussion of these privileges and its failure to provide any privilege log in response to the request.

- 14 -

**Request No. 40.**  In this request, we are seeking documents underlying Exxon's *factual* contention that the "change from mineral lease treatment to purchase treatment permanently and dramatically changes the amount of Plaintiff's lifetime gross income and deductions." We are not seeking Exxon's *legal* authority for this statement. Rather, Exxon made a factual claim to the Court and we are entitled to the documents supporting that claim. Moreover, we are entitled to workpapers, schedules, computations, and drafts regarding this subject, not just the final returns and refund claims Exxon decided to present to the IRS.

**Request No. 42.**  Exxon objects to this request on the grounds that the request (which seeks documents supporting Exxon's allegations in its Complaint)" are "vague and ambiguous, "overly broad, and unduly burdensome" and "not proportional to the needs of the case." The lack of specificity in Exxon's objections renders these objections nothing more than boilerplate that are prohibited by the Federal rules.

To the extent Exxon believes it has produced (in conjunction with the documents previously produced in this case or that will be produced in response to our first set of requests for production) all documents that support Exxon's allegations in its Complaint, then it certainly can make that representation. Exxon cannot make general or boilerplate objections to discovery requests; rather Exxon must show specifically how each request is overly broad, or unduly burdensome. Further, to the extent Exxon believes that too many entities and custodians are implicated, please provide the list of entities and custodians, the official names or titles, and quantify the time and expense associated with them conducting a requested search so we can evaluate the proportionality claims.

In the end, the responses to our requests for production are wholly inadequate. We are eager to conclude this part of our discovery and look forward to hearing from you to resolve these issues. We certainly want to avoid seeking relief from the Court, but these intransigent responses to our discovery appear to leave us with no alternative. Let us know when we can confer about these issues as soon as possible.

Sincerely yours,

JONATHAN L. BLACKER
Trial Attorney
Civil Trial Section
Southwestern Region

# THOMPSON & KNIGHT LLP

ATTORNEYS AND COUNSELORS

EMILY PARKER
DIRECT DIAL: (214) 969-1502
EMAIL: Emily.Parker@tklaw.com

ONE ARTS PLAZA
1722 ROUTH STREET ● SUITE 1500
DALLAS, TEXAS 75201
214.969.1700
FAX 214.969.1751
www.tklaw.com

AUSTIN
DALLAS
FORT WORTH
HOUSTON
LOS ANGELES
NEW YORK

ALGIERS
LONDON
MÉXICO CITY
MONTERREY
PARIS

September 25, 2017

**VIA EMAIL**

Cory A. Johnson
Senior Litigation Counsel
U.S. Department of Justice
P.O. Box 26
Washington, D.C. 20044

Jonathan L. Blacker
Trial Attorney, Tax Division
U.S. Department of Justice
717 N. Harwood, Suite 400
Dallas, Texas 75201

Joshua D. Smeltzer
Trial Attorney, Tax Division
U.S. Department of Justice
717 N. Harwood, Suite 400
Dallas, Texas 75201

> Re:   No. 3:16-cv-02921, *Exxon Mobil Corporation v. United States of America,* in the
>       United States District Court for the Northern District of Texas

Dear Counsel:

    Pursuant to our September 21, 2017 call, this letter sets forth our interpretation of the Protective Order, which we believe allows Exxon Mobil Corporation ("ExxonMobil") to designate as "Confidential Information" documents that were previously produced to the Internal Revenue Service (the "IRS") during audit, provided such documents otherwise qualify as "Confidential Information" under the Protective Order.

    **ExxonMobil has not disclosed Confidential Information to a party in this case.**

    Paragraph 2 of the Protective Order states that:  "Confidential Information does not include, and this Protective Order does not apply to, information that is already in the knowledge

**Exhibit 1-G**

September 25, 2017
Page 2

or possession of the party to whom disclosure is made unless that party is already bound by agreement not to disclose such information …."

The Protective Order distinguishes between a "party" and a "nonparty," making clear that "party" in paragraph 2 refers to a party to this lawsuit, which the IRS is not. *See* Prot. Order ¶ 1 (noting that the order "governs any document, information, or other thing furnished by any party to any other party" and "includes any nonparty who receives a subpoena in connection with this action"). Although Defendant is a party to the tax refund lawsuit, ExxonMobil did not disclose any confidential information to Defendant before the Court entered the Protective Order on June 20, 2017, and although ExxonMobil disclosed confidential information to the IRS during audit, the IRS is not a party to this tax refund lawsuit. Accordingly, there is no scenario under which ExxonMobil disclosed confidential information to a "party" to the tax refund lawsuit before the Protective Order was entered, such that paragraph 2 would prevent ExxonMobil from designating any information as "Confidential Information" under the Protective Order.

Case law, statutes, and the Federal Rules of Civil Procedure consistently distinguish between the IRS and the United States as parties. In a tax refund suit, a taxpayer must sue the United States, rather than the IRS, and if a refund suit names the IRS as the defendant, courts will usually substitute the United States as the proper party or dismiss the case. *See Long v. Secretary of Treasury*, No. CV-92-1280, 1992 WL 442694, at *2 n.1 (E.D.N.Y. Nov. 10, 1992) (concluding that the taxpayer's refund suit against the IRS and the Secretary of Treasury was not against the proper party and substituting the United States as defendant under I.R.C. § 7422(f)(2)); *Jones v. IRS*, No. 89-4369, 1990 WL 80051, at *1 (S.D.N.Y. May 30, 1990) (concluding that the IRS is not a proper party in a refund suit because I.R.C. § 7422(f)(1) "bars a suit directly against the IRS" and instead "[a] refund action must be brought against the United States, rather than against the IRS"); *Vann v. United States*, 615 F. Supp. 6, 6 n.1 (M.D. Tenn. 1985) (concluding that the IRS is not a proper defendant in a taxpayer's refund suit and dismissing the suit for the failure to state a claim for which relief may be granted). Likewise, a taxpayer must sue the United States in a summons proceeding, as the IRS is not a proper party in the suit. *See, e.g., Deleeuw v. IRS*, 681 F. Supp. 402, 403–04 (E.D. Mich. 1987) (finding that the IRS is not a proper party in a proceeding to quash a summons because "[a]n executive department of the United States or one of its agencies may only be sued in its own name if the authority to be sued has been expressly been conferred by Congress") (citing *Blackmar v. Guerre*, 342 U.S. 512, 514–15 (1952)).

In Freedom of Information Act ("FOIA") cases the reverse is true: the IRS, not the United States, is the proper defendant. *See Batton v. Evers*, 598 F.3d 169, 173 n.1 (5th Cir. 2010) (concluding that the proper defendant is the IRS and the United States is not "a proper party to this action"); *White v. United States*, No. C80-53, 1980 WL 1607, at *3 (N.D. Ohio May 30, 1980) (same); *Maginn v. IRS*, No. 92-313, 1995 WL 355241, at *4 (W.D. Penn. May 29, 1992) (same).

The Federal Rules of Civil Procedure also recognize a distinction between the United States and an agency like the IRS. When parties sue the United States and have to effect service

September 25, 2017
Page 3

of process, the Federal Rules of Civil Procedure require that a copy of the summons and complaint be provided to any "nonparty agency" whose order is being challenged in the lawsuit filed against the United States.  Fed. R. Civ. P. 4(i)(1)(C).  The rules therefore contemplate that even though the United States is a party to a lawsuit, an agency like the IRS can be a nonparty. This distinction has also been applied in the contexts of collateral estoppel, judicial estoppel, and a prosecutor's duty to search for and produce materials.  *See United States v. Ledee*, 772 F.3d 21, 30 (1st Cir. 2014) (noting that in the context of judicial estoppel the government "cannot inevitably be viewed as a single party"); *United States v. Hickey*, 367 F.3d 888, 893 (9th Cir. 2004) (holding that the SEC and the United States are "not the same party" for purposes of collateral estoppel); *United States v. LaRouche Campaign*, 695 F. Supp. 1265, 1280 (D. Mass. 1988) (rejecting defendants' argument that the United States is a single entity such that a prosecutor's duty to search for and produce all materials extended to any government office or agency in which those material might be found).   In short, ExxonMobil's disclosure of information to the IRS during audit was not disclosure to a "party" to this lawsuit and possession of the documents by the IRS is not "possession of the *party* to whom disclosure is made."  Prot. Order ¶ 2 (Dkt. No. 29) (emphasis added).

### The Protective Order provides the only procedure for challenging a designation.

If Defendant disagrees with any of ExxonMobil's confidentiality designations, paragraph 5 of the Protective Order provides the exclusive procedure for challenging the designation. Under that provision, Defendant must challenge a designation in writing, at which time ExxonMobil has 10 business days to advise Defendant whether or not it will change the designation.  If the parties cannot reach an agreement on the designation, and after conferring about the dispute under the Local Civil Rules, ExxonMobil must file a motion for protective order within 14 days, unless the parties agree to a different time period.

Until Judge Godbey—the "presiding judge"—rules on the dispute, paragraph 5 provides that "the designation will remain in full force and effect, and the information will continue to be accorded the confidential treatment required by this Protective Order."  Therefore, publicly filing any document designated as Confidential Information as part of a motion or other court filing, before Judge Godbey rules on the confidentiality dispute, violates the Protective Order and would be subject to sanction.  The same is true for any copy of a document designated as Confidential Information that Defendant received from the IRS, because the Protective Order applies not only to documents designated by ExxonMobil as Confidential Information, but also to "*any copies*, excerpts, abstracts, analyses, summaries, descriptions, or other forms of recorded information containing, reflecting, or disclosing such information."  Prot. Order ¶ 1 (emphasis added).[1]  Given the Protective Order's clear language, Defendant should not publicly file any

---

[1] During the September 21, 2017 call, you suggested that the parties could not enter into a "secret" agreement to modify the terms of the Protective Order.  Paragraph 13 specifically allows the parties to modify the provisions of the Protective Order, and provides that "[p]roducing or receiving Confidential Information, or otherwise complying with the terms of the Protective Order, will not… (e) prevent the parties from agreeing in writing to alter or waive the provisions or protections provided for in this Protective Order with respect to any particular information or material."

September 25, 2017
Page 4

confidential documents or copies thereof until the confidentiality of such documents under the Protective Order is finally resolved by the presiding judge.  As we advised during the September 21, 2017 call, publicly filing any document designated as Confidential Information could severely damage ExxonMobil's business by harming its relationships with foreign governments and providing its competitors (primarily non-U.S. companies) with competitive advantages.  If you wish to file with the Court any document designed as Confidential Information—whether an original, copy, or otherwise—you must file it under seal pursuant to paragraph 12 of the Protective Order.

While paragraph 5 provides the exclusive remedy for challenging a party's confidentiality designation, you are nonetheless required to confer with us under the Local Civil Rules regarding any motion you intend to file with the Court seeking clarity on whether documents previously provided to the IRS can be marked as confidential in this case.  As we explained during the September 21, 2017 call, the Magistrate Judge's June 30, 2017 ruling declined to clarify paragraph 2, and neither she nor Judge Godbey have issued any opinion interpreting paragraph 2 and agreeing with your reading of that provision.  Therefore, we believe any issue with the interpretation of paragraph 2 must be resolved and is best resolved under the procedures stated in paragraph 5 of the Protective Order.

After you have had a chance to review our confidentiality designations in light of this letter, please notify us in writing of any designation with which you disagree pursuant to paragraph 5 of the Protective Order.  We will then provide a timely response and confer further with you under the Local Civil Rules before we file any motion for protective order contemplated by paragraph 5.

Sincerely,

Emily A. Parker

EAP/llk

# THOMPSON & KNIGHT LLP

ATTORNEYS AND COUNSELORS

ONE ARTS PLAZA
1722 ROUTH STREET • SUITE 1500
DALLAS, TEXAS  75201
214.969.1700
FAX 214.969.1751
www.tklaw.com

AUSTIN
DALLAS
FORT WORTH
HOUSTON
LOS ANGELES
NEW YORK

ALGIERS
LONDON
MÉXICO CITY
MONTERREY
PARIS

EMILY PARKER
DIRECT DIAL: (214) 969-1502
EMAIL: Emily.Parker@tklaw.com

October 6, 2017

**VIA EMAIL**

Cory A. Johnson
Senior Litigation Counsel
U.S. Department of Justice
P.O. Box 26
Washington, D.C. 20044

Re:    No. 3:16-cv-02921, *Exxon Mobil Corporation v. United States of America,* in the United States District Court for the Northern District of Texas

Dear Cory:

I am writing in response to your September 27, 2017 letter addressing the parties' dispute about the designation of certain documents produced by Exxon Mobil Corporation ("ExxonMobil") as Confidential Information under the Protective Order.

As explained in my September 25, 2017 letter, ExxonMobil believes that the proper procedure for resolving the parties' dispute about these confidentiality designations is under paragraph 5 of the Protective Order.  You disagree, however, and have informed ExxonMobil that it must file any motion addressing the parties' dispute by October 9, 2017, which happens to be a federal holiday.  Although this deadline is substantially shorter than the one provided for in paragraph 5, ExxonMobil will be filing a Motion for Protective Order on October 9, 2017, to avoid further delay.  The Motion will seek a protective order for 416 of the 436 documents that it designated as confidential and produced to you on September 21, 2017.  These documents are comprised of trade secrets or commercial information that is not publicly known and is of technical or commercial advantage to ExxonMobil or are required by law or agreement to be kept confidential.  Therefore, these documents fall within the definition of "Confidential Information" set forth in paragraph 2 of the Protective Order, and ExxonMobil properly designated them as Confidential Information.  Because you have informed us that ExxonMobil must file a motion for protective order by October 9, we will assume that you continue to object to ExxonMobil's confidentiality designations for these 416 documents unless you notify us otherwise by noon on October 9.

ExxonMobil withdraws its confidentiality designation for 20 documents (EM_06-09_0008364 to EM_06-09_0008383, EM_06-09_0008431 to EM_06-09_0008444, EM_06-09_0008450 to EM_06-09_0008455, EM_06-09_0001700 to EM_06-09_0001703, EM_06-09_0005187 to EM_06-09_0005630, EM_06-09_0006133 to EM_06-09_0007099, EM_06-

**Exhibit 1-H**

Cory A. Johnson
October 6, 2017
Page 2

09_0007104   to   EM_06-09_0008363,   EM_06-09_0005660   to   EM_06-09_0006103,   and EM_06-09_0005158   to   EM_06-09_0005186)   that   were   produced   on   September   21st   and designated as Confidential Information.   We are withdrawing the designation because we have determined that the documents do not meet the definition of "Confidential Information" in paragraph 2 of the Protective Order.   We are not withdrawing our designation based on the erroneous interpretation of the Protective Order set forth in your September 27th letter.   As we discussed during our September 21, 2017, call and explained in our September 25th letter, ExxonMobil disagrees that documents previously provided by ExxonMobil to the IRS during audit may not be designated as Confidential Information under the Protective Order.

Until the presiding judge rules on the parties' dispute about ExxonMobil's confidentiality designations, ExxonMobil expects Defendant to abide by all of the confidentiality designations, consistent with paragraph 5 of the Protective Order.   If Defendant does not intend to do so, please notify me immediately.

Thank you.

Sincerely,

Emily A. Parker

**Palmer, Nathan**

| | |
|---|---|
| **From:** | Johnson, Cory A. (TAX) <Cory.A.Johnson@usdoj.gov> |
| **Sent:** | Friday, October 06, 2017 4:24 PM |
| **To:** | Parker, Emily A.; Smeltzer, Joshua D. (TAX); Blacker, Jonathan (TAX) |
| **Cc:** | McNulty, Mary A.; Katz, Bill; Kenworthy, Kevin (kkenworthy@milchev.com); Hani, George (GHani@milchev.com); Nylin, Meghan; Meyercord, Lee; Saito, Blaine G. (TAX) |
| **Subject:** | RE: ExxonMobil v. U.S. |

Emily,

Your letter below mischaracterizes our letter of September 27, 2017. In our letter, we responded to Exxon's new theory about the terms of the Protective Order. That "theory" violates the plain meaning of the Protective Order and the Court's rulings (after months of briefing), which preclude Exxon from even marking as confidential any documents previously given to the IRS. Thus, our letter was not a blanket objection to everything marked confidential in Exxon's recent production in this case. Instead, it was an objection to Exxon's new and baseless interpretation of the Protective Order, namely that, because the "United States" is the named defendant, documents previously given to the "IRS," and in our possession, could, nevertheless, somehow still be retroactively marked confidential in this case. This new theory of Exxon's is not only contrary to the Protective Order and the Court's rulings, but also belied by Exxon's own prior statements to the Court.

Additionally, while we were able to determine that Exxon's recent production contained some documents previously given to the IRS, your characterization of our letter as an objection under paragraph 5 to the confidentiality designations of all of the 436 documents that Bill represented had been marked confidential is inaccurate. And any representation by you to the Court to that effect would also be inaccurate. We objected to your new theory regarding the order, and your stated intention to make "no effort" to differentiate between documents previously given to the IRS and other, unique documents produced in this case. It is Exxon's burden and responsibility to abide by the plain terms of the Order and not even mark confidential any document previously given to the IRS, or otherwise disclosed – such documents are expressly excluded from the scope of the protective order in the first place. Exxon cannot intentionally ignore its responsibility under the Order and shift to us the burden of pointing out to it its willful violations of the order.

In sum, your mischaracterization of our letter is a transparent attempt to disguise what Exxon is attempting to do – seek, *for the fourth time,* a change to the Protective Order's terms. We trust that if you make a fourth attempt, you will not misrepresent our position. We have not yet completed a review of Exxon's productions, and have not lodged objections under paragraph 5 to all of the 416 documents you cite. We have objected to Exxon's new and

1
**Exhibit 1-I**

baseless theory about the meaning of the order, and Exxon's stated intent to do exactly what it previously told the Court it could *not* do under the Protective Order. Nor should Exxon obscure what it is trying to do with any motion it files – *reargue, for the fourth time, the terms of the Protective Order*.

Finally, we did not intend to choose a federal holiday as a deadline for Exxon to abandon its new theory. That was an oversight. If you intend to file some sort of motion for reconsideration based on the new theory put forth in your letter of September 25 (which we don't think would be procedurally or substantively proper), the 10th is OK with us.

On the other hand, we would, of course, prefer that Exxon simply abandon this latest attempt to reargue the terms of the Protective Order, so that the parties can proceed with discovery on the merits.

Cory

_____

Cory A. Johnson
Senior Litigation Counsel
U.S. Department of Justice, Tax Division
P.O. Box 26, Ben Franklin Station
Washington D.C. 20044
202-307-3046

---

**From:** Parker, Emily A. [mailto:Emily.Parker@tklaw.com]
**Sent:** Friday, October 06, 2017 10:52 AM
**To:** Johnson, Cory A. (TAX) <Cory.A.Johnson@tax.USDOJ.gov>; Smeltzer, Joshua D. (TAX) <Joshua.D.Smeltzer@tax.USDOJ.gov>; Blacker, Jonathan (TAX) <Jonathan.Blacker@tax.USDOJ.gov>
**Cc:** McNulty, Mary A. <Mary.McNulty@tklaw.com>; Katz, Bill <William.Katz@tklaw.com>; Kenworthy, Kevin (kkenworthy@milchev.com) <kkenworthy@milchev.com>; Hani, George (GHani@milchev.com) <GHani@milchev.com>; Nylin, Meghan <Meghan.Nylin@tklaw.com>; Meyercord, Lee <Lee.Meyercord@tklaw.com>
**Subject:** ExxonMobil v. U.S.

Please see the attached letter.

Emily

**Emily A. Parker | Thompson & Knight LLP**
Partner, Board Certified in Tax Law by the Texas Board of Legal Specialization

One Arts Plaza, 1722 Routh Street, Suite 1500, Dallas, TX  75201
214.969.1502 (direct) | 214.880.3184 (fax) | 214.803.4310 (cell) | Emily.Parker@tklaw.com
vCard | www.tklaw.com/emily-parker

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

EXXON MOBIL CORPORATION,

      Plaintiff,

v.

UNITED STATES OF AMERICA,

      Defendant.

CIVIL ACTION NO. 3:16-cv-2921-N

## <u>DECLARATION OF ROBERT F. YLAGAN</u>

1.      My name is Robert F. Ylagan.  I am of legal age and otherwise competent to make this declaration.  I am a Senior Commercial Consultant for Plaintiff Exxon Mobil Corporation ("ExxonMobil"), and I am submitting this declaration in support of ExxonMobil's motion for protective order (the "Motion").

2.      All of the facts stated in this declaration are true and correct and are based on my personal knowledge, unless stated otherwise.  I acquired my personal knowledge during the course and scope of my work as a Senior Commercial Consultant for ExxonMobil advising its worldwide upstream affiliates, including in Qatar and Malaysia.

3.      The documents at issue in this Motion were produced to Defendant on September 21, 2017 and designated as "Confidential Information" pursuant to paragraph 2 of the protective order (the "Confidential Documents").  The Confidential Documents include agreements and other documents relating to the transactions in Qatar and Malaysia at issue in this lawsuit and nonpublic detailed financial information, tax calculations and workpapers.  All of the Confidential Documents qualify as trade secrets or confidential commercial information.

**DECLARATION OF ROBERT F. YLAGAN — Page 1**

**Qatar–Related Confidential Documents**

4.      The Confidential Documents include the following categories of documents related to the Qatar transactions at issue in this lawsuit: (1) the Development and Fiscal Agreements ("DFAs") and other key agreements; (2) confidential and proprietary economic models analyzing the economics related to the construction of new liquefied natural gas ("LNG") trains under the DFAs; (3) internal presentations and documents regarding project financials and economics and development strategies in Qatar, including strategies related to marketing and expansion opportunities in Qatar and the assumptions used in ExxonMobil's economic evaluation of such opportunities;   and (4) technical information related to ExxonMobil's facilities and operations in Qatar.

5.      The Qatar agreements described in subpart (1) of paragraph 4 include the following categories of agreements and their related amendments, restatements, and supplements: (1) the joint venture agreements ("JVAs"), pursuant to which the joint stock companies were formed by ExxonMobil and the national oil company of the State of Qatar to develop and produce offshore natural gas reserves and to construct and operate facilities necessary to transport, manufacture, market, export, and deliver LNG and other constituent products to foreign locations and buyers; (2) the DFAs at issue in this lawsuit pursuant to which the joint stock companies purchased various rights, including the right to develop and exploit offshore natural gas reserves and to supply Qatar LNG produced from certain LNG trains; (3) joint facilities agreements and project management and services agreements governing the joint planning, development, construction, operation and maintenance of upstream and downstream facilities associated with the production and sale of LNG and other constituent products (e.g., facilities for receiving, handling, storing and loading Sulphur, LPG, and lean LNG, off-loading

**DECLARATION OF ROBERT F. YLAGAN — Page 2**

facilities, and jetty boil off gas recovery facilities) and related assignment, non-disturbance, operation, cost-sharing, sub-licensing and use agreements; (4) agreements for the sale and purchase of LNG and other constituent products ("SPAs") and related side letter agreements; and (5) land leases relating to the above activities.   These agreements are subject to broad confidentiality provisions and have not been publicly disclosed.   Access to these agreements within ExxonMobil is limited to key decision-makers and project personnel.   Public disclosure by ExxonMobil outside of this proceeding of the pricing information in the SPAs would create risk of antitrust and competition law liability.   These agreements govern ExxonMobil's operations in Qatar, where ExxonMobil and its predecessors have invested billions of dollars since the early 1990s in developing its business.   Disclosure of these agreements would significantly harm ExxonMobil: (a) by damaging its ongoing commercial relationship with its counterparties, the State of Qatar and Qatar Petroleum, the national oil company, because disclosure violates the terms of the agreements; (b) by damaging its relationship and credibility with other producing countries and their national oil companies, who could perceive ExxonMobil as more likely to violate the confidentiality provisions in their agreements; (c) by granting its competitors a competitive advantage over ExxonMobil in future contracting or bidding opportunities in Qatar and other producing countries; (d) by granting a competitive advantage to other producing countries and their national oil companies, who could use the terms of the Qatar agreements to negotiate a better deal from ExxonMobil; and (e) by granting a competitive advantage to purchasers of LNG and other constituent products who could use the terms of the disclosed SPAs in future negotiations for the sale and purchase of LNG and other constituent products.

**DECLARATION OF ROBERT F. YLAGAN — Page 3**

6.    The proprietary economic models described in subpart (2) of paragraph 4 contain information regarding projected revenues, expenses, profits, production, and prices related to the construction of LNG trains under the DFAs.  The economic models described therein are not publicly available, are used internally, and are considered by ExxonMobil to contain highly confidential and proprietary information.  Access to the economic models within ExxonMobil is limited to key decision-makers and personnel working on those models.  These economic models were developed over ExxonMobil and its predecessors' 40-year history of worldwide integrated LNG activities and are the result of significant efforts by hundreds of employees in ExxonMobil's development, gas and power marketing and production departments and in its Qatar-based affiliates.  Public disclosure by ExxonMobil outside of this proceeding of the information contained in these models on pricing, volumes, revenues and costs would create risk of antitrust and competition law liability.  Disclosure of these economic models would harm ExxonMobil's competitive advantage by giving its competitors and counterparties access to ExxonMobil's key metrics on which ExxonMobil bases its strategic decisions and develops its negotiating strategy and would harm ExxonMobil: (a) by giving its counterparties the economic analysis to better evaluate production, development and expansion opportunities in Qatar; and (b) by granting its counterparties, including producing countries and their national oil companies, insight into ExxonMobil's evaluation of business opportunities and negotiating strategy that may be used against ExxonMobil in future negotiations.  Disclosure would allow ExxonMobil's competitors and counterparties to gain these advantages without having to invest the significant time and resources that ExxonMobil invested to develop these complex proprietary economic models.

**DECLARATION OF ROBERT F. YLAGAN — Page 4**

7. The internal presentations and documents described in subpart (3) of paragraph 4 contain information regarding project financials and economics and development and expansion strategies in Qatar, including detailed (1) summaries and evaluations of the key terms of the JVAs, DFAs and SPAs; (2) strategies on marketing and pricing LNG; and (3) commercial opportunities, assumptions in evaluating the economics of such opportunities, sensitive negotiation topics and key contacts. None of this information has been publicly disclosed, and ExxonMobil treats such information as confidential and proprietary. Access to this information within ExxonMobil is limited to key decision-makers and project personnel. Public disclosure by ExxonMobil outside of this proceeding of the information in these documents on pricing and costs would create risk of antitrust and competition law liability. As explained in paragraph 5, disclosure of the terms of the agreements is prohibited by broad confidentiality provisions and would harm ExxonMobil. Disclosure of the other information described in this paragraph 7 would harm ExxonMobil: (a) by providing its competitors with insight into how ExxonMobil evaluates opportunities, makes strategic decisions and develops its negotiating strategy as well as information on strategic opportunities that its competitors could use in future contracting or bidding opportunities in Qatar; (b) by granting its counterparties, including producing countries and their national oil companies, insight into ExxonMobil's evaluation of business opportunities and negotiating strategy that may be used against ExxonMobil in future negotiations; and (c) by providing LNG purchasers with information on LNG pricing and marketing that purchasers could use against ExxonMobil in future SPA negotiations.

8. The technical information described in subpart (4) of paragraph 4 includes flow-schemes for various LNG trains and the mechanisms and calculation methodologies used to measure, reconcile and allocate the production and inventory of plant condensate, field

48

condensate within common condensate storage and loading facilities and the individual components, Propane and Butane, of Liquefied Petroleum Gas (LPG) within common LPG storage and loading facilities. The technical information is not publicly known and is considered by ExxonMobil to contain confidential and proprietary information regarding the design of LNG trains and the storage and loading of condensate and LPG.  Access to this information within ExxonMobil is limited to key decision-makers and project personnel.  This technical information was developed over ExxonMobil and its predecessors' 40-year history of worldwide integrated LNG activities and is the result of significant efforts by hundreds of employees in ExxonMobil's commercial, engineering and geoscience departments, including commercial developers, project engineers, facilities engineers, subsurface engineers and geoscientists.  Public disclosure of these documents would harm ExxonMobil because it would lose the competitive advantage that results from its confidential technical and engineering proprietary information.

9.      Disclosure of any of the documents described above in paragraphs 4 – 8 would also harm ExxonMobil because its contractual counterparties would view ExxonMobil as not properly maintaining the agreements' terms in confidence, which would impact ExxonMobil's ongoing and future relationships with those counterparties.  ExxonMobil is engaged in current negotiations for expansion opportunities with the State of Qatar.  As evidenced by the broad confidentiality provisions in the key agreements and public statements by the State of Qatar and Qatar Petroleum, confidentiality is very important to the State of Qatar and therefore it likely would penalize ExxonMobil if it perceives ExxonMobil as violating the confidentiality provisions in the agreements.

10.      ExxonMobil's operations in Qatar are material to its business.  At year-end 2016, through the joint stock companies, ExxonMobil's net acreage in Qatar totaled 65 thousand acres

49

offshore, and ExxonMobil participated in 62.2 million tons per year gross LNG capacity and 2.0 billion cubic feet per day of flowing gas capacity.   Therefore, any negative change in ExxonMobil's relationship with Qatar would cause significant and immediate economic harm to ExxonMobil's business.   Disclosure may also cause the State of Qatar and other counterparties (including other foreign producing countries and their national oil companies) to refuse to do business with U.S. companies because of the risk that their confidential and proprietary information would not be protected from disclosure in a U.S. court proceeding.   That would further exacerbate the financial harm to ExxonMobil.

**Malaysia–Related Confidential Documents**

11.     With respect to its Malaysia operations, ExxonMobil designated as confidential and produced the following categories of documents that would cause commercial harm if publicly disclosed: (1) the production sharing contracts ("PSCs") with Petroliam Nasional Berhad ("Petronas"), the Malaysian national oil and gas company, at issue in this lawsuit, and any amendments, and other related key agreements and documents; (2) confidential and proprietary models analyzing the economics related to various PSCs that were used to analyze the profitability of entry into those PSCs and are relevant to any potential new PSC; and (3) internal presentations regarding development strategies in Malaysia, including strategies related to the negotiation and execution of a new PSC.

12.     The PSCs described in subpart (1) of paragraph 11 are considered confidential by Petronas and ExxonMobil and are not publicly disclosed.   Because Petronas considers such documents confidential, public disclosure of the PSCs would harm ExxonMobil: (a) by impeding ExxonMobil's ability to negotiate further PSCs in Malaysia; (b) by interfering with ExxonMobil's ongoing commercial relationship with Petronas; (c) by granting ExxonMobil's

**DECLARATION OF ROBERT F. YLAGAN — Page 7**

competitors a competitive advantage over it in future contracting or bidding opportunities in Malaysia and other producing countries; and (d) by granting a competitive advantage to other producing countries and their national oil companies, who could use the terms of the Malaysian agreements to negotiate a better deal from ExxonMobil.  Because the rights under the PSCs themselves are ExxonMobil's most valuable asset in Malaysia, disclosure of the terms of the PSCs would disadvantage ExxonMobil and assist ExxonMobil's competitors.

13.    The proprietary economic models described in subpart (2) of paragraph 11 contain information regarding ExxonMobil's projected revenues, expenses, profits, production, and prices related to certain PSCs.  The economic models described herein are not publicly available, are used internally, and are considered by ExxonMobil to contain highly confidential and proprietary information.  Access to the economic models is limited to key decision-makers and personnel working on those models.  These economic models were developed during ExxonMobil's over 40 years of experience operating in the Malay Basin and are the result of significant efforts by hundreds of employees in ExxonMobil's development, gas and power marketing and production departments and in its Malaysia-based affiliate.  Disclosure of these economic models would harm ExxonMobil's competitive advantage by giving its competitors and counterparties access to the key metrics on which ExxonMobil bases its strategic decisions and develops its negotiating strategy and would harm ExxonMobil: (a) by giving its counterparties the economic analysis to better evaluate production, development and expansion opportunities in the Malay Basin; and (b) by granting its counterparties, including producing countries and their national oil companies, insight into ExxonMobil's evaluation of business opportunities and negotiating strategy that may be used against ExxonMobil in future negotiations.  Disclosure would allow ExxonMobil's competitors and counterparties to gain

these advantages without having to invest the significant time and resources that ExxonMobil invested to develop these complex proprietary economic models.

14.     The internal presentations described in subpart (3) of paragraph 11 contain information regarding ExxonMobil's development and expansion strategies, including strategies related to the negotiation and execution of a new PSC with Petronas.  ExxonMobil developed these strategies during its over 40 years of experience operating within the Malay Basin and its investment of billions of dollars in infrastructure in Malaysia.  The presentations discuss terms of the PSCs, which ExxonMobil considers confidential and proprietary.   The presentations described herein are not publicly available, are used internally, and are considered by ExxonMobil to contain confidential and proprietary information.  Access to such presentations is limited to key decision-makers and project personnel.  Disclosure of this information would harm ExxonMobil: (a) by providing its competitors with insight into how ExxonMobil evaluates opportunities, makes strategic decisions and develops its negotiating strategy as well as information on strategic opportunities that its competitors could use in future contracting or bidding opportunities in Malaysia; and (b) by granting its counterparties, including producing countries and their national oil companies, insight into ExxonMobil's evaluation of business opportunities and negotiating strategy that may be used against ExxonMobil in future negotiations.

15.     Disclosure of any of the documents described above in paragraphs 11 – 14  would negatively impact ExxonMobil's relationship with Petronas.  Both Petronas and ExxonMobil consider the PSCs to be confidential and do not publicly disclose them.  Access to the PSCs within ExxonMobil is limited to key decision-makers and project personnel.   During negotiations, Petronas has emphasized to ExxonMobil that it considers the PSCs and other

52

documents regarding the parties' ongoing operations in the Malay Basin to be confidential.  In addition, neither ExxonMobil nor its competitors in Malaysia have publicly released their PSCs with Petronas.  ExxonMobil has not done so because it considers the terms of the PSCs to give ExxonMobil a commercial advantage over its competitors.  ExxonMobil is currently negotiating with Petronas regarding additional PSCs in Malaysia, and any public disclosure of ExxonMobil's agreements with Petronas would negatively impact ExxonMobil's ability to continue those negotiations.   Public disclosure would also negatively impact ExxonMobil's ongoing commercial relationship with Petronas under the PSCs at issue in this litigation.

16.     ExxonMobil's operations in Malaysia are material to its business.  At year-end 2016, ExxonMobil had interests in PSCs in Malaysia covering 200 thousand net acres offshore.  Therefore, any negative change in ExxonMobil's relationship with Malaysia would cause significant and immediate economic harm to ExxonMobil's business.  Disclosure may also cause the Government of Malaysia and other counterparties (including other foreign producing countries and their national oil companies) to refuse to do business with U.S. companies because of the risk that their confidential and proprietary information would not be protected from disclosure in a U.S. court proceeding.   That would further exacerbate the financial harm to ExxonMobil.

**Tax and Financial Confidential Documents**

17.     ExxonMobil also designated as confidential and produced tax workpapers and calculations pertaining to its tax refund claim at issue in this lawsuit.  This information contains nonpublic financial and tax information, including calculations regarding ExxonMobil's foreign tax credits, which ExxonMobil considers proprietary and confidential information.  Access to this information is limited to key decision-makers and those who have a business reason to have

**DECLARATION OF ROBERT F. YLAGAN — Page 10**

or know such information.  This nonpublic information reflects ExxonMobil's internal analyses and evaluations of the transactions or agreements at issue in this lawsuit.  Public disclosure of this information would harm ExxonMobil in at least two ways:  (a) by allowing its competitors to use the information against ExxonMobil in future contracting or bidding opportunities; and (b) by allowing its contractual counterparties to understand how ExxonMobil analyzes and evaluates the transactions and agreements at issue, which would impact future negotiations.

**Measures Taken to Guard Confidential Information**

18.    None of the documents at issue in the Motion have been publicly disclosed. ExxonMobil takes a variety of steps to ensure that the terms of its confidential agreements and other confidential information —including those at issue in the Motion—are not publicly disclosed.  These steps include, but are not limited to, restricting the persons who have access to the confidential information; restricting the internal distribution of the confidential information to personnel with a business reason to have or know such information; keeping digital copies of the agreements and other documents on secure, password-protected computer systems; and restricting access to the facilities where the agreements and other documents are stored, either in hard copy or electronically.

* * *

19.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Spring, Texas, on October 9, 2017.

Robert F. Ylagan

_____
Robert F. Ylagan