**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| EXXON MOBIL CORPORATION, | |
| Plaintiff, | |
| v. | CIVIL ACTION NO. 3:16-cv-2921-N |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

**APPENDIX IN SUPPORT OF PLAINTIFF EXXON MOBIL CORPORATION'S
RESPONSE TO DEFENDANT'S MOTION AND REPLY IN SUPPORT OF EXXON
MOBIL CORPORATION'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON
CHANGE IN METHOD OF ACCOUNTING**

Plaintiff Exxon Mobil Corporation ("ExxonMobil") submits the following appendix in support of its response to Defendant United States of America's motion for partial summary judgment and ExxonMobil's reply in support of its motion for partial summary judgment on Defendant's affirmative defense of change in method of accounting:

| DESCRIPTION | EXHIBIT | APPENDIX CITE |
|---|---|---|
| Declaration of Paige Merkle | 1 | App. 1 – App. 4 |
| Declaration of Renee Gonzalez (with exhibits) | 2 | App. 5 – App. 52 |
| Excerpts from Deposition of Paige Merkle | 3 | App. 53 – App. 69 |
| IRS Email Chain dated May 16-17, 2013 produced by Defendant | 4 | App. 70 – App. 76 |
| 26 U.S.C. § 199 in effect during 2006 – 2009 tax years at issue | 5 | App. 77 – App. 108 |
| Declaration of Michael Bates | 6 | App. 109 – App. 110 |

| DESCRIPTION | EXHIBIT | APPENDIX CITE |
|---|---|---|
| Dep't of the Treasury, Policy Statement on the Tax Regulatory Process, *available at* https://home.treasury.gov/system/files/131/Policy-Statement-on-the-Tax-Regulatory-Process.pdf (last visited Apr. 29, 2019) | 7 | App. 111 – App. 114 |

Respectfully submitted,

THOMPSON & KNIGHT LLP

By: _____

Emily A. Parker
Texas Bar No. 15482500
emily.parker@tklaw.com
Mary A. McNulty
Texas Bar No. 13839680
mary.mcnulty@tklaw.com
William M. Katz, Jr.
Texas Bar No. 00791003
william.katz@tklaw.com
J. Meghan Nylin
Texas Bar No. 24070083
meghan.nylin@tklaw.com
Leonora S. Meyercord
Texas Bar No. 24074711
lee.meyercord@tklaw.com
1722 Routh Street, Suite 1500
Dallas, Texas 75201
(214) 969-1700
FAX (214) 969-1751

MILLER & CHEVALIER, CHARTERED

Kevin L. Kenworthy
D.C. Bar No. 414887
kkenworthy@milchev.com
George A. Hani
D.C. Bar No. 451945
ghani@milchev.com
Andrew L. Howlett
D.C. Bar No. 1010208
ahowlett@milchev.com
900 16th Street NW
Washington, D.C. 20006
(202) 626-5800
FAX (202) 626-5801

**ATTORNEYS FOR PLAINTIFF
EXXON MOBIL CORPORATION**

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

EXXON MOBIL CORPORATION,

       Plaintiff,

v.

UNITED STATES OF AMERICA,

       Defendant.

CIVIL ACTION NO. 3:16-cv-2921-N

## DECLARATION OF PAIGE MERKLE

1.     My name is Paige Merkle. I am of legal age and otherwise competent to make this declaration. I joined Exxon Mobil Corporation ("ExxonMobil") in 2000 and am the Upstream Subject Matter Expert in the Tax Reporting & Analysis Center for ExxonMobil. As Upstream Subject Matter Expert, my job responsibilities include advising tax return analysts, managers and supervisors in the Tax Reporting & Analysis Center (the department responsible for preparing and filing ExxonMobil's tax returns) on the tax reporting of transactions involving the exploration, development and production of oil and gas. I am submitting this declaration in support of ExxonMobil's partial motion for summary judgment (the "Motion").

2.     All of the facts stated in this declaration are true and correct and are based on my personal knowledge as stated herein. I have personal knowledge of how the transactions at issue in Malaysia and Qatar (the "Transactions"), the payments to the State of Qatar (the "SOQ") and the Malaysian national oil and gas company, Petroliam Nasional Berhad ("Petronas"), (referred to herein as the "Contingent Payments") and the production and income attributable to the Contingent Payments were reported on ExxonMobil's 2006 – 2009 original returns. I acquired my personal knowledge during the course and scope of my work as a Tax Return Analyst,

Upstream Supervisor, Manager, and Upstream Subject Matter Expert for the Tax Reporting & Analysis Center for ExxonMobil, including through my preparation of the 2004 Qatar tax return package as a Tax Return Analyst and my review of the 2010 Malaysia tax return cost recovery package as an Upstream Supervisor. The reporting of the Contingent Payments and the income attributable to the Contingent Payments in the 2004 Qatar tax return package is consistent with the reporting in the 2006 – 2008 Qatar tax return packages. The reporting of the Contingent Payments and the production and income attributable to the Contingent Payments in the 2010 Malaysia tax return package is consistent with the reporting in the 2006 – 2009 Malaysia tax return packages. The Malaysia and Qatar tax return packages are separate pro forma tax returns for the Qatar and Malaysia affiliates, which are used to prepare ExxonMobil's consolidated tax return.

3.      I have reviewed the reporting of the Contingent Payments and the production and income attributable to the Contingent Payments on ExxonMobil's original 2006 – 2009 returns and the 2006 – 2009 separate tax return packages for Qatar and Malaysia, which were used to prepare ExxonMobil's 2006 – 2009 original returns. The Transactions were treated as mineral leases, and the payments to the SOQ and Petronas were treated as royalties.

4.      The in-kind Contingent Payments to Petronas and the in-kind production attributable to the Contingent Payments were not reported on ExxonMobil's 2006 – 2009 original returns.

5.      On ExxonMobil's original 2006 – 2009 returns, the cash Contingent Payments to Petronas were included as a cost of goods sold on line 2 and an amount equal to the Contingent Payments was included in line 1 (Gross receipts or sales), resulting in no gross profit attributable to the Contingent Payments on line 3.

**DECLARATION OF PAIGE MERKLE — Page 2**

6.      On ExxonMobil's original 2006 – 2008 tax returns, the Contingent Payments made by Ras Laffan Liquefied Natural Gas Company Limited ("RL1") and Ras Laffan Liquefied Natural Gas Company Limited (II) ("RL2") and an amount equal to the Contingent Payments were reported on line 10 (Other income), resulting in no income on line 10 attributable to such payments.

7.      ExxonMobil Ras Laffan (III) Limited ("RL3") and ExxonMobil Qatargas (II) Limited ("QG2") did not make any Contingent Payments before 2009, and ExxonMobil did not report any Contingent Payments or income attributable to the Contingent Payments on its returns before 2009.

8.      On ExxonMobil's original 2009 return, the Contingent Payments by RL1, RL2, RL3 and QG2 to the SOQ were included on line 26 (Other deductions) and an amount equal to the Contingent Payments was included in line 1 (Gross receipts or sales).

9.      On ExxonMobil's original 2006 – 2009 returns, ExxonMobil did not include any portion of the Contingent Payments in its cost of the mineral property for purposes of computing cost depletion.

10.     ExxonMobil never increased its basis in the property purchased in the Transactions by the Contingent Payments made before 2006.

* * *

11.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Spring, Texas, on May 11, 2018.

Paige Merkle

Paige Merkle

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

EXXON MOBIL CORPORATION,

      Plaintiff,

v.

                      CIVIL ACTION NO. 3:16-cv-2921-N

UNITED STATES OF AMERICA,

      Defendant.

## DECLARATION OF RENEE GONZALEZ

1.      My name is Renee Gonzalez. I am of legal age and otherwise competent to make this declaration. I am a Vice President of Plaintiff Exxon Mobil Corporation ("ExxonMobil"), and I am submitting this declaration in support of ExxonMobil's partial motion for summary judgment (the "Motion").

2.      All of the facts stated in this declaration are true and correct and are based on my personal knowledge as stated herein. I have been employed as a tax lawyer by ExxonMobil since 1987 and acquired my personal knowledge during the course and scope of my work as a tax lawyer, Senior Tax Counsel, and Assistant General Tax Counsel & Vice President for ExxonMobil.

3.      ExxonMobil's affiliate is a shareholder in certain Qatari joint stock companies ("JVCos") that are treated as partnerships for U.S. federal income tax purposes, and ExxonMobil's affiliate is allocated its share of the JVCos' income, gain, loss, deductions and credits for U.S. federal income tax purposes. Through the execution of certain Development and Fiscal Agreements ("DFAs"), the State of Qatar (the "SOQ") granted to the JVCos various rights, including the exclusive right to develop and exploit certain natural gas reserves within

Qatar's North Field; and in exchange, the JVCos agreed to make certain contractual payments to the SOQ in the future (the "Qatar Transactions").

4.      ExxonMobil's affiliate entered into certain production sharing contracts ("PSCs") with Petroliam Nasional Berhad ("Petronas"), the Malaysian national oil and gas company. The PSCs granted ExxonMobil the right to explore, develop and produce petroleum in the Malay Basin in accordance with the terms of the PSCs in exchange for certain contractual payments to Petronas in the future (the "Malaysia Transactions" together with the Qatar Transactions, the "Transactions").

5.      I have personal knowledge of ExxonMobil's amended 2006 – 2007 tax returns filed on June 27, 2014 and its amended 2008 – 2009 tax returns filed on April 17, 2015, which treated the Transactions as purchases. I reviewed and signed the amended returns.

6.      I have personal knowledge of ExxonMobil's foreign tax credit position from the time of the Transactions through the filing of the original and amended returns based on my review of computations from ExxonMobil's and Mobil Oil Corporation's returns as originally filed, as amended, and as changed or adjusted by the Internal Revenue Service ("IRS").

7.      From the time of the Transactions through the filing of the original and amended returns, ExxonMobil had excess foreign tax credits, which are credits for income taxes paid to a foreign government that exceed the amount that can be used to reduce U.S. tax liability due to limitations imposed by the Internal Revenue Code.

8.      On ExxonMobil's 2006 – 2009 amended returns, ExxonMobil included in its income all of its share of the JVCos' income from the property purchased under the DFAs and all of the income from the property purchased under the PSCs, including an amount equal to the

payments made to the SOQ and Petronas on which ExxonMobil's claim is based (referred to herein as the "Contingent Payments").

9.  On ExxonMobil's 2006 – 2009 amended returns, ExxonMobil reported the Contingent Payments as contingent purchase price payments and reported a portion of each payment as principal and the remainder as imputed interest under section 483.[1]  ExxonMobil capitalized the principal component of each payment and took depletion deductions with respect to the property purchased in each Transaction.  The interest deductions were apportioned between U.S. and foreign source income.  Depletion deductions reduced ExxonMobil's foreign source income.  As a result, ExxonMobil's taxable income on the amended returns was greater than on its original returns because its foreign source taxable income increased by more than its U.S. source taxable income was reduced by the allocated interest deductions.

10.  ExxonMobil used some of its excess foreign tax credits to satisfy the tax on the additional foreign source income generated by its adjusted reporting and carried over the remaining excess foreign tax credits to subsequent years.

11.  When preparing ExxonMobil's 2006 – 2009 amended returns, ExxonMobil did not increase its basis in the property purchased under the DFAs and PSCs by any amount of the Contingent Payments incurred during tax years before 2006.

12.  Attached hereto as Exhibit A is a true and correct copy of the IRS Chief Counsel Advice dated June 20, 2014, and received by ExxonMobil on July 30, 2014, addressing whether treatment of the Qatar Transactions as purchases is a change in method of accounting.

---

[1] Unless otherwise stated, all "section" references herein are to the Internal Revenue Code (26 U.S.C.), as amended, as in effect for the years in issue.

13.    Attached hereto as Exhibit B is a true and correct copy of the IRS Chief Counsel Advice dated July 7, 2014, and received by ExxonMobil on July 30, 2014, addressing whether treatment of the Malaysia Transactions as purchases is a change in method of accounting.

\* \* \*

14.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Spring, Texas, on May 15, 2018.

_____
Renee Gonzalez

# EXHIBIT A



**Office of Chief Counsel**
**Internal Revenue Service**

# memorandum

CC:ITA:B07:GDAnderson
POSTF-137295-12

UILC:   446.04-00, 446.04-03, 446.04-01

date:   June 20, 2014

to:   John Frederick Eiman
      Senior Counsel
      (Large Business & International)

from:   Grant D. Anderson
        Senior Counsel, Branch 7
        (Income Tax & Accounting)

RECEIVED

JUL 3 0 2014

ExxonMobil   ax
*TRAC - SHARED ADMIN TEAM*

subject:   Request for Chief Counsel Advice -- ExxonMobil

This Chief Counsel Advice responds to your request for assistance. This advice may not be used or cited as precedent.

LEGEND

**RECEIVED**

**AUG 0 6 2014**

TRAC
L&F - Income Tax Audit

| | | |
|---|---|---|
| TAXPAYER | = | ExxonMobil Corporation |
| COUNTRY | = | State of Qatar (Qatar) |
| FIRM | = | Qatar Petroleum (QP), formerly Qatar General Petroleum Corporation |
| LAW | = | Emiri Decree Number 10 (1974) |
| DEPOSIT | = | North Field |
| FIRM SUB1 | = | Qatargas Operating Company Ltd. (Qatargas) |
| FIRM SUB2 | = | RasGas Company Limited (RasGas) |
| JSC1 | = | RasLaffan Liquefied Natural Gas Company Limited (RL I) |
| JSC2 | = | RasLaffan Liquefied Natural Gas Company Limited (RL II) |

App. 0011

POSTF-137295-12                              2

| | | |
|---|---|---|
| JSC3 | = | RasLaffan Liquefied Natural Gas Company Limited (RL III) |
| JSC4 | = | Qatargas II (QG II) |
| AGREEMENT | = | Development and Fiscal Agreement (DFA) |
| TAXPAYER SUB1 | = | ExxonMobil RasGas Inc. (EMRG) |
| TAXPAYER SUB2 | = | ExxonMobil Ras Laffan III Ltd. |
| TAXPAYER SUB3 | = | ExxonMobil Petroleum and Chemical Holdings, Inc. |
| TAXPAYER SUB4 | = | ExxonMobil Qatargas II Ltd. |
| YEAR 1 | = | 1971 |
| YEAR 2 | = | 2000 |
| YEAR 3 | = | 2004 |
| YEAR 4 | = | 2006 |
| YEAR 5 | = | 2007 |
| YEAR 6 | = | 2008 |
| YEAR 7 | = | 2009 |
| YEAR 8 | = | 2010 |
| YEAR 9 | = | 2011 |
| YEAR 10 | = | 2012 |
| X | = | 70 |
| Y | = | 30 |

<u>ISSUES</u>

1. Did TAXPAYER's changes in the United States income tax reporting of expenses for its oil and gas operations located in COUNTRY represent changes in its methods of accounting or corrections of errors?

POSTF-137295-12                    3

2. If the changes in reporting are determined to be changes in method of accounting, was TAXPAYER required to seek and obtain the Commissioner's consent before implementing such changes in its methods of accounting?

3. If the changes in reporting are determined to be changes in method of accounting, did TAXPAYER's failure to seek and obtain the Commissioner's consent before implementing the changes in accounting method preclude TAXPAYER from implementing these changes for the years claimed?

CONCLUSIONS

1. TAXPAYER's changes in the United States income tax reporting of expenses for its oil and gas operations located in COUNTRY represented changes in its method of accounting.

2. TAXPAYER was required to seek and obtain the Commissioner's consent before implementing such changes in method of accounting.

3. TAXPAYER's failure to seek and obtain the Commissioner's consent precluded TAXPAYER from implementing the accounting method changes for the years claimed.

FACTS

TAXPAYER is a domestic energy company with worldwide operations in many countries, including COUNTRY. As explained below, TAXPAYER conducts its business in COUNTRY through wholly-owned domestic subsidiaries that are members of TAXPAYER's consolidated group.

FIRM is a state-owned corporation established by LAW and is responsible for all phases of the oil and gas industry in COUNTRY. FIRM manages upstream, midstream and downstream oil and gas operations on behalf of COUNTRY; it also acts as COUNTRY's investment arm in the oil and gas sector.

In YEAR 1, DEPOSIT was discovered in COUNTRY. FIRM devised a plan to produce and liquefy natural gas from DEPOSIT and market the product to high-demand international markets. The operations and activities of FIRM's endeavor in DEPOSIT were accomplished, in part, through FIRM SUB1 and FIRM SUB2.

FIRM SUB2 is a COUNTRY joint venture company established to produce and sell hydrocarbons from DEPOSIT. Furthermore, FIRM SUB2 serves as an operating company on behalf of the owners of certain exploration and development rights in DEPOSIT. The owners include joint stock companies JSC1, JSC2, JSC3 and JSC4 (collectively, the joint stock companies). These joint stock companies were formed under AGREEMENTS among COUNTRY, FIRM and TAXPAYER which granted FIRM and TAXPAYER permission to develop the resources of certain areas in exchange for

POSTF-137295-12                               4

the payment of royalties to COUNTRY. The joint stock companies are characterized as foreign partnerships for U.S. income tax purposes.

JSC1, JSC2 and JSC3 are owned by FIRM (roughly X%) and TAXPAYER (roughly Y%) through TAXPAYER SUB1, which is a member of TAXPAYER's consolidated group. TAXPAYER SUB1's 30% interest in JSC1 and JSC2 is directly owned, while it owns its 30% in JSC3 through TAXPAYER SUB2, a disregarded foreign entity.

JSC4 is owned by FIRM (majority shareholder), TAXPAYER, and various other foreign minority shareholders. JSC4 is treated as a partnership for U.S. tax purposes. TAXPAYER owns its interest in JSC4 through TAXPAYER SUB3, a member of Taxpayer's consolidated group. TAXPAYER SUB3's interest in JSC4 is in turn owned through TAXPAYER SUB4, a disregarded foreign entity.

The joint stock companies entered into Joint Venture Agreements ("JVAs") with FIRM. The JVAs establish the rights, responsibilities, terms and conditions that govern each party's conduct and operations in the development of COUNTRY's DEPOSIT under the applicable AGREEMENTS, including royalties payable in cash to COUNTRY. The first royalty payments made to COUNTRY by JSC1, JSC2, JSC3 and JSC4 occurred, respectively, in YEAR 2, YEAR 3, YEAR 7 and YEAR 7.

From their inception, TAXPAYER has treated the AGREEMENTs as oil and gas leases for United States federal income tax purposes. Accordingly, TAXPAYER has recognized its share of production from properties subject to the AGREEMENTs as gross income, and claimed its share of the royalty payments on such production which the joint stock companies made to COUNTRY as deductions or through cost of goods sold (Lease Method).

In YEAR 9 and YEAR 10, TAXPAYER submitted to Examination affirmative adjustments with regard to the following entities and taxable years: JSC1 and JSC2 (YEAR 4, YEAR 5, YEAR 6, YEAR 7), JSC3 (YEAR 7), and JSC4 (YEAR 7) (hereinafter the "Claims"). The adjustments in the Claims propose to change the U.S. income tax treatment of the AGREEMENTs from the Lease Method to a Contingent Purchase Price Method (CPP Method), under which TAXPAYER would treat each AGREEMENT as a purchase of its share of production in exchange for future payments equaling the royalty payments on its share of production. TAXPAYER asserts that these future payments should have been reported as deferred payments subject to section 483 of the Internal Revenue Code, resulting in a portion of each payment being treated as a payment of interest and the remainder of each payment being treated as a payment of principal. (This memorandum does not address whether the CPP Method is a permissible method of accounting. In particular, we express no opinion on TAXPAYER's assertions that (i) the royalty payments should be reported as deferred payments of principal, and (ii) section 483 would apply to such deferred payments.)

POSTF-137295-12                            5

Accordingly, the royalty payments which TAXPAYER previously deducted or treated as cost of goods sold under the Lease Method would be recast under the CPP Method as (i) part interest, and (ii) part payment of principal, which is subsequently recovered through deductions for depletion, abandonment and so on. For every dollar of royalty expense that TAXPAYER recognizes under the Lease Method, TAXPAYER would ultimately take a dollar of combined deductions for interest and cost recovery under the CPP Method. TAXPAYER would recognize the same amount of gross income under the CPP Method as it does under the Lease Method.

Results for JSC1, JSC2, JSC3 and JSC4 have been reported using the CPP Method for taxable year YEAR 8 and thereafter.

TAXPAYER has never requested the consent of the Commissioner to change its method of accounting for JSC1, JSC2, JSC3 or JSC4 under section 446(e) and the regulations and administrative procedures thereunder.

LAW

Section 446 of the Internal Revenue Code (IRC) provides the general rules for methods of accounting. Specifically, section 446(a) provides that taxable income is to be computed under the method of accounting on the basis of which the taxpayer regularly computes its income in keeping its books. See also Treas. Reg. § 1.446-1(a)(1).

The term "method of accounting" includes not only the overall method of accounting of the taxpayer but also the accounting treatment of any item. Treas. Reg. 1.446-1(a)(1). An accounting practice that involves the timing of when an item is included in income or when it is deducted is considered an accounting method. FPL Group, Inc. v Commissioner, 115 T.C. 554, 562 (2000); General Motors Corp. v. Commissioner, 112 T.C. 270, 296 (1999); Color Arts, Inc. v. Commissioner, T.C. Memo. 2003-95. An "item" is any recurring element of income or expense. Thus, a local tax is an "item" and the treatment it is given qualifies as an accounting method. American Can Co. v. Commissioner, 317 F.2d 604 (2nd Cir. 1963), cert. denied 375 U.S. 993 (1964). Likewise, a vacation pay accrual is an "item" and the treatment it is given qualifies as an accounting method. Color Arts. See also, Capital One Financial Corp. v. Commissioner, 130 T.C. 147, 159-161 (2008), aff'd 659 F.3d 316 (4th Cir. 2011)(late fee income was separate item from interest income, including original issue discount (OID)).

An accounting method may exist under the definition in Treas. Reg. § 1.446-1(e)(2)(ii)(a) without the necessity of a pattern of consistent treatment, but in most instances, an accounting method is not established for an item without consistent treatment. See Treas. Reg. § 1.446-1(e)(2)(ii)(a). The treatment of a material item in the same way in determining the gross income or deductions in two or more consecutively filed tax returns (without regard to any change in status of the method as permissible or impermissible) represents consistent treatment of that item for purposes of Treas. Reg. § 1.446-1(e)(2)(ii)(a). However, if a taxpayer treats an item properly in

App. 0015

POSTF-137295-12                    6

the first return that reflects the item, it is not necessary for the taxpayer to treat the item consistently in two or more consecutively filed tax returns to have adopted an accounting method for that item. See Rev. Rul. 90-38, 1990-1 C.B. 57, Rev. Proc. 2002-18, 2002-1 C.B. 678, § 2.01(2).

Under the consolidated return regulations each subsidiary establishes its own method of accounting. Treas. Reg. §1.1502-17(a) states that "the method of accounting to be used by each member of the [consolidated] group shall be determined in accordance with the provisions of section 446 as if such member filed a separate return." See Sunoco, Inc. v. Commissioner, T.C. Memo. 2004-29. Thus, each member of an affiliated group of corporations determines its method of accounting on a separate-company basis, and section 446 controls the determination of that member's method of accounting.

### Consent to change method of accounting

Under section 446(e), a taxpayer which changes the method of accounting on the basis of which it regularly computes its income in keeping its books is generally required to secure the consent of the IRS before computing its taxable income under the new method. This is usually accomplished by filing a Form 3115, Request for Consent to Change Method of Accounting, pursuant to the appropriate administrative guidance (currently Rev. Proc. 97-27 and Rev. Proc. 2011-14, as amended). Treas. Reg. § 1.446-1(e)(2)(i),(3).

A taxpayer that has adopted a method of accounting cannot change the method by amending its prior income tax return(s). Although the Commissioner is authorized to consent to a retroactive accounting method change, a taxpayer does not have a right to a retroactive method change, regardless of whether the change is from a permissible or impermissible method. See Rev. Rul. 90-38; Rev. Proc. 2002-18, §§ 2.01(2) and 2.03.

Consent of the Commissioner under section 446(e) to change a method of accounting must be secured whether or not the method to be changed is proper or is permitted under the Internal Revenue Code or the regulations thereunder. Treas. Reg. § 1.446-1(e)(2)(i). See also Treas. Reg. § 1.446-1(e)(2)(iii), Examples (6)-(8), Rev. Rul. 80-190, 1980-2 C.B. 161, Rev. Rul. 77-134. Although some cases have held that the consent requirement of section 446(e) does not apply where the method to be changed is improper, the vast majority of current judicial opinion agrees that section 446(e) consent is required even for changes from improper accounting methods. See, for example, O. Liquidating v. Commissioner , 292 F.2d 225, 230-31 (3rd Cir. 1961) cert. denied 368 U.S. 898 (1961); Wright Contracting Co. v. Commissioner, 316 F.2d 249, 254 (5th Cir. 1963) cert. denied 375 U.S. 879 (1963), rehg. denied 375 U.S. 981 (1964); Witte v. Commissioner, 513 F.2d 391, 393-5 (D.C. Cir. 1975); Wayne Nut and Bolt v. Commissioner, 93 T.C. 500, 511 (1989); Diebold, Inc. v. United States, 16 Cl. Ct. 193, 211-212, affd. 891 F.2d 1579, 1583 (Fed. Cir. 1989), cert. denied 498 U.S. 823 (1990); Helmsley v. U.S., 941 F.2d 71, 87 (2nd Cir. 1991); Pacific Enterprises, 101 T.C. 1, 23 (1993); Convergent Technologies, Inc., v. Commissioner, T. C. Memo. 1995-320, Rankin v. Commissioner, 138 F.3d 1286, 1289 (9th Cir. 1998).

EM_06-09_0370316

POSTF-137295-12                          7

*What constitutes a change in accounting method?*

Treas. Reg. § 1.446-1(e)(2)(ii)(*a*) provides that a change in accounting method includes a change in the overall plan of accounting for gross income or deductions, or a change in the treatment of any material item used in such overall plan. A "material item" includes "any item that involves the proper time for the inclusion of the item in income or the taking of a deduction." Treas. Reg. § 1.446-1(e)(2)(ii)(a). In determining whether timing is involved, generally the pertinent inquiry is whether the accounting practice permanently affects the taxpayer's lifetime taxable income or merely changes the tax year in which taxable income is reported. See Rev. Proc. 2002-18, section 2.01; Rev. Proc. 91-31, 1991-1 C.B. 566, Primo Pants Co. v. Commissioner, 78 T.C. 705, 723-724 (1982); Knight Ridder Newspapers, Inc. v. United States, 743 F.2d 781, 798 (11th Cir. 1984); Huffman v. Commissioner, 126 T.C. 322, 343 (2006) affd. 518 F.3d 357, 364-5 (6th Cir. 2008); Peoples Bank & Trust Co. v. Commissioner, 415 F.2d 1341, 1344 (7th Cir. 1969).

In addition, a change in accounting method does not include adjustment of any item of income or deduction that does not involve the proper time for the inclusion of the item of income or the taking of a deduction. For example, a change from treating an item as a personal expense to treating it as a business expense is not a change in method of accounting because it does not involve the proper timing of an item of income or deduction. See Treas. Reg. § 1.446-1(e)(2)(ii)(*b*).

Under the foregoing principles, a consistent practice for determining when a taxpayer recognizes gross income for a type of revenue generally constitutes an accounting method, and a change from one such practice to another generally constitutes a change in accounting method. In Johnson v. Commissioner, 108 T.C. 448 (1997) affd. in part, revd. in part 184 F.3d 786 (8th Cir. 1999), for example, the Tax Court held that switching the time for recognizing escrowed customer payments as gross income from when the escrow agent released funds to the taxpayer to when the customer gave the sale price to the taxpayer was a change in accounting method. For further examples, see generally Rev. Proc. 2011-14, APPENDIX section 15.

Similarly, a consistent practice for determining when a taxpayer recognizes deductions for a type of expense generally constitutes an accounting method, and a change from one such practice to another generally constitutes a change in accounting method. Thus, a change from deducting officers' bonuses in the year they are declared to deducting the bonuses in the year following the declaration year constitutes a change in accounting method. Summit Sheet Metal Co. v. Commissioner, T.C. Memo 1996-563. Similarly, a change from deducting real estate taxes when paid to deducting these taxes when incurred is also a change in accounting method. Treas. Reg. § 1.446-1(e)(2)(iii), Example (2). Further, various courts have found accounting method changes in similar circumstances involving a variety of different types of expenses, including vacation pay (American Can), interest (Peoples Bank; Mulholland v. U.S., 28 Fed. Cl. 320 (1993)

POSTF-137295-12                    8

affd. 22 F.3d 1105 (Fed. Cir. 1994);, Prabel v. Commissioner, 882 F.2d 820 (3rd Cir. 1989)), customer rebates (Knight-Ridder), and related party payables (Bosamia v. Commissioner, 661 F.3d 250 (5th Cir. 2011) cert. denied 133 S.Ct. 105 (2012)).

*Mathematical and posting errors*

A change in accounting method does not include correction of mathematical or posting errors, or errors in the computation of tax liability. A "mathematical error" is defined by section 6213(g)(2) as "an error in addition, subtraction, multiplication, or division." See Capital One, 130 T.C. at 166; Huffman, 126 T.C. at 344 (accepting this definition for the purposes of Treas. Reg. § 1.446-1(e)(2)(ii)(*b*)). But see Huffman, 518 F.3d at 363, where the Sixth Circuit refused to either adopt or reject the Tax Court's definition. A "posting error" is an error in "the act of transferring an original entry to a ledger." Wayne Bolt & Nut Co., 93 T.C. at 510-511 (quoting Black's Law Dictionary 1050 (5th ed. 1979)); see also Huffman 126 T.C. at 343 (accepting the definition of posting error provided by Wayne Bolt & Nut). But see Northern States Power Co. v. Commissioner, 151 F.3d 876, 884-885 (8th Cir. 1998) where the Eighth Circuit held that a posting error occurred when the taxpayer mistakenly capitalized certain costs while deducting similar costs under its accrual method.

Where the correction of an error results in a change in accounting method, the requirements of IRC § 446(e) are applicable. Huffman, 126 T.C. at 354, First National Bank of Gainesville v. Commissioner, 88 T.C. 1069, 1085 (1987), Diebold, 16 Cl. Ct. at 203-4.

*Changes in character of revenue or deduction*

If a change in accounting practice does involve timing, then it is an accounting method change, even if it also arguably involves a change in how the item of revenue or expense is characterized, such as changing from treating transactions as leases to treating the transactions as sales. Certain cases, such as Underhill v. Commissioner, 45 T.C. 489 (1966), are sometimes read to stand for the proposition that changes involving a change in the "characterization" of an item cannot be accounting method changes under section 446. This reading, however, is not supported by the regulations. In particular, Treas. Reg. § 1.446-1(e)(2)(ii)(*b*) enumerates numerous adjustments that do not constitute changes in accounting method, but contains no exception for changes that involve recharacterization of an item. In fact, the Treasury Regulations include corrections of erroneous characterizations among examples of changes in accounting methods. See Example 11 of Treas. Reg. § 1.446-1(e)(2)(iii) (inventory to depreciable asset). See also Cargill Inc. v. U.S. 91 F.Supp.2d 1293, 1298 (D. Minn., 2000) ("Like the petitioner in Witte, Cargill has not directed the Court to any provision of the Code that sets forth such a "characterization" exception. Accordingly, the Court concludes that no such exception exists." Citing Witte v. Commissioner, 513 F.2d 391 (D.C. Cir. 1975)).

POSTF-137295-12                    9

Moreover, numerous cases have held that a change in characterization can be a change in accounting method. See <u>Diebold Inc. v. U.S.</u>, 891 F.2d at 1583 (a change in treatment from inventory to capital asset constituted an accounting method change), <u>Cargill</u>, 91 F. Supp. 2d at 1293 (re-characterization of interest from leasehold to ownership), <u>Pacific Enterprises v. Commissioner</u> (recharacterizing "working gas" (inventory) to "cushion gas" (capital asset)), <u>Standard Oil Co. v. Commissioner</u>, 77 T.C. 349 (1981) (IRC § 1250 property to IRC § 1245 property), <u>Capital One</u> (a change for late fees from not treating the fees as OID to treating the fees as creating or increasing OID), <u>Humphrey, Fairington & McClain</u>, T.C. Memo. 2013-23 (advanced litigation expenses from deductible business expenses to loans).

The automatic accounting method change procedures in Rev. Proc. 2011-14 set forth changes in characterization that constitute changes in method of accounting. See, for example, APPENDIX sections 2.01 (a change in treatment of amounts received from the Commodity Credit Corporation from gross income to loan constitutes an accounting method change), and 3.01 (a change in treatment of advanced litigation costs from deductible business expenses to loans constitutes an accounting method change). In particular, APPENDIX section 6.03(1)(a)(iv) provides that a change in method of accounting includes a change from "improperly treating property as leased by the taxpayer to properly treating property as purchased by the taxpayer," which mirrors TAXPAYER's assertions with respect to its attempted change in treatment of the AGREEMENTs.

The foregoing authorities illustrate that the change in characterization of an asset, liability, or overall transaction typically alters the tax characterization of the associated income and expense. Thus, for changes between inventory and capital assets, as in <u>Diebold</u> and <u>Pacific Enterprises</u>, the income and cost recovery elements change characterizations between gross receipts/cost of goods sold and amount realized/adjusted basis. Such change in classification does not, in itself, impact the amount of lifetime taxable income recognized, and thus does not preclude changes that embody such reclassifications from qualifying as changes in method of accounting.

Similarly, a change in accounting method reflecting a change in the characterization can also involve a change in the character of taxable income from capital gain (loss) to ordinary income (loss), or *vice versa*. For example, in <u>Witte</u>, the taxpayer's shift from the cost recovery accounting method to the completed transaction method constituted a "change in the accounting method" within the meaning of the Treasury Regulations. While the <u>Witte</u> Court found that the change involved the proper timing of a material item, the deficiency determination at issue was based on the finding that the amounts reported as long-term capital gain should be taxed as ordinary income since such amounts were in part interest income and income from the sale of properly held primarily for sale. <u>Diebold</u> and <u>Pacific Enterprises</u> also involved changes between capital and ordinary taxable income. See also <u>Mingo v. Commissioner</u>, T.C.Memo. 2013-149 (change in accounting method for the proceeds from a partnership interest

POSTF-137295-12                    10

sale attributable to unrealized receivables from the installment method resulting in capital gain to the cash receipts and disbursements method yielding ordinary income).

### Divergences from established methods

A taxpayer is generally required to apply the same accounting method to all instances of a particular item.  On occasion, however, a taxpayer purports or attempts to report an item using the accounting method that it has adopted, established, or elected, but fails to apply the accounting method with perfect consistency.  As a result, the taxpayer treats the item in two different ways; part of the item is reported under the primary accounting method, while the remainder of the item is reported using a treatment that diverges from the primary accounting method (divergent treatment).

When the divergent treatment is discovered by the taxpayer or Field Operations, the issue arises whether adjustments to conform the divergent treatment to the primary accounting method should be treated as the correction of errors in open tax years or as a change in accounting method under sections 446 and 481.  Under current law, we believe that the proper classification of a divergent treatment depends upon whether the divergent treatment is a timing practice that is used on a consistent basis.  If it is, then the divergent treatment is a material item, and conforming the divergent treatment to the primary accounting method is a change in the treatment of a material item that constitutes an accounting method change.  See Treas. Reg. § 1.446-1(e)(2)(ii)(*a*).  In contrast, if the divergent treatment is not a timing practice and/or is not a consistent practice, it will have a permanent impact on lifetime taxable income, and the divergent treatment is an error (or series of errors).

A number of older cases, however, have held that conforming a divergent treatment to the primary accounting method is error correction and not an accounting method change, even where the divergent treatment was a timing practice that would otherwise qualify as an accounting method under section 446, and even where the divergent treatment has been consistently followed over many tax years.  Examples of these cases (divergent treatment as error cases) include Gimbel Brothers, Inc. v. U.S., 535 F.2d 14 (Ct. Cl. 1976) and Standard Oil, 77 T.C. at 381-84.

In Gimbel Brothers, the taxpayer elected to use the installment method in 1952.  The Court concluded that this election included both traditional installment sales and revolving credit sales.  For many years after the election was made, however, the taxpayer consistently reported only its traditional installment sales on the installment method, but reported its revolving credit sales on an accrual method.

The taxpayer in Gimbel Brothers filed amended returns to change its reporting of the revolving credit sales to the installment method, characterizing its original treatment of such sales as an error.  The Internal Revenue Service rejected the amended returns as constituting a retroactive change in accounting method made without the requisite consent under section 446(e).  The Court, however, concluded that taxpayer's use of

POSTF-137295-12                              11

accrual reporting for revolving credit sales was an error because it was inconsistent with its installment method election.  The Internal Revenue Service *non-acquiesced* to the Court's decision in AOD 1976-345.  See also Rev. Rul 90-38 and I.R.S. Tech. Adv. Mem. 200043010 (June 9, 2000).

Similarly, in Standard Oil, the taxpayer made an election to write off intangible drilling costs (IDCs).  Thereafter, the taxpayer filed amended returns seeking to deduct as IDCs certain offshore oil platform construction costs that it had originally capitalized into the depreciable basis of such platforms.  The Court concluded that taxpayer's claim of additional deductions on its amended returns constituted "an attempt to remedy its failure to report similar items consistently under a fixed method of accounting.  Such correction of internal inconsistencies does not constitute a change in accounting method."  77 T.C. at 383.  While the Internal Revenue Service did *acquiesce* to the Court's decision that the drilling platforms were properly characterized as IDCs, the Court's reasoning as to the accounting change was rejected in I.R.S. Tech. Adv. Mem. 200043010 (June 9, 2000).

Additional cases with similar results and rationales include Korn Industries, Inc. v. United States, 532 F.2d 1352 (Ct. Cl. 1976) (holding that taxpayer did not change its accounting method when it included three previously omitted classes of costs in finished good inventory because this was consistent with how taxpayer treated similar items in that class of expenditures.  But see, Rev. Rul. 77-134, 1977-1 C.B. 132), Thompson-King-Tate, Inc., 296 F.2d 290 (6th Cir. 1961)(holding that changes to correct the application of taxpayer's existing completed contract method to a new contract were not an accounting method change), and Northern States Power (holding that a change from capitalizing losses on nuclear fuel contracts to deducting such losses as incurred was not a change in accounting method because the taxpayer was deducting losses on other fuel contracts as incurred).

The divergent treatment as error cases have become anomalies and anachronisms within the law of section 446 in several crucial respects.

First, the divergent treatment as error cases rely heavily upon the proposition that the consent of the Commissioner under section 446(e) is not required where the taxpayer's existing treatment is improper.  As discussed above, this proposition is expressly rejected by Treas. Reg. § 1.446-1(e)(2)(i) and the preponderance of judicial decisions.

Second, the divergent treatment as error cases rely on the proposition that conforming the divergent treatment to the primary accounting method is not a change in accounting method because the necessary adjustments have not altered the primary accounting method for the item; rather, the adjustments merely apply the primary accounting method across the item on a correct and uniform basis.  See Northern States Power, 151 F.3d at 884-885, Korn, 532 F.2d at 1355-1356, Beacon Publishing Co. v. Commissioner, 218 F.2d 697, 702 (10th Cir. 1955).  This proposition is overly broad and simplistic because it neglects the critical analytical test required by section 446(e), that

is, whether the divergent treatment is a material item (a timing practice applied on a consistent basis). If the divergent treatment is not a material item, it constitutes an error (or group of errors); if the divergent treatment is a material item, then a change in the treatment of such material item is an accounting method change under section 446. See Treas. Reg. § 1.446-1(e)(2)(ii)(*a*), Huffman, 126 T.C. at 354-355.

Third, the divergent treatment as error cases rely upon the argument that a divergent treatment cannot be a "material item" because by its very nature a divergent treatment applies to only a portion of an item; the remainder of the item remains subject to the primary accounting method. This argument finds no support in the regulations, which define material item as "any item that involves the proper time for the inclusion of the item in income or the taking of a deduction." Treas. Reg. § 1.446-1(e)(2)(ii)(*a*). Further, the case law has generally concluded that the pertinent inquiry for determining whether timing is involved is whether the accounting practice permanently affects the taxpayer's lifetime income or merely changes the tax year in which taxable income is reported. See Primo Pants, Knight Ridder, Peoples Bank & Trust. In other words, the lynchpin for determining whether an accounting practice is a "material item" is timing – and the presence or absence of timing in an accounting practice is completely unrelated to how widely or narrowly the accounting practice is applied. Accordingly, the inquiry into whether a divergent treatment applies to an entire item or only a portion of an item tells us nothing about whether conforming the divergent treatment to the primary accounting method would be an accounting method change because the inquiry tells us nothing about whether the divergent treatment involves timing.

Fourth, the divergent treatment as error cases are incompatible with the existence of hybrid accounting methods and related accounting method changes as recognized in section 446(c). Subject to certain limitations, any combination of accounting methods is permitted in connection with a trade or business if such combination clearly reflects income and is consistently used. See Treas. Reg. § 1.446-1(c)(1)(iv)(*a*). Further, changes to or from a hybrid accounting method, or between one hybrid method and another, are changes in accounting method. This is clearly illustrated by Example (2) of Treas. Reg. § 1.446-1(e)(2)(iii), which states that a taxpayer that uses an overall accrual accounting method but uses the cash receipts and disbursements method for a single item (real estate taxes) requires consent under section 446(e) to change its treatment of real estate taxes to the accrual method.

The conclusions of Example 2 of Treas. Reg. § 1.446-1(e)(2)(iii) were echoed by the Tax Court in Connors, Inc. v. Commissioner, 71 T.C. 913 (1979), whose facts are essentially the inverse of the facts of Example 2. The taxpayer in Connors used the cash receipts and disbursements method as its overall accounting method but reported bonus compensation expenses using an accrual method. The Court concluded that changing the treatment of bonus compensation from the accrual method to the cash receipts and disbursements method "is a change in method of accounting because such change is a change in the treatment of a material item, that is, this is a change in the proper time for the taking of a deduction from the year incurred to the year paid." 71

T.C. at 919.  See also, Miele v. Commissioner, 72 T.C. 284 (1979), Pierce Ditching Co. Inc. v. Commissioner, 73 T.C. 301 (1979), Brunton v. Commissioner, T.C. Memo. 1982-166, affd. 723 F.2d 914 (7th Cir. 1983).

If changing the divergent treatment of real estate taxes or bonuses to conform to an overall accounting method (either cash receipts and disbursements or accrual) constitutes an accounting method change, then it is difficult to understand why, in Gimbel Brothers, a change to conform the divergent treatment (accrual method) of the credit sales to the primary accounting method (installment method) is not a change in accounting method.

Fifth, the divergent treatment as error cases embody the highly counterintuitive notion that the computations of taxable income shown on filed returns do not necessarily reflect or determine the accounting methods that a taxpayer is 'really' using.  In other words, Gimbel Brothers implies that its taxpayer was 'really' on the installment method for its revolving credit sales, even though it used an accrual method on its returns to compute and report taxable income from such sales for more than a decade.

In light of the foregoing serious problems, it is not surprising that the persuasive force of the divergent treatment as error cases is severely limited in numerous respects.  First, the courts frequently distinguish these cases using a narrow reading of their facts. Numerous cases have been distinguished because they did not involve correction of "internal inconsistencies," or reflect inadvertence or mistake of fact.  See, for example, Hitachi Sales Corporation of America v. Commissioner, T.C. Memo. 1994-159, Hooker Industries, Inc. v. Commissioner, T.C. Memo. 1982-357, Color Arts, Cargill, 91 F.Supp. 2d at 1300, Huffman, 126 T.C. at 351-2.  As a further example, the Tax Court concluded that Pacific Enterprises was distinguishable from Gimbel Brothers and Standard Oil merely because these cases "do not involve inventory identification or valuation," which are specifically mentioned in Treas. Reg. § 1.446-1(e)(2)(ii)(c).

Second, the courts question or outright reject the divergent treatment cases on the basis of their inconsistencies (discussed above) with the well-established requirements of section 446.  Thus, Cargill, 91 F.Supp.2d at 1298 concludes that the divergent treatment as error cases "all ultimately rest on the erroneous premise that consent is not required if the taxpayer's previous treatment of the item was improper." See also Huffman, 126 T.C. at 347, and Capital One, 130 T.C. at 167 (divergent treatment cases decided prior to 1970 revision of Treas. Reg. 1.446-1(e) have "uncertain" weight because they fail to address consistency and timing considerations emphasized in revision).

Finally, in cases where the divergent treatment as error cases are not invoked or expressly considered, the courts often fail to apply the principle of these cases.  In Adolph Coors Co. v. Commissioner, 519 F.2d 1280 (10th Cir. 1975) cert. denied 423 U.S. 1087 (1976), for example, only the direct costs of self-constructed assets were capitalized as error while indirect costs were deducted as part of the cost of goods sold.

POSTF-137295-12                    14

The 10th Circuit upheld the holding of the Tax Court that conforming the divergent treatment of the indirect costs (deduction) to the primary accounting method (capitalization) was an accounting method change under section 446 that triggered an adjustment under section 481(a).  See also <u>Sartor v Commissioner</u>, T.C. Memo. 1977-327 (divergent accrual treatment of interest by an individual using the overall cash receipts and disbursements method).

<u>ANALYSIS</u>

1.  Did TAXPAYER's changes in the United States income tax reporting of expenses for its oil and gas operations located in COUNTRY represent changes in its methods of accounting or corrections of errors?

In YEAR 9 and YEAR 10, TAXPAYER filed Claims attempting to amend filed returns to change its reporting of the AGREEMENTs at issue from the Lease Method to the CPP Method.  TAXPAYER also began to report the AGREEMENTs under the CPP Method in tax returns filed for YEAR 8 and thereafter.

TAXPAYER stated that this change in reporting would correct the "inconsistent treatment" of the AGREEMENTs, and cited Treas. Reg. §1.446-1(e)(2) and <u>Standard Oil</u> for the proposition that "a taxpayer's alignment of an item of income to its previously established method of accounting is not a change in method of accounting."  In response to Information Document Requests issued by the Examination team, TAXPAYER stated that it had an established business practice of treating acquisition of oil and gas interests as either a lease or a purchase, depending on the underlying characteristics of the transaction.  TAXPAYER claimed it had consistently implemented this practice, and therefore established a method of accounting.  TAXPAYER asserted that it mistakenly placed the AGREEMENTs at issue in the lease category when these AGREEMENTs properly belonged in the purchase category.

A change in the treatment of an AGREEMENT is a change in method of accounting under section 446 if the AGREEMENT is a material item, which is defined by Treas. Reg. 1.446-1(e)(2)(ii)(a) to be an item that involves the proper time for the inclusion of the item into income or the taking of a deduction.  Under the lifetime income test, an item generally involves timing if the tax reporting practices for the item do not permanently impact the lifetime taxable income of a taxpayer but merely determine the timing (amounts and taxable years) of recognizing such taxable income.

A taxpayer would report the same cumulative amount of gross income over the lifetime of an AGREEMENT whether it used the Lease Method or the CPP Method.  Similarly, a taxpayer would recognize the same cumulative amount of reductions to taxable income over the lifetime of an AGREEMENT under the Lease Method or the CPP Method because the cumulative amount of hypothetical purchase price under the CPP Method (which is entirely recovered over the lifetime of the AGREEMENT as deductions for interest expense, depletion, abandonments and so on) is equal to the cumulative

POSTF-137295-12                    15

amount of royalty expense recovered as deductions or cost of goods sold under the
Lease Method.

Accordingly, an AGREEMENT constitutes a material item under Treas. Reg. § 1.446-
1(e)(2)(ii)(a) and the lifetime taxable income test, and the change in treatment of such a
material item constitutes a change in method of accounting under sections 446 and 481
unless the change falls within one of the recognized exceptions.

The purported "errors" in reporting the AGREEMENT as a lease rather than a sale do
not involve any of the exceptions listed in Treas. Reg. § 1.446-1(e)(2)(ii)(b).  The errors
are not mathematical errors, posting errors, or errors in the computation of tax liability.
The correction of these "errors" does involve timing of income and deductions.  Finally,
the "errors" do not result from a change in the underlying facts since the facts have
remained the same; only TAXPAYER's tax interpretation of those facts has changed.

Accordingly, TAXPAYER's position that it is merely correcting errors must rest upon two
alternative but overlapping arguments.  First, TAXPAYER argues that the claims cannot
be an accounting method change because they represent a mere change in the
characterization of the AGREEMENTs.  Second, TAXPAYER asserts that the claims
represent the correction of an erroneous divergence from an established accounting
method rather than a change from one accounting method to another.

With respect to the first argument regarding change in character, TAXPAYER
apparently bases its claims on its purportedly belated realization that the
AGREEMENTs were more in the nature of a purchase than a lease, and thus the
AGREEMENTs should have been reported under the CPP Method rather than the
Lease Method.  What is really being changed, TAXPAYER implicitly argues, is the
characterization of the AGREEMENTs; the revision of the tax reporting simply follows
as an automatic consequence of the recharacterization.

As discussed above, however, the fact that a change in accounting practice for an item
may involve or reflect a change in the characterization of the item does not preclude
that change in practice from constituting an accounting method change if it involves
timing and would otherwise qualify as an accounting method change under sections 446
and 481.  Similarly, the fact that the Lease Method and the CPP Method report
differently labeled items of deduction or cost recovery does not disqualify the change
between such methods from qualifying as a change in method of accounting.

TAXPAYER's second argument is that the changes contained in its claims constitute
corrections of erroneous divergences from its established CPP Method.  This argument
logically requires that TAXPAYER actually have an established method of treating
mineral contracts such as the AGREEMENTs at issue as purchases under the CPP
Method.  You have indicated that TAXPAYER has provided no evidence that any
agreements similar to the AGREEMENTs at issue were ever treated as purchases for
federal income tax purposes.  In fact, TAXPAYER seems to have consistently treated

POSTF-137295-12                    16

AGREEMENTs as leases for tax purposes.

TAXPAYER relies heavily upon Standard Oil to support its theory of divergence from an established method.  In Standard Oil, however, the taxpayer had clear evidence of the accounting method (deducting IDC) from which the asserted divergence (capitalization) occurred.  The taxpayer had expressly elected to deduct IDC and had deducted most, but not all, of its IDC.  By contrast, TAXPAYER has shown little or no evidence that it customarily (or ever) treated AGREEMENTs as purchases, and thus fails to establish the essential factual core of Standard Oil, Gimbel Brothers and other divergent treatment as error cases: an established method from which the erroneous divergence has occurred.

In contrast to Standard Oil, TAXPAYER's taxable income was always calculated treating each AGREEMENT as a lease for tax purposes, and TAXPAYER never had any AGREEMENT that was not treated as a lease for tax purposes.  No aspect of the AGREEMENTs were treated as anything other than a lease, in contrast to Standard Oil where some items were capitalized in violation of the elected method of accounting.  It is not as if certain components of the AGREEMENTs were erroneously accorded lease treatment for tax purposes; lease treatment was the only treatment.  There is no inconsistent treatment of the AGREEMENTs as there was with expensing and capitalizing IDC in Standard Oil.  See also Diebold, 891 F.2d at 1582 ("Diebold does not seek to account for the replacement modules in the same manner that it accounts for other similar items or to correct the omission of an item from a method of accounting that it otherwise consistently applies to a single category of related items.").

In other words, TAXPAYER's use of the Lease Method is not an error in the implementation of the CPP Method because TAXPAYER apparently made no attempt to implement such method.  On the contrary, TAXPAYER consciously implemented and consistently used the Lease Method for all of the AGREEMENTs at issue until TAXPAYER's abrupt discovery in YEAR 9 that it was purportedly making errors in its implementation of the CPP Method.  JSC1 and JSC2 were reported under the Lease Method through YEAR 7 (ten and six continuous taxable years, respectively), thereby evidencing sufficient consistency to establish the Lease Method as the method of accounting for these AGREEMENTs, whether or not such method is permissible. Consistent with this well-established practice, TAXPAYER reported JSC3 and JSC4 under the Lease Method for YEAR 7 when these AGREMENTs began operations. Treas. Reg. § 1.446-1(e)(2)(ii)(a).

Furthermore, the absence of an established CPP Method means that TAXPAYER's fact pattern can be distinguished from the divergent treatment as error cases discussed above.  TAXPAYER's multiyear use of the Lease Method for its AGREEMENTs at issue cannot plausibly be described as being an "internal inconsistency" in its (apparently nonexistent) use of the CPP Method or as a series of errors occurring within the "context of a broader compliance" with the CPP Method. Sunoco; Huffman, 126 T.C. at 351-52.

POSTF-137295-12                    17

Even if TAXPAYER were to produce some evidence of treating similar AGREEMENTs as purchases, however, TAXPAYER would still fall short of a convincing argument that its adjustments constitute correction of erroneous divergences from an established method. The insufficiency of the deviation as error arguments in the Claims is clearly illustrated by Huffman v. Commissioner, in which the Service imposed an involuntary accounting method change on the taxpayer's calculation of its inventory. For over 10 years, the taxpayer's accountant had consistently omitted a step in the link-chain LIFO method of accounting, which resulted in an understatement of the LIFO values of the inventories and as a result income from sales was underreported. The taxpayer argued that the Service's adjustment was a correction of an error which did not require a section 481 adjustment; the Service argued that the adjustment was a change in accounting method which required a section 481 adjustment.

As in the present case, the court in Huffman stressed that the error involved timing. The court stated:

> Consequently, the accountant's error would, if applied consistently (as, in fact, it was), self correct, at least in the sense that, if the error were continued over the life of the inventory pool, the total gain reported on account of the sale of items in the pool would be correct. Huffman, 126 T.C. at 343.

Citing Treas. Reg. § 1.446-1(e)(2)(ii)(a), the court further stated "[b]y consistently repeating the same error, the accountant established a pattern, which (although not determinative of) is indicative of a method of accounting." Id.

Having established that the error was a timing issue, the Tax Court addressed the situation in which a taxpayer elects a method of accounting and adheres to that method for some time, then deviates from the established method, and then returns to the established method. The Court noted that "a short-lived deviation from an already established method of accounting need not be viewed as establishing a new method of accounting." Id. at 354.   The Court went on to say:

> The question, of course, is what is short-lived. The Commissioner's position is that consistency is established for purposes of section 1.446-1(e)(2)(ii)(a), Income Tax Regs., by the same treatment of a material item in two or more consecutively filed returns. Rev. Proc. 2002-19, 202-1 C.B. 678. We have said something similar. Johnson v. Commissioner, supra at 494. Here, even if we were to assume that the members elected the link-chain method and adopted it, see supra pp. 46-48, no member deviated from the link-chain method for less than 10 years. This is not a short-lived deviation. [emphasis added] Id. at 354.

The Tax Court also noted that "[w]hile, in some circumstances, a taxpayer deviating from its previously established method of accounting may again adhere to its established method before the deviation has time to harden into a method of its own,

the accountant's consistent error for no less than 10 years rules out that possibility." Huffman, 126 T.C. at 355.   For an instance of an alleged deviation hardening into a method of accounting in a far shorter two taxable years, see Capital One, 659 F.3d 316 at 326 (treatment of late-fee income consistently for 1998 and 1999 under the current-inclusion method nullified taxpayer argument that such treatment was an erroneous deviation from a method of accounting to treat late-fee income as OID which the taxpayer allegedly had received consent to use beginning with 1998).

In the instant case, JSC1 and JSC2 were consistently treated as leases for ten and six continuous taxable years, respectively, before TAXPAYER concluded that such treatment was an erroneous deviation.  Therefore, even if TAXPAYER had an established CPP Method from which to deviate, it would be absurd to argue that the lengthy treatment of JSC1 and JSC2 as leases was a "brief" deviation.   As in Huffman, TAXPAYER's consistent treatment of JSC1 and JSC2 as leases over extended periods of time had hardened any purported deviation into a method of accounting.  Any attempt to change such treatment must constitute a change in method of accounting under sections 446 and 481.

By contrast, JSC3 and JSC4 were only reported on the Lease Method for a single taxable year in YEAR 7.  Beginning with YEAR 8, TAXPAYER reported JSC3 and JSC4 on the CPP Method, and filed the Claims to amend YEAR 7 returns to the CPP Method. The use of a permissible method of accounting for one taxable year is sufficient to constitute adoption of such method.  See Rev. Rul. 90-38; Rev. Proc. 2002-18, § 2.01(2).  Moreover, in light of TAXPAYER's extended use of the Lease Method for JSC1 and JSC2 prior to Year 7, it is far more plausible to treat the use of the Lease Method for JSC3 and JSC4 for the YEAR 7 return as the adoption of what TAXPAYER considered to be a proper method of accounting for AGREEMENTs rather than as an "error" in the implementation of the CPP Method.  Because JSC3 and JSC4 adopted the Lease Method by using it for the YEAR 7 taxable year, this method could not be changed retroactively by the Claims.

For the foregoing reasons, we conclude that the adjustments asserted in the Claims for the four joint stock companies constitute an attempt to change their methods of accounting from the Lease Method to the CPP Method on a retroactive basis.

Finally, we note that a second set of changes in method of accounting occurred when the four joint stock companies reported on the CPP Method for YEAR 8 and subsequent taxable years.  All the joint stock companies had an established or adopted Lease Method of accounting for the YEAR 7 taxable year, and had reported on the Lease Method for that taxable year.  These changes in method of accounting between YEAR 7 and YEAR 8 as reflected on the original returns would effectively disappear if effect were given to the attempt by the Claims to impose a retroactive accounting method change in YEAR 7 or prior taxable years.

2.  If the changes in reporting are determined to be changes in method of accounting,

POSTF-137295-12                      19

was TAXPAYER required to seek and obtain the Commissioner's consent before implementing such changes in its method of accounting?

TAXPAYER was required to obtain the consent of the Commissioner under section 446(e) prior to implementing the changes in method of accounting discussed above. Such consent was required even if (as has not been established) TAXPAYER's existing Lease Method were impermissible.

3.  If the changes in reporting are determined to be changes in method of accounting, did TAXPAYER's failure to seek and obtain the Commissioner's consent before implementing the changes in accounting method preclude TAXPAYER from implementing these changes for the years claimed?

A taxpayer cannot implement an accounting method retroactively by filing amended returns.  Treas. Reg. § 1.446-1(e)(3)(i); Rev. Rul. 90-38; Rev. Proc. 2002-18, § 2.06, 2002-1 C.B. 678.

In a case in which the taxpayer does not obtain the Commissioner's consent before implementing the change, the question is whether the change constitutes a change of accounting method that is subject to section 446(e). See Southern Pacific Transportation Co. v. Commissioner, 75 T.C. 497, 682 (1980); Wright Contracting Co., 36 T.C. at 635-636; cf. Poorbaugh v. United States, 423 F.2d 157, 163 (3d Cir. 1970); Hackensack Water Co. v. United States, 173 Ct. Cl. 606, 352 F.2d 807 (1965); FPL Group, Inc., 115 T.C. 554, 573-575 (2000). If the change constitutes a change of accounting method that is subject to section 446(e), then the taxpayer is foreclosed from making the change by section 446(e) and the regulations promulgated thereunder without regard to whether the new method would be proper. See Southern Pacific Transportation Co., 75 T.C. at 682; Wright Contracting Co., 36 T.C. at 635-636.

If a taxpayer changes a method of accounting without first obtaining consent, the Commissioner can assert section 446(e) and require the taxpayer to abandon the new method of accounting and to report taxable income using the old method of accounting. See, e.g., Lattice Semiconductor v. Commissioner, T.C.Memo. 2011-100; FPL Group, Inc.; O. Liquidating Corp.; Wright Contracting Co. v. Commissioner; Drazen v. Commissioner, 34 T.C. 1070, 1076 (1960); Advertisers Exchange, Inc. v. Commissioner, 25 T.C. 1086, 1093 (1956), affd. per curiam 240 F.2d 958 (2nd Cir. 1957).

Accordingly, the failure of TAXPAYER to request the required consent to change its method of accounting for the AGREEMENTSs at issue precludes TAXPAYER from implementing such change.

POSTF-137295-12                              20

<u>CASE DEVELOPMENT, HAZARDS AND OTHER CONSIDERATIONS</u>

This writing may contain privileged information.  Any unauthorized disclosure of this writing may undermine our ability to protect the privileged information.  If disclosure is determined to be necessary, please contact this office for our views.

Please call (202) 317-4657 if you have any further questions.

App. 0030

EM_06-09_0370330

# EXHIBIT B



**Office of Chief Counsel**
**Internal Revenue Service**
# memorandum
CC:ITA:B07:
POSTF-137295-12

[Third Party Communication:
Date of Communication: <Month> DD, YYYY]

UILC:   446.04-00, 446.04-03, 446.04-01

date:   July 07, 2014

to:   John Frederick Eiman
      Senior Counsel
      (Large Business & International)

RECEIVED
JUL 3 0 2014
ExxonMobil Tax
*TRAC - SHARED ADMIN TEAM*

from:   Grant D. Anderson
        Senior Counsel, Branch 7
        (Income Tax & Accounting)

subject:   Request for Advice -- TAXPAYER

This Chief Counsel Advice responds to your request for assistance.  This advice may
not be used or cited as precedent.

**RECEIVED**
AUG 0 6 2014
TRAC
I&F - Income Tax Audit

LEGEND

TAXPAYER  =  ExxonMobil Corporation

COUNTRY  =  Federation of Malaysia (Malaysia)

SUB  =  ExxonMobil Exploration and Production Malaysia Inc. (EMEPMI)

CONTRACT =  production sharing contract (PSC)

FIRM  =  PETRONAS

A  =  115

YEAR 1  =  1968

YEAR 2  =  1976

YEAR 3  =  1988

YEAR 4  =  1990

POSTF-137295-12                                    2

| YEAR 5 | = | 1995 |
|---|---|---|
| YEAR 6 | = | 1998 |
| YEAR 7 | = | 2006 |
| YEAR 8 | = | 2007 |
| YEAR 9 | = | 2008 |
| YEAR 10 | = | 2009 |
| YEAR 11 | = | 2010 |
| YEAR 12 | = | 2011 |
| YEAR 13 | = | 2012 |
| YEAR 14 | = | 2013 |
| YEAR 15 | = | 2014 |

ISSUES

1. Did TAXPAYER's changes in the United States income tax reporting of income and expenses for its oil and gas operations located in COUNTRY represent changes in its methods of accounting or corrections of errors?

2. If the changes in reporting are determined to be changes in methods of accounting, was TAXPAYER required to seek and obtain the Commissioner's consent before implementing such changes in its methods of accounting?

3. If the changes in reporting are determined to be changes in methods of accounting, did TAXPAYER's failure to seek and obtain the Commissioner's consent before implementing the changes in accounting methods preclude TAXPAYER from implementing these changes for the years claimed?

CONCLUSIONS

1. TAXPAYER's changes in the United States income tax reporting of expenses for its oil and gas operations located in COUNTRY represented changes in its methods of accounting.

2. TAXPAYER was required to seek and obtain the Commissioner's consent before implementing such changes in methods of accounting.

POSTF-137295-12                    3

3.  TAXPAYER's failure to seek and obtain the Commissioner's consent precluded TAXPAYER from implementing the accounting method changes for the years claimed.

FACTS

TAXPAYER is a domestic energy company with worldwide operations in many countries, including COUNTRY.  TAXPAYER conducts business in COUNTRY through a wholly-owned subsidiary, SUB, which is a member of TAXPAYER's consolidated group.

Subsidiaries and predecessors of TAXPAYER have operated in COUNTRY for over A years.  With respect to the offshore oil and gas properties which are the subject of this request, TAXPAYER first entered into a CONTRACT for the exploration of such properties with COUNTRY in YEAR 1.  During the years of TAXPAYER's claims (YEAR 7 – YEAR 11), SUB operated under six CONTRACTs with COUNTRY national oil company, FIRM.  These CONTRACTs were initiated in YEAR 5 (a renewal/modification of an original dated in YEAR 2), YEAR 3 (three CONTRACTs), YEAR 4 and YEAR 6.  A wholly-owned subsidiary of FIRM also owns an interest in each of the CONTRACTs.

The CONTRACTs contain details of the parties' oil and gas production shares. In general, TAXPAYER receives a share of in-kind production as reimbursement of TAXPAYER's capital expenditures, operational costs, and other specified expenses (cost oil), and also receives a share of in-kind production as profit on its investment (profit oil) (the cost oil and profit oil are collectively referred to as "TAXPAYER's production share").  In addition to certain cash payments from TAXPAYER ("TAXPAYER's cash payments"), some of which are reimbursed with cost oil, FIRM receives a share of in-kind production as payment of royalties and, after TAXPAYER recovers the cost oil, also receives a share of in-kind production as profit ( these in-kind receipts are collectively referred to as "FIRM's production share"). The income and expenses from the pertinent COUNTRY operations are reported on the pro forma returns of SUB.

For financial and U.S. income tax reporting purposes and from the inception of the terms of the applicable CONTRACT arrangements through the calendar year ended YEAR 11, TAXPAYER reported the CONTRACTs as leases under which FIRM conveyed to TAXPAYER and other parties the rights and responsibilities to exploit specific offshore oil and gas properties in exchange for a share of production, while FIRM retained an economic interest in the same properties.  Under this established reporting method (Lease Method), TAXPAYER recognized gross income on TAXPAYER's production share equal to the value of the cost oil and profit oil. TAXPAYER amortized or deducted as expenses both its reimbursed and non-reimbursed costs, including depletion and depreciation on capital expenditures to develop the entire property, operating costs, and cash payments made to FIRM.

POSTF-137295-12                                    4

In YEAR 13, TAXPAYER submitted to Examination affirmative adjustments (the "Claims") which it asserts correct its U.S. tax reporting with regard to the COUNTRY CONTRACT transactions for the YEAR 7, YEAR 8, YEAR 9, and YEAR 10 taxable years (the "Claim Years"). (In Year 15, TAXPAYER submitted a similar claim for YEAR 11.) The Claims propose to change the tax treatment of the CONTRACT transactions from the current Lease Method, under which no portion of FIRM's production share is reported as generating taxable income or expense, to the Contingent Purchase Price Method (CPP Method). The CPP Method was also used to report CONTRACTs on returns filed for the YEAR 12 taxable year and thereafter.

Under the CPP Method, TAXPAYER purports to purchase (i) TAXPAYER's production share and (ii) a proportionate share of FIRM's production share ("the proportionate FIRM production share") in exchange for (i) future in-kind payments equaling the gross income from the proportionate FIRM production share and (ii) the cash payments TAXPAYER makes to FIRM. TAXPAYER asserts that both the deemed "payments" and the actual cash payments it makes to FIRM should have been treated as deferred payments subject to adjustment under section 483 of the Internal Revenue Code, resulting in each "payment" being reported in part as a payment of interest and in part as a payment of principal which is recovered through depletion, abandonment or other cost-recovery deductions. (This memorandum does not address whether the CPP Method is a permissible method of accounting. In particular, we express no opinion on TAXPAYER's assertions that (i) the payments should be treated as deferred payments, and (ii) section 483 would apply to such deferred payments.)

For each CONTRACT transaction, TAXPAYER recognizes the same cumulative amount of taxable income over the lifetime of the transaction under either the Lease Method or CPP Method. Under the CPP Method, TAXPAYER recognizes additional gross income attributed to the proportionate FIRM production. Under the CPP Method TAXPAYER also recognizes additional interest expense and principal (subject to depletion and other cost recovery) which is equal to, and thus offsets, the additional gross income from the proportionate FIRM production share. The CPP and Lease Methods both recognize the same cumulative amounts of actual cash payments made by TAXPAYER to FIRM, although the Lease Method generally reports them as cost of goods sold or other cost recovery, while the CPP Method reports them as part interest deduction and part recovery of principal. The remaining reimbursed and non-reimbursed costs are reported identically under the Lease and CPP Methods.

Although TAXPAYER would report the same amount of cumulative taxable income for a CONTRACT transaction under either the Lease Method or the CPP Method, the use of the CPP Method results in additional amounts of foreign source gross income, and additional amounts of interest expense, which has the effect of reducing TAXPAYER's U.S. source taxable income and increasing its foreign source taxable income by equal amounts. This in turn increases TAXPAYER's foreign tax credit limitation under section 904 and its FOGEI limitation under section 907, which in turn increase TAXPAYER's

POSTF-137295-12                              5

available foreign tax credit under section 901, resulting in claims for refund of U.S. tax.

TAXPAYER did not request the consent of the Commissioner to change its method of accounting for the CONTRACT transactions under section 446(e) and the regulations and administrative procedures thereunder.

LAW

Section 446 of the Internal Revenue Code (IRC) provides the general rules for methods of accounting.  Specifically, section 446(a) provides that taxable income is to be computed under the method of accounting on the basis of which the taxpayer regularly computes its income in keeping its books.  See also Treas. Reg. § 1.446-1(a)(1).

The term "method of accounting" includes not only the overall method of accounting of the taxpayer but also the accounting treatment of any item.  Treas. Reg. 1.446-1(a)(1).  An accounting practice that involves the timing of when an item is included in income or when it is deducted is considered an accounting method.  FPL Group, Inc. v Commissioner, 115 T.C. 554, 562 (2000); General Motors Corp. v. Commissioner, 112 T.C. 270, 296 (1999); Color Arts, Inc. v. Commissioner, T.C. Memo. 2003-95. An "item" is any recurring element of income or expense.  Thus, a local tax is an "item" and the treatment it is given qualifies as an accounting method.  American Can Co. v. Commissioner, 317 F.2d 604 (2nd Cir. 1963), cert. denied 375 U.S. 993 (1964).  Likewise, a vacation pay accrual is an "item" and the treatment it is given qualifies as an accounting method.  Color Arts.  See also, Capital One Financial Corp. v. Commissioner, 130 T.C. 147, 159-161 (2008), aff'd 659 F.3d 316 (4th Cir. 2011)(late fee income was separate item from interest income, including original issue discount (OID)).

An accounting method may exist under the definition in Treas. Reg. § 1.446-1(e)(2)(ii)(a) without the necessity of a pattern of consistent treatment, but in most instances, an accounting method is not established for an item without consistent treatment.  See Treas. Reg. § 1.446-1(e)(2)(ii)(a).  The treatment of a material item in the same way in determining the gross income or deductions in two or more consecutively filed tax returns (without regard to any change in status of the method as permissible or impermissible) represents consistent treatment of that item for purposes of Treas. Reg. § 1.446-1(e)(2)(ii)(a).  However, if a taxpayer treats an item properly in the first return that reflects the item, it is not necessary for the taxpayer to treat the item consistently in two or more consecutively filed tax returns to have adopted an accounting method for that item.  See Rev. Rul. 90-38, 1990-1 C.B. 57, Rev. Proc. 2002-18, 2002-1 C.B. 678, § 2.01(2).

Under the consolidated return regulations each subsidiary establishes its own method of accounting. Treas. Reg. §1.1502-17(a) states that "the method of accounting to be used by each member of the [consolidated] group shall be determined in accordance with the provisions of section 446 as if such member filed a separate return."  See Sunoco, Inc. v. Commissioner, T.C. Memo. 2004-29.  Thus, each member of an affiliated group of

POSTF-137295-12                    6

corporations determines its method of accounting on a separate-company basis, and section 446 controls the determination of that member's method of accounting.

*Consent to change method of accounting*

Under section 446(e), a taxpayer which changes the method of accounting on the basis of which it regularly computes its income in keeping its books is generally required to secure the consent of the IRS before computing its taxable income under the new method. This is usually accomplished by filing a Form 3115, Request for Consent to Change Method of Accounting, pursuant to the appropriate administrative guidance (currently Rev. Proc. 97-27 and Rev. Proc. 2011-14, as amended). Treas. Reg. § 1.446-1(e)(2)(i),(3).

A taxpayer that has adopted a method of accounting cannot change the method by amending its prior income tax return(s). Although the Commissioner is authorized to consent to a retroactive accounting method change, a taxpayer does not have a right to a retroactive method change, regardless of whether the change is from a permissible or impermissible method. See Rev. Rul. 90-38; Rev. Proc. 2002-18, §§ 2.01(2) and 2.03.

Consent of the Commissioner under section 446(e) to change a method of accounting must be secured whether or not the method to be changed is proper or is permitted under the Internal Revenue Code or the regulations thereunder. Treas. Reg. § 1.446-1(e)(2)(i). See also Treas. Reg. § 1.446-1(e)(2)(iii), Examples (6)-(8), Rev. Rul. 80-190, 1980-2 C.B. 161, Rev. Rul. 77-134. Although some cases have held that the consent requirement of section 446(e) does not apply where the method to be changed is improper, the vast majority of current judicial opinion agrees that section 446(e) consent is required even for changes from improper accounting methods. See, for example, O. Liquidating v. Commissioner, 292 F.2d 225, 230-31 (3rd Cir. 1961) cert. denied 368 U.S. 898 (1961); Wright Contracting Co. v. Commissioner, 316 F.2d 249, 254 (5th Cir. 1963) cert. denied 375 U.S. 879 (1963), rehg. denied 375 U.S. 981 (1964); Witte v. Commissioner, 513 F.2d 391, 393-5 (D.C. Cir. 1975); Wayne Nut and Bolt v. Commissioner, 93 T.C. 500, 511 (1989); Diebold, Inc. v. United States, 16 Cl. Ct. 193, 211-212, affd. 891 F.2d 1579, 1583 (Fed. Cir. 1989), cert. denied 498 U.S. 823 (1990); Helmsley v. U.S., 941 F.2d 71, 87 (2nd Cir. 1991); Pacific Enterprises,101 T.C. 1, 23 (1993); Convergent Technologies, Inc., v. Commissioner, T. C. Memo. 1995-320, Rankin v. Commissioner, 138 F.3d 1286, 1289 (9th Cir. 1998).

*What constitutes a change in accounting method?*

Treas. Reg. § 1.446-1(e)(2)(ii)(*a*) provides that a change in accounting method includes a change in the overall plan of accounting for gross income or deductions, or a change in the treatment of any material item used in such overall plan. A "material item" includes "any item that involves the proper time for the inclusion of the item in income or the taking of a deduction." Treas. Reg. § 1.446-1(e)(2)(ii)(a). In determining whether timing is involved, generally the pertinent inquiry is whether the accounting practice

EM_06-09_0370295

permanently affects the taxpayer's lifetime taxable income or merely changes the tax year in which taxable income is reported. See Rev. Proc. 2002-18, section 2.01; Rev. Proc. 91-31, 1991-1 C.B. 566, Primo Pants Co. v. Commissioner, 78 T.C. 705, 723-724 (1982); Knight Ridder Newspapers, Inc. v. United States, 743 F.2d 781, 798 (11th Cir. 1984); Huffman v. Commissioner, 126 T.C. 322, 343 (2006) affd. 518 F.3d 357, 364-5 (6th Cir. 2008); Peoples Bank & Trust Co. v. Commissioner, 415 F.2d 1341, 1344 (7th Cir. 1969).

In addition, a change in accounting method does not include adjustment of any item of income or deduction that does not involve the proper time for the inclusion of the item of income or the taking of a deduction. For example, a change from treating an item as a personal expense to treating it as a business expense is not a change in method of accounting because it does not involve the proper timing of an item of income or deduction. See Treas. Reg. § 1.446-1(e)(2)(ii)(b).

Under the foregoing principles, a consistent practice for determining when a taxpayer recognizes gross income for a type of revenue generally constitutes an accounting method, and a change from one such practice to another generally constitutes a change in accounting method. In Johnson v. Commissioner, 108 T.C. 448 (1997) affd. in part, revd. in part 184 F.3d 786 (8th Cir. 1999), for example, the Tax Court held that switching the time for recognizing escrowed customer payments as gross income from when the escrow agent released funds to the taxpayer to when the customer gave the sale price to the taxpayer was a change in accounting method. For further examples, see generally Rev. Proc. 2011-14, APPENDIX section 15.

Similarly, a consistent practice for determining when a taxpayer recognizes deductions for a type of expense generally constitutes an accounting method, and a change from one such practice to another generally constitutes a change in accounting method. Thus, a change from deducting officers' bonuses in the year they are declared to deducting the bonuses in the year following the declaration year constitutes a change in accounting method. Summit Sheet Metal Co. v. Commissioner, T.C. Memo 1996-563. Similarly, a change from deducting real estate taxes when paid to deducting these taxes when incurred is also a change in accounting method. Treas. Reg. § 1.446-1(e)(2)(iii), Example (2). Further, various courts have found accounting method changes in similar circumstances involving a variety of different types of expenses, including vacation pay (American Can), interest (Peoples Bank; Mulholland v. U.S., 28 Fed. Cl. 320 (1993) affd. 22 F.3d 1105 (Fed. Cir. 1994); Prabel v. Commissioner, 882 F.2d 820 (3rd Cir. 1989)), customer rebates (Knight-Ridder), and related party payables (Bosamia v. Commissioner, 661 F.3d 250 (5th Cir. 2011) cert. denied 133 S.Ct. 105 (2012)).

*Mathematical and posting errors*

A change in accounting method does not include correction of mathematical or posting errors, or errors in the computation of tax liability. A "mathematical error" is defined by section 6213(g)(2) as "an error in addition, subtraction, multiplication, or division." See Capital One, 130 T.C. at 166; Huffman, 126 T.C. at 344 (accepting this definition for the

POSTF-137295-12                               8

purposes of Treas. Reg. § 1.446-1(e)(2)(ii)(*b*)).  But see Huffman, 518 F.3d at 363, where the Sixth Circuit refused to either adopt or reject the Tax Court's definition.  A "posting error" is an error in "the act of transferring an original entry to a ledger."  Wayne Bolt & Nut Co., 93 T.C. at 510-511 (quoting Black's Law Dictionary 1050 (5th ed. 1979)); see also Huffman 126 T.C. at 343 (accepting the definition of posting error provided by Wayne Bolt & Nut).  But see Northern States Power Co. v. Commissioner, 151 F.3d 876, 884-885 (8th Cir. 1998) where the Eighth Circuit held that a posting error occurred when the taxpayer mistakenly capitalized certain costs while deducting similar costs under its accrual method.

Where the correction of an error results in a change in accounting method, the requirements of IRC § 446(e) are applicable.  Huffman, 126 T.C. at 354, First National Bank of Gainesville v. Commissioner, 88 T.C. 1069, 1085 (1987), Diebold, 16 Cl. Ct. at 203-4.

<em>Changes in character of revenue or deduction</em>

If a change in accounting practice does involve timing, then it is an accounting method change, even if it also arguably involves a change in how the item of revenue or expense is characterized, such as changing from treating transactions as leases to treating the transactions as sales.  Certain cases, such as Underhill v. Commissioner, 45 T.C. 489 (1966), are sometimes read to stand for the proposition that changes involving a change in the "characterization" of an item cannot be accounting method changes under section 446.  This reading, however, is not supported by the regulations.  In particular, Treas. Reg. § 1.446-1(e)(2)(ii)(*b*) enumerates numerous adjustments that do not constitute changes in accounting method, but contains no exception for changes that involve recharacterization of an item.  In fact, the Treasury Regulations include corrections of erroneous characterizations among examples of changes in accounting methods.  See Example 11 of Treas. Reg. § 1.446-1(e)(2)(iii) (inventory to depreciable asset).  See also Cargill Inc. v. U.S. 91 F.Supp.2d 1293, 1298 (D. Minn., 2000) ("Like the petitioner in Witte, Cargill has not directed the Court to any provision of the Code that sets forth such a "characterization" exception.  Accordingly, the Court concludes that no such exception exists."  Citing Witte v. Commissioner, 513 F.2d 391 (D.C. Cir. 1975)).

Moreover, numerous cases have held that a change in characterization can be a change in accounting method.  See Diebold Inc. v. U.S., 891 F.2d at 1583 (a change in treatment from inventory to capital asset constituted an accounting method change), Cargill, 91 F. Supp. 2d at 1293 (re-characterization of interest from leasehold to ownership), Pacific Enterprises v. Commissioner (recharacterizing "working gas" (inventory) to "cushion gas" (capital asset)), Standard Oil Co. v. Commissioner, 77 T.C. 349 (1981) (IRC § 1250 property to IRC § 1245 property), Capital One (a change for late fees from not treating the fees as OID to treating the fees as creating or increasing OID), Humphrey, Fairington & McClain, T.C. Memo. 2013-23 (advanced litigation expenses from deductible business expenses to loans).

The automatic accounting method change procedures in Rev. Proc. 2011-14 set forth changes in characterization that constitute changes in method of accounting. See, for example, APPENDIX sections 2.01 (a change in treatment of amounts received from the Commodity Credit Corporation from gross income to loan constitutes an accounting method change), and 3.01 (a change in treatment of advanced litigation costs from deductible business expenses to loans constitutes an accounting method change). In particular, APPENDIX section 6.03(1)(a)(iv) provides that a change in method of accounting includes a change from "improperly treating property as leased by the taxpayer to properly treating property as purchased by the taxpayer," which mirrors TAXPAYER's assertions with respect to its attempted change in treatment of the AGREEMENTs.

The foregoing authorities illustrate that the change in characterization of an asset, liability, or overall transaction typically alters the tax characterization of the associated income and expense. Thus, for changes between inventory and capital assets, as in Diebold and Pacific Enterprises, the income and cost recovery elements change characterizations between gross receipts/cost of goods sold and amount realized/adjusted basis. Such change in classification does not, in itself, impact the amount of lifetime taxable income recognized, and thus does not preclude changes that embody such reclassifications from qualifying as changes in method of accounting.

Similarly, a change in accounting method reflecting a change in the characterization can also involve a change in the character of taxable income from capital gain (loss) to ordinary income (loss), or *vice versa*. For example, in Witte, the taxpayer's shift from the cost recovery accounting method to the completed transaction method constituted a "change in the accounting method" within the meaning of the Treasury Regulations. While the Witte Court found that the change involved the proper timing of a material item, the deficiency determination at issue was based on the finding that the amounts reported as long-term capital gain should be taxed as ordinary income since such amounts were in part interest income and income from the sale of properly held primarily for sale. Diebold and Pacific Enterprises also involved changes between capital and ordinary taxable income. See also Mingo v. Commissioner, T.C.Memo. 2013-149 (change in accounting method for the proceeds from a partnership interest sale attributable to unrealized receivables from the installment method resulting in capital gain to the cash receipts and disbursements method yielding ordinary income).

*Items implicating both gross income and deductions*

In some situations, the tax reporting of an item implicates both gross income and deductions. For example, in Saline Sewer Co. v. Commissioner, T.C.Memo. 1992-236, and Florida Progress Corp. v. United States, 156 F.Supp.2d 1265 (M.D. Fla. 1999) affd 250 F.3d 747 (11th Cir. 2001), vacated and superseded 264 F.3d 1313 (11th Cir. 2001), the item at issue was a payment made by customers to taxpayer utilities to initiate

POSTF-137295-12                    10

service or to connect to the utility system (a connection charge). The connection charge could be treated as a contribution in aid of construction (CIAC) under section 118(c) (the CAIC treatment). Under this treatment, no gross income would be recognized in connection with receipt of the payment from the customer, but taxpayer would not acquire any basis in property constructed with the funds and would not be entitled to take depreciation deductions with respect to such property. Alternatively, the connection charge could be treated as taxable fee (taxable fee treatment), resulting in gross income which creates basis in the assets purchased therewith; the basis of such assets is ultimately recovered through some combination of deductions for depreciation or abandonment or as basis offsetting proceeds in a sale or disposition.

In addition to addressing the issue of which of these two treatments was proper, the courts in Saline Sewer and Florida Progress also faced the issue whether changing the treatment of a connection charge from the former treatment to the latter treatment constituted a change in method of accounting within the meaning of sections 446 and 481. These courts held that such a change did not satisfy the lifetime taxable income because the change gives rise to a permanent difference in lifetime taxable income, rather than a mere timing difference, and thus cannot be an accounting method change. To reach this conclusion, the courts applied the lifetime taxable income test to gross income and deductions separately. Thus, connection charges are not taxable income under the CAIC treatment but are gross income under the taxable fee treatment, resulting in a permanent, rather than a timing, difference in lifetime taxable income. Similarly, the CAIC treatment results in no cost recovery while the taxable fee treatment results in deductions or basis offsetting proceeds in a sale or disposition, which again results in a permanent difference in lifetime taxable income.

In Rev. Rul. 2008-35, 2008-5 I.R.B. 1156, the IRS declined to acquiesce in the holding on the change in method of accounting issue in Saline Sewer and Florida Progress. Revenue Ruling 2008-35 points out that the "taxable income" in the lifetime taxable income test is defined by section 63 to mean gross income minus allowable deductions. Therefore, an analysis of the impact of the change on lifetime taxable income must include the impact of the change on both gross income and deductions. Applied in this way, the lifetime taxable income test shows that the CAIC treatment and the taxable fee treatment produce identical amounts of lifetime taxable income. The CAIC treatment recognizes no gross income and allows no deductions. The taxable fee treatment recognizes gross income, but allows cost recovery that equals and offsets the amount of gross income recognized, resulting in the same lifetime taxable income as the CAIC treatment.

The lifetime taxable income test is also applied jointly to the gross income and deduction aspects of an item in Johnson v. Commissioner, 108 T.C. 448, 495 (1997) (both income and related offsetting deductions are considered when determining if lifetime income is affected), aff'd in part, rev'd in part,184 F.3d 786, 790 (8th Cir. 1999) and in Rankin v. Commissioner, 138 F.3d 1286, 1289 (9th Cir. 1998) (combined effect

App. 0041

POSTF-137295-12                    11

of current-year deductions and offsetting income in future years must be considered in determining whether a change in method of accounting occurs).

Further, numerous accounting method changes eligible for automatic consent also involve changes to both gross income and deductions, and they pass the lifetime taxable income test only if such test is applied to both the revenue and expense aspects of the item.  See Rev. Proc. 2011-14, 2002-1 C.B. 327, §§ 1.01, 1A.01 of the APPENDIX.

Most recently, in Humphrey, Farrington and McClain, P.C. v. Commissioner, T.C.Memo. 2013-23, the Tax Court considered a fact pattern similar to Saline Sewer and Florida Progress but concluded that the adjustments at issue did constitute an accounting method change under sections 446 and 481. Taxpayer, a law firm, deducted advanced litigation expenses when they were paid and recognized any reimbursement of those expenses in income when they were received.  On examination, the IRS adjustments put taxpayer on a method taking no deduction when the expenses were paid but allowing a bad debt deduction for any expenses for which reimbursement was never received.  The Tax Court concluded:

> "In cases where the tax treatment of an item involves accelerated deductions that are later offset by income, courts have considered both pieces of the tax treatment in determining whether it distorts lifetime taxable income. *See* Knight–Ridder Newspapers, Inc., 743 F.2d at 786–787, 799; Johnson v. Commissioner, 108 T.C. 448, 493–496, (1997), *aff'd in relevant part, rev'd in part*, 184 F.3d 786 (8th Cir.1999); Firetag v. Commissioner, T.C. Memo.1999–355, slip op. at 3–6, 13–17, *aff'd without published opinion*, 232 F.3d 887 (4th Cir. 2000); Rankin v. Commissioner, T.C. Memo.1996–350, slip op. at 14–19, aff'd, 138 F.3d 1286 (9th Cir.1998). Considering both pieces of HFM's tax treatment—deduction of advanced expenses and inclusion of reimbursed expenses in income—it is apparent that HFM did not permanently distort its lifetime taxable income. Overall, the amount of expenses deducted (and thus the amount of income taxed) was the same as under the IRS's method of deducting unreimbursed expenses when cases were closed. Therefore, HFM's dispute with the IRS involves when, not whether, its income should be taxed."

In light of the foregoing authorities, we believe that where an item implicates both gross income and deductions, both of these should be considered jointly when applying the lifetime income test.  Thus, if an item impacts both gross income and deductions, it is a material item under the lifetime income test if the accounting practice (including jointly both the gross income and deduction practices) permanently affects the taxpayer's lifetime taxable income or merely changes the tax year in which taxable income is reported.

*Divergences from established methods*

EM_06-09_0370300

POSTF-137295-12                    12

A taxpayer is generally required to apply the same accounting method to all instances of a particular item.  On occasion, however, a taxpayer purports or attempts to report an item using the accounting method that it has adopted, established, or elected, but fails to apply the accounting method with perfect consistency.  As a result, the taxpayer treats the item in two different ways; part of the item is reported under the primary accounting method, while the remainder of the item is reported using a treatment that diverges from the primary accounting method (divergent treatment).

When the divergent treatment is discovered by the taxpayer or Field Operations, the issue arises whether adjustments to conform the divergent treatment to the primary accounting method should be treated as the correction of errors in open tax years or as a change in accounting method under sections 446 and 481.  Under current law, we believe that the proper classification of a divergent treatment depends upon whether the divergent treatment is a timing practice that is used on a consistent basis.  If it is, then the divergent treatment is a material item, and conforming the divergent treatment to the primary accounting method is a change in the treatment of a material item that constitutes an accounting method change.  See Treas. Reg. § 1.446-1(e)(2)(ii)(a).  In contrast, if the divergent treatment is not a timing practice and/or is not a consistent practice, it will have a permanent impact on lifetime taxable income, and the divergent treatment is an error (or series of errors).

A number of older cases, however, have held that conforming a divergent treatment to the primary accounting method is error correction and not an accounting method change, even where the divergent treatment was a timing practice that would otherwise qualify as an accounting method under section 446, and even where the divergent treatment has been consistently followed over many tax years.  Examples of these cases (divergent treatment as error cases) include Gimbel Brothers, Inc. v. U.S., 535 F.2d 14 (Ct. Cl. 1976) and Standard Oil, 77 T.C. at 381-84.

In Gimbel Brothers, the taxpayer elected to use the installment method in 1952.  The Court concluded that this election included both traditional installment sales and revolving credit sales.  For many years after the election was made, however, the taxpayer consistently reported only its traditional installment sales on the installment method, but reported its revolving credit sales on an accrual method.

The taxpayer in Gimbel Brothers filed amended returns to change its reporting of the revolving credit sales to the installment method, characterizing its original treatment of such sales as an error.  The Internal Revenue Service rejected the amended returns as constituting a retroactive change in accounting method made without the requisite consent under section 446(e).  The Court, however, concluded that taxpayer's use of accrual reporting for revolving credit sales was an error because it was inconsistent with its installment method election.  The Internal Revenue Service *non-acquiesced* to the Court's decision in AOD 1976-345.  See also Rev. Rul 90-38 and I.R.S. Tech. Adv. Mem. 200043010 (June 9, 2000).

Similarly, in Standard Oil, the taxpayer made an election to write off intangible drilling costs (IDCs).  Thereafter, the taxpayer filed amended returns seeking to deduct as IDCs certain offshore oil platform construction costs that it had originally capitalized into the depreciable basis of such platforms.  The Court concluded that taxpayer's claim of additional deductions on its amended returns constituted "an attempt to remedy its failure to report similar items consistently under a fixed method of accounting.  Such correction of internal inconsistencies does not constitute a change in accounting method."  77 T.C. at 383.  While the Internal Revenue Service did *acquiesce* to the Court's decision that the drilling platforms were properly characterized as IDCs, the Court's reasoning as to the accounting change was rejected in I.R.S. Tech. Adv. Mem. 200043010 (June 9, 2000).

Additional cases with similar results and rationales include Korn Industries, Inc. v. United States, 532 F.2d 1352 (Ct. Cl. 1976) (holding that taxpayer did not change its accounting method when it included three previously omitted classes of costs in finished good inventory because this was consistent with how taxpayer treated similar items in that class of expenditures.  But see, Rev. Rul. 77-134, 1977-1 C.B. 132), Thompson-King-Tate, Inc., 296 F.2d 290 (6th Cir. 1961)(holding that changes to correct the application of taxpayer's existing completed contract method to a new contract were not an accounting method change), and Northern States Power (holding that a change from capitalizing losses on nuclear fuel contracts to deducting such losses as incurred was not a change in accounting method because the taxpayer was deducting losses on other fuel contracts as incurred).

The divergent treatment as error cases have become anomalies and anachronisms within the law of section 446 in several crucial respects.

First, the divergent treatment as error cases rely heavily upon the proposition that the consent of the Commissioner under section 446(e) is not required where the taxpayer's existing treatment is improper.  As discussed above, this proposition is expressly rejected by Treas. Reg. § 1.446-1(e)(2)(i) and the preponderance of judicial decisions.

Second, the divergent treatment as error cases rely on the proposition that conforming the divergent treatment to the primary accounting method is not a change in accounting method because the necessary adjustments have not altered the primary accounting method for the item; rather, the adjustments merely apply the primary accounting method across the item on a correct and uniform basis.  See Northern States Power, 151 F.3d at 884-885, Korn, 532 F.2d at 1355-1356, Beacon Publishing Co. v. Commissioner, 218 F.2d 697, 702 (10th Cir. 1955).  This proposition is overly broad and simplistic because it neglects the critical analytical test required by section 446(e), that is, whether the divergent treatment is a material item (a timing practice applied on a consistent basis).  If the divergent treatment is not a material item, it constitutes an error (or group of errors); if the divergent treatment is a material item, then a change in the treatment of such material item is an accounting method change under section 446. See Treas. Reg. § 1.446-1(e)(2)(ii)(*a*), Huffman, 126 T.C. at 354-355.

POSTF-137295-12                         14

Third, the divergent treatment as error cases rely upon the argument that a divergent treatment cannot be a "material item" because by its very nature a divergent treatment applies to only a portion of an item; the remainder of the item remains subject to the primary accounting method.  This argument finds no support in the regulations, which define material item as "any item that involves the proper time for the inclusion of the item in income or the taking of a deduction."  Treas. Reg. § 1.446-1(e)(2)(ii)(a).  Further, the case law has generally concluded that the pertinent inquiry for determining whether timing is involved is whether the accounting practice permanently affects the taxpayer's lifetime income or merely changes the tax year in which taxable income is reported.  See Primo Pants, Knight Ridder, Peoples Bank & Trust.  In other words, the lynchpin for determining whether an accounting practice is a "material item" is timing – and the presence or absence of timing in an accounting practice is completely unrelated to how widely or narrowly the accounting practice is applied.  Accordingly, the inquiry into whether a divergent treatment applies to an entire item or only a portion of an item tells us nothing about whether conforming the divergent treatment to the primary accounting method would be an accounting method change because the inquiry tells us nothing about whether the divergent treatment involves timing.

Fourth, the divergent treatment as error cases are incompatible with the existence of hybrid accounting methods and related accounting method changes as recognized in section 446(c).  Subject to certain limitations, any combination of accounting methods is permitted in connection with a trade or business if such combination clearly reflects income and is consistently used.  See Treas. Reg. § 1.446-1(c)(1)(iv)(a).  Further, changes to or from a hybrid accounting method, or between one hybrid method and another, are changes in accounting method.  This is clearly illustrated by Example (2) of Treas. Reg. § 1.446-1(e)(2)(iii), which states that a taxpayer that uses an overall accrual accounting method but uses the cash receipts and disbursements method for a single item (real estate taxes) requires consent under section 446(e) to change its treatment of real estate taxes to the accrual method.

The conclusions of Example 2 of Treas. Reg. § 1.446-1(e)(2)(iii) were echoed by the Tax Court in Connors, Inc. v. Commissioner, 71 T.C. 913 (1979), whose facts are essentially the inverse of the facts of Example 2.  The taxpayer in Connors used the cash receipts and disbursements method as its overall accounting method but reported bonus compensation expenses using an accrual method.  The Court concluded that changing the treatment of bonus compensation from the accrual method to the cash receipts and disbursements method "is a change in method of accounting because such change is a change in the treatment of a material item, that is, this is a change in the proper time for the taking of a deduction from the year incurred to the year paid." 71 T.C. at 919.  See also, Miele v. Commissioner, 72 T.C. 284 (1979), Pierce Ditching Co. Inc. v. Commissioner, 73 T.C. 301 (1979), Brunton v. Commissioner, T.C. Memo. 1982-166, affd. 723 F.2d 914 (7th Cir. 1983).

POSTF-137295-12                    15

If changing the divergent treatment of real estate taxes or bonuses to conform to an overall accounting method (either cash receipts and disbursements or accrual) constitutes an accounting method change, then it is difficult to understand why, in Gimbel Brothers, a change to conform the divergent treatment (accrual method) of the credit sales to the primary accounting method (installment method) is not a change in accounting method.

Fifth, the divergent treatment as error cases embody the highly counterintuitive notion that the computations of taxable income shown on filed returns do not necessarily reflect or determine the accounting methods that a taxpayer is 'really' using. In other words, Gimbel Brothers implies that its taxpayer was 'really' on the installment method for its revolving credit sales, even though it used an accrual method on its returns to compute and report taxable income from such sales for more than a decade.

In light of the foregoing serious problems, it is not surprising that the persuasive force of the divergent treatment as error cases is severely limited in numerous respects. First, the courts frequently distinguish these cases using a narrow reading of their facts. Numerous cases have been distinguished because they did not involve correction of "internal inconsistencies," or reflect inadvertence or mistake of fact. See, for example, Hitachi Sales Corporation of America v. Commissioner, T.C. Memo. 1994-159, Hooker Industries, Inc. v. Commissioner, T.C. Memo. 1982-357, Color Arts, Cargill, 91 F.Supp. 2d at 1300, Huffman, 126 T.C. at 351-2. As a further example, the Tax Court concluded that Pacific Enterprises was distinguishable from Gimbel Brothers and Standard Oil merely because these cases "do not involve inventory identification or valuation," which are specifically mentioned in Treas. Reg. § 1.446-1(e)(2)(ii)(c).

Second, the courts question or outright reject the divergent treatment cases on the basis of their inconsistencies (discussed above) with the well-established requirements of section 446. Thus, Cargill, 91 F.Supp.2d at 1298 concludes that the divergent treatment as error cases "all ultimately rest on the erroneous premise that consent is not required if the taxpayer's previous treatment of the item was improper." See also Huffman, 126 T.C. at 347, and Capital One, 130 T.C. at 167 (divergent treatment cases decided prior to 1970 revision of Treas. Reg. 1.446-1(e) have "uncertain" weight because they fail to address consistency and timing considerations emphasized in revision).

Finally, in cases where the divergent treatment as error cases are not invoked or expressly considered, the courts often fail to apply the principle of these cases. In Adolph Coors Co. v. Commissioner, 519 F.2d 1280 (10th Cir. 1975) cert. denied 423 U.S. 1087 (1976), for example, only the direct costs of self-constructed assets were capitalized as error while indirect costs were deducted as part of the cost of goods sold. The 10th Circuit upheld the holding of the Tax Court that conforming the divergent treatment of the indirect costs (deduction) to the primary accounting method (capitalization) was an accounting method change under section 446 that triggered an adjustment under section 481(a). See also Sartor v Commissioner, T.C. Memo. 1977-

POSTF-137295-12                    16

327 (divergent accrual treatment of interest by an individual using the overall cash receipts and disbursements method).

ANALYSIS

1. Did TAXPAYER's changes in the United States income tax reporting of income and expenses for its oil and gas operations located in COUNTRY represent correction of errors or a change in methods of accounting under sections 446 and 481 of the Internal Revenue Code?

TAXPAYER filed Claims attempting to change its reporting of the CONTRACTs at issue from the Lease Method to the CPP Method. TAXPAYER stated that this change would correct the "inconsistent treatment" of the CONTRACTs, and cited Treas. Reg. §1.446-1(e)(2) and Standard Oil Co. v. Commissioner, 77 T.C. 349 (1981), for the proposition that "a taxpayer's alignment of an item of income to its previously established method of accounting is not a change in method of accounting." In response to Information Document Requests issued by the Examination team, TAXPAYER stated that it had an established business practice of treating acquisition of oil and gas interests as either a lease or a purchase (i.e. sale), depending on the underlying characteristics of the transaction. TAXPAYER claimed it had consistently implemented this practice, and therefore, established a method of accounting. TAXPAYER stated that it mistakenly placed the CONTRACTs at issue in the lease category when they properly belonged in the sale category.

A change in the treatment of a CONTRACT is a change in method of accounting under section 446 if the CONTRACT is a material item, which is defined by Treas. Reg. 1.446-1(e)(2)(ii)(a) to be an item that involves the proper time for the inclusion of the item into income or the taking of a deduction. Under the lifetime income test, an item generally involves timing if the tax reporting practices for the item do not permanently impact the lifetime taxable income of a taxpayer but merely determine the timing (amounts and taxable years) of recognizing such taxable income.

At first glance, the change in reporting for the CONTRACTs from the Lease Method to the CPP Method appears to involve a permanent difference in the cumulative amount of taxable income recognized over the lifetime of a CONTRACT. TAXPAYER does recognize more gross income under the CPP Method than the Lease Method because the CPP Method assumes that taxpayer receives gross income attributable to the proportionate FIRM share. TAXPAYER also recognizes more deductions and other reductions of taxable income under the CPP Method than the Lease Method because it recovers the assumed cost of purchasing the proportionate FIRM share. Consistent with Humphrey, Farrington & McClain, Rev. Rul. 2008-35 and other authorities discussed above, however, the better approach is to focus on how gross income and deductions jointly impact the lifetime taxable income of a CONTRACT.

As noted above, the amount of additional gross income under the CPP Method is equal

POSTF-137295-12                    17

to, and offset by, the amount of additional deductions and other gross income offsets under the CPP Method, resulting in no increase in lifetime taxable income for a CONTRACT under the CPP Method as compared to the Lease Method. The Lease and CPP Methods also report identical amounts of gross income for TAXPAYER'S production share and identical cumulative reductions of taxable income for the cash payments made by TAXPAYER to FIRM, although the Lease Method reports such amounts as cost of goods sold or other cost recovery, while the CPP Method reports these amounts as interest and principal recovered thru depletion or abandonment. Thus, the cumulative amount of taxable income recognized by TAXPAYER over the lifetime of a CONTRACT would be same whether TAXPAYER used the Lease Method (as it did for many years) or the CPP Method (reflected in Taxpayer's Claims); only the timing of taxable income recognition (the amounts of taxable income recognized in various years) would differ between these two methods.

Accordingly, a CONTRACT constitutes a material item under Treas. Reg. § 1.446-1(e)(2)(ii)(a) and the lifetime taxable income test, and the change in treatment of such a material item presumptively constitutes a change in method of accounting under sections 446 and 481 unless the change falls within one of the recognized exceptions.

The purported "errors" do not involve any of the exceptions listed in Treas. Reg. §1.466-1(e)(2)(ii)(b). The errors are not mathematical errors, posting errors, or errors in the computation of tax liability. The correction of these "errors" does involve timing of income and deductions. Finally, the "errors" do not result from a change in the underlying facts since the facts have remained the same; only TAXPAYER's tax interpretation of those facts has changed.

Thus, TAXPAYER's position that it is merely correcting errors must rest upon two alternative but overlapping arguments. First, TAXPAYER argues that the claims cannot be an accounting method change because they represent a mere change in the characterization of the CONTRACTs. Second, TAXPAYER asserts that the claims represent the correction of an erroneous deviation from an established accounting method rather than a change from one accounting method to another.

With respect to the first argument regarding change in character, TAXPAYER apparently bases its claims on its belated realization that the CONTRACTs were more in the nature of a purchase rather than a lease, and thus the CONTRACTs should have been reported under the CPP Method rather than the Lease Method. What is really being changed, Taxpayer implicitly argues, is the characterization of the CONTRACTs; the revision of the tax reporting simply follows as an automatic consequence of the recharacterization.

As discussed above, however, the fact that a change in accounting practice for an item may involve or reflect a change in the characterization of the item does not preclude that change in practice from constituting an accounting method change if it involves only timing and would otherwise qualify as an accounting method change under sections 446

App. 0048

EM_06-09_0370306

POSTF-137295-12                    18

and 481. Similarly, the fact that the Lease Method and the CPP Method report differently labeled items of gross income or expense does not disqualify the change between such methods from qualifying as a change in method of accounting.

TAXPAYER's second argument is that the changes contained in its claims constitute corrections of erroneous deviations from its established CPP Method. This argument logically requires that taxpayer actually have an established method of treating mineral contracts such as the CONTRACTs at issue as purchases under the CPP Method. You have indicated that TAXPAYER has provided no evidence that any agreements similar to the CONTRACTs at issue were ever treated as purchases for federal income tax purposes. In fact, Taxpayer seems to have consistently treated CONTRACTs as leases for tax purposes.

TAXPAYER relies heavily upon Standard Oil to support its theory of deviation from an established method. In Standard Oil, however, the taxpayer had clear evidence of the accounting method (deducting IDC) from which the asserted deviation (capitalization) occurred. The taxpayer had expressly elected to deduct IDC and had deducted most, but not all, of its IDC. By contrast, TAXPAYER has shown little or no evidence that it customarily (or ever) treated CONTRACTs as purchases, and thus fails to establish the essential factual core of Standard Oil, Gimbel Brothers and other divergent treatment as error cases: an established method from which the erroneous divergence has occurred.

In contrast to Standard Oil, SUB's taxable income was always calculated treating each CONTRACT as a lease for tax purposes, and SUB never had any CONTRACT that was not treated as a lease for tax purposes. No aspect of the CONTRACTs were treated as anything other than a lease, in contrast to Standard Oil where some items were capitalized in violation of its elected method of accounting. It is not as if certain components of the CONTRACTs were erroneously accorded lease treatment for tax purposes; lease treatment was the only treatment. There is no inconsistent treatment of the CONTRACTs as there was with expensing and capitalizing IDC in Standard Oil. See also Diebold, 891 F.2d at 1582 ("Diebold does not seek to account for the replacement modules in the same manner that it accounts for other similar items or to correct the omission of an item from a method of accounting that it otherwise consistently applies to a single category of related items.").

The absence of an established CPP Method means that TAXPAYER's fact pattern can be distinguished from the divergent treatment as error cases in numerous cases as discussed above. TAXPAYER's multiyear use of the Lease Method for its CONTRACTs at issue cannot plausibly be described as being an "internal inconsistency" in its (apparently nonexistent) use of the CPP Method or as a series of errors occurring within the "context of a broader compliance" with the CPP Method. Sunoco; Huffman, 126 T.C. at 351-52. In other words, TAXPAYER's use of the Lease Method is not an error in the implementation of the CPP Method because TAXPAYER apparently made no attempt to implement such method. On the contrary, TAXPAYER consciously implemented and consistently used the Lease Method for all of the

POSTF-137295-12                    19

CONTRACTs at issue.

Even if TAXPAYER were to produce some evidence of treating similar CONTRACTs as purchases, however, TAXPAYER would still fall short of a convincing argument that its adjustments constitute correction of erroneous deviations from an established method. Many of the issues raised by the Claims were discussed by the Tax Court in Huffman v. Commissioner, 126 T.C. 322 (2006). In Huffman, the Service adjusted the taxpayer's link-chain LIFO inventory accounting method. For over 10 years, the taxpayer's accountant consistently omitted a step in the link-chain LIFO method, which resulted in an understatement of the LIFO values of the inventories and as a result income from sales was underreported. The taxpayer argued that the Service's adjustment was a correction of an error which did not require a section 481 adjustment; the Service argued that the adjustment was a change in accounting method which required an section 481 adjustment.

As in the present case, the court in Huffman stressed that the error involved timing. The court stated:

> Consequently, the accountant's error would, if applied consistently (as, in fact, it was), self correct, at least in the sense that, if the error were continued over the life of the inventory pool, the total gain reported on account of the sale of items in the pool would be correct. Huffman, 126 T.C. at 343.

Citing Treas. Reg. § 1.446-1(e)(2)(ii)(a), the court further stated "[b]y consistently repeating the same error, the accountant established a pattern, which (although not determinative of) is indicative of a method of accounting." Id.

Having established that the error was a timing issue, the Tax Court addressed the situation in which a taxpayer elects a method of accounting and adheres to that method for some time, then deviates from the established method, and then returns to the established method. The Court noted that "a short-lived deviation from an already established method of accounting need not be viewed as establishing a new method of accounting." Id. at 354.   The Court went on to say:

> The question, of course, is what is short-lived. The Commissioner's position is that consistency is established for purposes of section 1.446-1(e)(2)(ii)(a), Income Tax Regs., by the same treatment of a material item in two or more consecutively filed returns. Rev. Proc. 2002-19, 2002-1 C.B. 678. We have said something similar. Johnson v. Commissioner, supra at 494. Here, even if we were to assume that the members elected the link-chain method and adopted it, see supra pp. 46-48, no member deviated from the link-chain method for less than 10 years. This is not a short-lived deviation. [emphasis added] Id. at 354.

The Tax Court also noted that "[w]hile, in some circumstances, a taxpayer deviating from its previously established method of accounting may again adhere to its

EM_06-09_0370308

POSTF-137295-12                    20

established method before the deviation has time to harden into a method of its own, the accountant's consistent error for no less than 10 years rules out that possibility." Huffman, 126 T.C. at 355.

In the instant case, the CONTRACTs were consistently treated as leases for decades. Therefore, it would be absurd to argue that the treatment of the CONTRACTs as leases was a "brief" deviation.   As in Huffman, TAXPAYER's consistent treatment of the CONTRACTs as leases hardened into a method of accounting. It does not matter whether the adopted method is permissible or not, it is still a method of accounting which requires timely consent of the Commissioner prior to change.

Finally, we note that a second set of changes in method of accounting occurred when the six CONTRACTs were reported on the CPP Method for YEAR 12 and subsequent taxable years.  TAXPAYER has a well-established Lease Method for each of these CONTRACTs thru YEAR 11, and TAXPAYER's use of the CPP Method to report these CONTRACTs for YEAR 12 represented an unauthorized change in method of accounting in violation of section 446(e).  These changes in method of accounting between YEAR 11 and YEAR 12 as reflected on the original returns would effectively disappear if effect were given to the attempt by the Claims to impose a retroactive accounting method change in YEAR 7 and subsequent taxable years.

2.  If TAXPAYER's changes constituted a change in method of accounting, was Taxpayer required to timely seek and obtain the Commissioner's consent under section 446(e) before implementing such changes in its method of accounting?

TAXPAYER's adjustments constitute a change in method of accounting.  Accordingly, TAXPAYER was required to obtain the consent of the Commissioner under section 446(e) prior to implementing the change.

3.  If TAXPAYER was so required, did its failure to timely seek and obtain consent to change its method of accounting preclude TAXPAYER from implementing such changes for the years claimed?

A taxpayer cannot implement an accounting method retroactively by filing amended returns.  Rev. Rul. 90-38; Rev. Proc. 2002-18, § 2.06, 2002-1 C.B. 678.

In a case in which the taxpayer does not obtain the Commissioner's consent before implementing the change, the question is whether the change constitutes a change of accounting method that is subject to section 446(e). See S. Pac. Transp. Co. v. Commissioner, 75 T.C. 497, 682; Wright Contracting Co., 36 T.C. 620, 635-636, cert. denied, 375 U.S. 879 (1963), reh'g denied 375 U.S. 981 (1964); cf. Poorbaugh v. United States, 423 F.2d 157, 163 (3d Cir. 1970); Hackensack Water Co. v. United States, 173 Ct. Cl. 606, 352 F.2d 807 (1965); FPL Group, Inc., 115 T.C. at 573-575. If the change constitutes a change of accounting method that is subject to section 446(e), then the taxpayer is foreclosed from making the change by section 446(e) and the regulations

POSTF-137295-12                    21

promulgated thereunder without regard to whether the new method would be proper. See S. Pac. Transp. Co., 75 T.C. at 682; Wright Contracting Co., 36 T.C. at 635-636.

If a taxpayer changes a method of accounting without first obtaining consent, the Commissioner can assert section 446(e) and require the taxpayer to abandon the new method of accounting and to report taxable income using the old method of accounting. See, e.g., Lattice Semiconductor v. Commissioner, T.C.Memo. 2011-100; FPL Group, Inc. & Subs. v. Commissioner, 115 T.C. 554 (2000); Commissioner v. O. Liquidating Corp., 292 F.2d 225 (3d Cir. 1961), cert. denied, 368 U.S. 898 (1961); Wright Contracting Co. v. Commissioner, 316 F.2d 249 (5th Cir. 1963), aff'g 36 T.C. 620 (1961), cert. denied, 375 U.S. 879 (1963), reh'g denied, 375 U.S. 981 (1964); Drazen, 34 T.C. at 1076; Advertisers Exch., Inc., 25 T.C. at 1093.

Accordingly, the failure of TAXPAYER to request the required consent to change its method of accounting for the CONTRACTs at issue precludes TAXPAYER from implementing such change.

CASE DEVELOPMENT, HAZARDS AND OTHER CONSIDERATIONS


This writing may contain privileged information. Any unauthorized disclosure of this writing may undermine our ability to protect the privileged information. If disclosure is determined to be necessary, please contact this office for our views.

Please call (202) 317-4657 if you have any further questions.

# EXHIBIT 3

Page 1

1                    IN THE UNITED STATES DISTRICT COURT

                   FOR THE NORTHERN DISTRICT OF TEXAS

2                           DALLAS DIVISION

3       EXXONMOBIL CORPORATION,      §

                                     §

4            Plaintff,               §

                                     §

5       vs.                          § CASE NO. 3:16-cv-2921

                                     §

6       UNITED STATES OF AMERICA,  §

                                     §

7            Defendant.              §

8

9       *** ATTORNEYS' EYES ONLY UNDER A PROTECTIVE ORDER ***

10                    ORAL VIDEOTAPED DEPOSITION

11                      MS. PAIGE M. MERKLE

12                        December 6, 2018

13

14           ORAL VIDEOTAPED DEPOSITION OF MS. PAIGE M.

15      MERKLE, produced as a witness at the instance of the

16      Defendant and duly sworn, was taken in the

17      above-styled and numbered cause on the 6th day of

18      December, 2018, from 9:25 a.m. to 11:57 a.m., before

19      Michelle Hartman, Certified Shorthand Reporter in and

20      for the State of Texas and Registered Professional

21      Reporter, reported by computerized stenotype machine

22      at the offices of Thompson & Knight, 811 Main, Suite

23      2500, Houston, Texas, pursuant to the Federal Rules

24      of Civil Procedure and the provisions stated on the

25      record or attached hereto.

Page 2

```
 1                   A P P E A R A N C E S
 2
 3     FOR  THE  PLAINTIFF:
 4          Mr.  William  M.  Katz,  Jr.
       and   Ms.  Emily  Parker
 5          THOMPSON  &  KNIGHT
            1722  Routh  Street
 6          Suite  1500
            Dallas,  Texas  75201
 7          Telephone:
            Fax:
 8          E-mail:  william.katz@tklaw.com
 9     FOR  THE  DEFENDANT:
10          Mr.  Cory  A.  Johnson
       and   Ms.  Elizabeth  Kanyer
11          U.S.  DEPARTMENT  OF  JUSTICE
            P.O.  Box  26
12          Washington,  D.C.  20044
            Telephone:  202-307-3046
13          Fax:   202-514-9440
            E-mail:  cory.a.johnson@usdog.gov
14
15     ALSO  PRESENT:
16          Mr.  Jim  Ferguson,  ExxonMobil
17          Mr.  Mike  Flores,  videographer
18
19
20
21
22
23
24
25
```

Page 3

```
 1                        INDEX
 2                                              PAGE
 3   MS. PAIGE M. MERKLE
 4   Examination by Mr. Johnson ......................5
     Signature Page  ...............................87
 5   Signature Page  ...............................88
     Court Reporter's Certificate ..................89
 6
 7                      EXHIBITS
 8   EXHIBIT           DESCRIPTION           PAGE
 9   Exhibit 505   Affidavit of Paige Merkle      8
10   Exhibit 506   ExxonMobil Proprietary 2006   18
                   Form 1120
11
     Exhibit 512   the 2006 1120 for ExxonMobil  43
12                 RasGas
13   Exhibit 521   1120 Form for ExxonMobil RasGas 64
                   for 2009
14
     Exhibit 523   Plaintiff ExxonMobil          76
15                 Corporation's Objections and
                   Response to Defendant's
16                 Interrogatory No. 22
17   Exhibit 524   Plaintiff ExxonMobil          77
                   Corporation's Objections and
18                 Responses to Defendant's
                   Interrogatory Nos. 24 - 27
19
     Exhibit 530   Excel spreadsheet             35
20                 EM_06-09_0456926
21   Exhibit 531   Excel Spreadsheet Bates       51
                   EM_06-09_0388404
22
23
24
25
```

Page  4

```
 1                    (All exhibits marked by Counsel for

 2                    the U.S. previously)

 3                    THE VIDEOGRAPHER:  We are now on the

 4         record.  Please note that the microphones are

 5         sensitive and may pick up whispering and private

 6         conversations.  Please turn off all cellphones or

 7         place them away from the microphones as they can

 8         interfere with the deposition audio.  Recording will

 9         continue until all parties agree to go off the

10         record.

11                    My name is Mike Flores representing

12         Veritext Legal Solutions.  The date today is December

13         6th, 2018.  The time is approximately 9:26 a.m.  This

14         deposition is being held at Thompson & Knight located

15         at 811 Main Street, Suite 2500, Houston, Texas,

16         and is being taken by counsel for the Defendant.

17                         The caption of the case is ExxonMobil

18         Corporation versus United States of America.  The

19         case is being held in the United States District

20         Court for the Northern District of Texas, Dallas

21         Division, Case Number 3:16-cv-2921.  The name of the

22         witness is Paige Merkle.

23                         At this time will Counsel please state

24         their appearance for the record.

25                         MR. JOHNSON:  Cory Johnson from the
```

Ms. Paige M. Merkle                           December 6, 2018

Page 5

```
 1    Justice Department for the United States.

 2                    MS. KANYER:  Elizabeth Kanyer, the

 3    Justice Department.

 4                    MR. KATZ, JR.:  William Katz here on

 5    behalf of Plaintiff ExxonMobil Corporation, and the

 6    witness, Paige Merkle.

 7                    MS. PARKER:  Emily Parker, Thompson &

 8    Knight, joining Mr. Katz.

 9                    MR. FERGUSON:  Jim Ferguson,

10    ExxonMobil.

11                    THE VIDEOGRAPHER:  Our court reporter

12    today is Michelle Hartman.

13                    At this time, would you please swear

14    in the witness.

15                    MS. PAIGE M. MERKLE,

16    having been first duly sworn, testified as follows:

17                         EXAMINATION

18         Q.  (BY MR. JOHNSON)  Good morning,

19    Ms. Merkle.

20         A.  Good morning.

21         Q.  Could you tell us your full name for

22    the record.

23         A.  Paige Marie Merkle.

24         Q.  And you're employed by ExxonMobil?

25         A.  That's correct.
```

1              A.   Okay.

2              Q.   So that one dollar is deducted in 2006?

3              A.   Correct.

4              Q.   Okay.  And then is it correct that the

5       three dollars, the remaining three is carried over to

6       the next year as --

7              A.   Base.

8              Q.   -- a depletable basis?

9              A.   That's right.  That's correct.

10             Q.   And then in year two -- or year 2007,

11      that three dollars that's been carried over is

12      incorporated in the depletable basis used for the

13      computation of that year?

14             A.   Correct.

15             Q.   Okay.  So in 2007, we'll have three

16      dollars of basis carried over from 2006.

17             A.   '06, plus whatever we capitalize as a

18      depletable under the net present value calculation,

19      for '07.

20             Q.   For 2007.

21             A.   And then we will apply a UOP rate to

22      that basis.

23             Q.   So the deduction in 2007 is based on

24      both the depletable basis generated in 2007 plus

25      what's carried over from 2006?

1           A.   Correct.

2           Q.   Okay.  And that continues on until that

3      three dollars is deducted down to zero?

4           A.   That's an interesting question, because

5      I -- can you -- you know, if you're saying I am

6      taking ten percent of ten percent of ten percent and

7      we never get to zero, you can get very close, maybe a

8      penny off.  But yeah, essentially that's the idea.

9           Q.   Okay.  You have to be a math major or

10     former math teacher, too.

11          A.   Yeah.

12          Q.   Okay.  So that's the -- the -- the four

13     dollars of depletable basis that's computed under the

14     new method, and that's what happens to it.  So then

15     the remaining six was interest?

16          A.   Correct.

17          Q.   And so that is deducted all in 2006?

18          A.   Yes.

19          Q.   Okay.  Does that then show up on line

20     18 under the new treatment?

21          A.   Yes.

22          Q.   Okay.  And under the new treatment, is

23     it correct that no portion of that interest is

24     capitalized?

25          A.   There's capitalized interest rules, so

1      a small portion could -- of that could get

2      capitalized.

3             Q.  Do you know whether under the new

4      treatment any is capitalized?

5             A.  I didn't review that aspect, but I'm

6      going to say -- I'm going to bet yes.

7             Q.  Okay.

8             A.  Well, it is a speculation, so I

9      shouldn't.  But the -- the -- I would have expected

10     them to capitalize a little bit of that interest,

11     yes.

12            Q.  And why is that?

13            A.  Like you say, just under the 263A cap

14     rules, that if you've got projects under construction

15     and there's interest expense out there, that we need

16     to capitalize a portion of it; not, you know, tons,

17     but a portion needs to get capitalized and becomes a

18     fixed asset.

19                 MR. JOHNSON:  Okay.  Sorry, but the

20     mouse is not responding.

21                 THE WITNESS:  Okay.

22                 MR. JOHNSON:  Houston, we have a

23     problem.

24                 MR. KATZ, JR.:  Yeah, I can --

25                 MR. JOHNSON:  Oh, there we go.

Page 86

1     Ms. Merkle.

2                     That is all the questions I have.

3                     MR. KATZ, JR.:  We will reserve our

4     questions to trial.

5                     Thank you.

6                     THE VIDEOGRAPHER:  Off the record,

7     11:57 a.m.

8                     (Proceedings concluded at 11:57 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 87

1    STATE OF TEXAS

2    COUNTY OF HARRIS

3

4                    REPORTER'S CERTIFICATE

5               ORAL VIDEOTAPED DEPOSITION OF

6                    MS. PAIGE M. MERKLE

7                    December 6, 2018

8

9         I, Michelle Hartman, the undersigned

10   Certified Shorthand Reporter in and for the State of

11   Texas and Registered Professional Reporter, certify

12   that the facts stated in the foregoing pages are true

13   and correct.

14             I further certify that I am neither

15   attorney or counsel for, related to, nor employed by

16   any parties to the action in which this testimony is

17   taken and, further, that I am not a relative or

18   employee of any counsel employed by the parties

19   hereto or financially interested in the action.

20             That the deposition transcript was duly

21   submitted on _____ to the witness or to

22   the attorney for the witness for examination,

23   signature, and returned to me by _____.

24

25

1              SUBSCRIBED AND SWORN TO under my hand and

2        seal of office on this _____ day of December, 2018.

3

4

5

6              Michelle Hartman, CSR, RPR

               Texas CSR 7093

7              Expiration:  12/31/19

               Veritext Legal Solutions

8              Firm Registration No. 571

               300 Throckmorton, Suite 1600

9              Ft. Worth, Texas 76102

               817-336-3042

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foreging transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

Page 91

1    A C K N O W L E D G E M E N T   O F   D E P O N E N T

2

3    I, Ms. Paige M. Merkle, do hereby acknowledge

4    I have read and examined the foregoing pages of

5    testimony, and the same is a true, correct and

6    complete transcription of the testimony given

7    by me, and any changes or corrections, if any,

8    appear in the attached errata sheet signed by me.

9

10

11

12

13

14

15

     1/31/2019                          *Paige M. Merkle*

16   Date                    Ms. Paige M. Merkle

17

18

19

20

21

22

23

24

25

Page 93

1    Capital Reporting Company

     1250 Eye Street, Northwest

2    Suite 350

     Washington, D.C. 20005

3    (202) 857-DEPO

4              E R R A T A   S H E E T

5    Case Name:   Exxon Mobil Corporation v. United States Of America

6    Witness Name:  Ms. Paige M. Merkle

7    Deposition Date:   12/6/2018

8    Job No.: 3112516

9    Page No.    Line No.     Change/Reason for Change

10

11

12

13

14

15

16

17

18

19

20

21      See attached errata sheet

22

23

24      Paige Merkle                    1/31/2019

25   Signature                          Date

## PAIGE M. MERKLE – ERRATA SHEET

Page 7, line 3 – add "/" between downstream and chemicals – transcription error

Page 8, line 3 – change "the math and economics" to "for math and economics" – transcription error

Page 12, line 14 – change "bill" to "fuel" – transcription error

Page 16, line 19 – change "OG" to "QG" – transcription error

Page 32, line 7 – change "base" to "basis" – transcription error

Page 36, line 11 – add "we" before "reimbursed" – transcription error

Page 45, line 15 – add "we" before "prepared" – transcription error

Page 45, line 16 – change "entities" to "entries" – transcription error

Page 49, line 13 – change "back" to "book" – transcription error

Page 56, lines 11 and 12 – change "gap" to "GAAP" – transcription error

Page 56, line 13 – change "YY" to "YNY" – transcription error

Page 57, line 13 – change "the" to "to" – transcription error

Page 57, lines 22 and 23 – change "Fisk" to "Fiske" – transcription error

Page 58, lines 12, 14, 15, 17, and 25 – change "Fisk" to "Fiske" – transcription error

Page 59, line 2 – change "Fisk" to "Fiske" – transcription error

Page 59, lines 3, 21, and 22 – change "FOGE" to "FOGEI" – transcription error

Page 59, line 8 –  change "hears this" to "here, it's" – transcription error

Page 60, line 9 – change "RL2plus" to "RL2 plus" – transcription error

Page 60, line 12 – change "RL2and" to "RL2 and" – transcription error

1

# EXHIBIT 4

| | |
|---|---|
| **From:** | Allred Wayne |
| **To:** | Green Andrea M |
| **Cc:** | Allred Wayne |
| **Subject:** | RE: Oatmeal Meeting notes from the May 1, 2013 meeting and updated task list |
| **Date:** | Friday, May 17, 2013 12:35:51 PM |
| **Attachments:** | AGENDA FOR CPP TEAM MEETING.doc |

Andrea,



**From:** Green Andrea M
**Sent:** Thursday, May 16, 2013 4:42 PM
**To:** Allred Wayne; Boak Roger I; Cao David Q; Darling Regina A; Eiman John F; Foyt David A; Holsworth Edwin A; Martin Bates R; McCann Robert; Rigsby Esther O; Salmon Scott D; Shen Caroline; Zamora David U; Zeller Ryan M; Wilkerson Donna C
**Subject:** RE: Oatmeal Meeting notes from the May 1, 2013 meeting and updated task list

Below is a summary of the May 1, 2013 meeting and associated task list. I have also included updates since the meeting. The next meeting will be May 22,2013. Please send agenda items by COB Monday May 20,2013.

:

The following topics were be discussed in the meeting May 1, 2013

- Summons of Qatari documents-Request contracts from claim 50.2 and 50.3 on Qatar- Caroline Shen- Summons is with TLAL for review . Gary wants to check with TLAL regarding whether these requests need to be issued as friendly summons. He would prefer them to go out as IDRs. The TP was in API meetings and was not able to review. Andrea will follow-up with Gary on the

USPROD-0252525

status. ( Current status as of May 16,2013 - Summons Issued as of May 7, 2013)

- IDRs to be issued & difficulties . Group discussion.
- Discussion :Stipulations from Allred and Eiman- status   Wayne is trying to issue the IDR  IE 880  stipulations.   John has reviewed. Wayne  broke the stipulations into categories.   (1)  For US **tax purposes -** book, tax, Malaysian Income tax, and legal;  (2) Ownership;(3) Filing of Amended Returns (4) Filing of US return as PSC and PSA (5) EPMI and Carigali not filing US return; (6) Claims position creates large amount of imputed interest (7) 2009 Carigali entered into a new PSC etc.  (Current status as of May 16,2013 - Wayne met with Gary. Stipulation IDRs were issued).
- Discussion on write up of the facts- approach & assignments  Wayne, and Buddy work on the infrastructure facts,  (Ulises should be getting in the IDR response on infrastructure) Scott work on the 483 position. Ryan and Caroline work on the change of accounting. Ryan work on the economic  substance.
- Status of the issued IDR requesting the FTC carry forward Schedule - Wayne Allred requested Gary Thompson said they didn't have them.-- discussion  - Update Gary and Wayne met on May 15th on the 2004-2005 Appeals audit statement.  Page 42 of this statement contains the FTC CF.Wayne will issue the IDR. IDR 878 issue ready to issue 5/16/2013.   Request asks for FTC generated  and FTC CF. (2) updated schedule of  FTC Sch K  of Form 1118 (3) updated schedule of FOGEI Sch I  Form 1118, (4) Summary of FTC generated by EM in Malaysia and Qatar (5) Schedule of Malaysia and Qatar creditable tax generated.(6) Historical and under the CPP claim.
- Section 1311 & 1314 - mitigating provisions- John Eiman, David Cao and Edwin Holsworth.  - in process
- Interest apportionment worksheets  and copies of the E&Y Studies for 2006-2009- Wayne Allred and Scott Salmon  in process.
- National Office attorney contact- John Eiman and David Cao John discussed his conversation with the National office.  A conference call  is  set up for Friday May 3, 2013 with Brenda Stewart and Jaime Parks. At this point we will go for informal verbal advice.Wayne suggested that we meet with the attorney's for a week and discuss the  legal positions and alternative postions.  A selection of dates will be sent out.   (Current status: Team agreed on the dates of June 4-June 7th 2013. Wayne sent out calendar invite)
- Emiri Decree No 10-1974-  Ryan Zeller discussed what he found out regarding ownership . He is still trying to find documents  John will check with ACCI to see how to obtain the 1974 and the 1977 decrees.
- Economic Substance directive - Ryan Zeller & John Eiman will frame the issue.  Ryan gave a presentation of the directive and the two prong test. Need to look at the directive to see if it applies to our tax years.
- Section 483 - pursue analysis on the services & right to use property- Scott Salmon, John Eiman and David Cao. John looked at 1964 senate report re: timber, coal,. It didn't explain why Oil and gas was not covered. Looked at the treatment of ordinary income.John will continue to pursue and see if David can assist. John will check into Section 467 on rental agreements re: imputed interest. Update. Scott sent John and David an email asking for comments on the TP use of section 483 as their support for the issue.

USPROD-0252526

- Need Presentation on pricing and the prices in the vicinity and other markets  - Discussion of the pricing for Qatar. Post train is sold FOB Qatar. not FOB Korea. waiting on data. Need to look in the contract for the sharing of production. for Qatar. Ulises will  work on who owns the facilities.
- IPG response - comments - it is posted on the server   FYI - IPG Response has also been posted to the server @ the following link:Z:\AffClaim06-07\Change in Accounting Method   Ryan will continue to work on . CAM need to address lifetime taxable income.. Wayne ran through the Lifetime taxable income scenario with EPMI share ( original ) and EPMI plus PETRONAS share. Conclusion :would never be equal because would still have depletable basis remaining after production ceased.


**TASK List I will continue to use the our task list below to keep us on track.  We will only discuss certain items from the list each week.**

1. Status of your part of the issue updates and IDRs received.

      IDRs Received; IDRs 868 & 870 - Wayne Buddy Martin  commented on

2.<u>IDRs Summary for matrix status of comments in matrix -</u> Caroline in charge of checking status

- 854,855,856,857,858,859,866,867  Scott Salmon - **completed**
- 862,863 Roger Boak -**completed**
- Harrington IDRs Andrea Green
- 868 Buddy Martin
- future IDRs issuer will add summary to the matrix after they have been reviewed
- summons- Caroline Shen, Andrea Green

3.  Status of matrix input ( look on server under team member inboxes for the matrix - names are assigned).- on-going process

4..  CFC IDR on Indonesia - Wayne Allred- **Issued**

5.  Qatar contract  review Ryan Zeller & Buddy Martin -  Buddy placed contract summaries on server under "LIMBO'

6.  Stipulation of facts- January 22,2013 email.  Met with TP  Wayne Issued IDR 880 5/13/2013 due  6/24/2013.

7.  Newly received Malaysian contracts review - Buddy Martin  - place on  server under "Limbo'

8   Previously reviewed Malaysian contracts - summary for matrix- Buddy Martin

9.  National Office attorney contact- John Eiman and David Cao. Next step is to find out who is assigned to the TAM and PLRs.  Completed May 1, 2013- Found out

USPROD-0252527

Brenda Stewart

10.  Request the FTC carry forward Schedule - Wayne Allred requested Gary Thompson said they didn't have them.Update Gary and Wayne met on May 15th on the 2004-2005 Appeals audit statement.  Page 42 of this statement contains the FTC CF.Wayne will issue the IDR. IDR 878 issue ready to issue 5/16/2013.   Request asks for FTC generated  and FTC CF. (2) updated schedule of  FTC Sch K  of Fomr 1118 (3) updated schedule of FOGEI Sch I  Form 1118, (4) Summary of FTC generated by EM in Malaysia and Qatar (5) Schedule of Maylaysia and Qatar creditable tax generated.(6) Historical and under the CPP claim.

11. Economic Compulsion- (Looking at limited to a term and if renewable indicates ownership)-John Eiman,& David Cao  in process.

12. Determination of applicability of Section 269- . For FITC purposes only cases- Caroline Shen  & Ulises Zamora  determined not applicable per Ulises. May 2013

13.Section 483 - pursue analysis on the services & right to use property- Scott Salmon, John Eiman and David Cao.- John found out William Blanchard and David Siber are assigned. John & David will pursue.John looked at 1964 senate report re: timber, coal,. It didn't explain why Oil and gas was not covered. Looked at the treatment of ordinary income.John will continue to pursue and see if David can assist. John will check into Section 467 on rental agreements re: imputed interest. Update. Scott sent John and David an email askingf for comments on the Tp use of section 483 as their support for the issue.

14. IPG contacts- need to narrow the scope on questions -   Engaging the CAM IPG. Several discussions have occurred.

15. Analyze which contract still need to be requested on Malaysia. Buddy Martin

16. Request contracts from  claim 50.2 and 50.3 on Qatar- Caroline Shen- completed  Summons  was issued May 6, 2013  is with TLAL for review

17.Section 1311 & 1314 - mitigating provisions- John Eiman & David Cao and Edwin Holsworth.  --

18. Copies of the interest apportionment worksheets  and copies of the E&Y Studies for 2006-2009- Wayne Allred and Scott Salmon  in process.

19. Look at partnership provision on Qatar  for FOGEI / FORI  - maybe can use the partnership limitation-.Ryan Zeller

20.. Eventually get TCS to work through the information provided from the Carry forward FTC schedules.  Gerry Benta -  **TABLE** until later  Wayne is in contact with Gerry Benta regarding what is in BNA.

21. More details on the depletion calculations in the past.- Buddy Martin.

USPROD-0252528

22. IDR on Abandonment CESS- more specifics on how it is an additional source of income.- Ulises Zamora & Wayne Allred -Received IDRs 872 IE  5/14/2013 .

23. IDR on Research CESS-  received IDR  873 IE  5/14/2013

24. Still missing a few more field operating agreements Andrea Green & Wayne Allred.

25.Check the contract see if taxpayer is claiming Qatari tax. Need to find out who paid the tax, Ryan Zeller & Buddy Martin.

26. Need to request in an IDR whether Qatar has total ownership of the reserves.- or confirm in stipulations

27. Need to request in an IDR who owns the infrastructure in Qatar. or confirm in stipulations.

28. need IDR on infrastructure financing.

29. Investigate more  regarding the Indian contract - later trains where not an equity ownership like Japan.

30. Revenue Procedure 2011-14."  CAM"John Eiman and David Cao will take a closer look.

31. Write IDR for financing documents. How the financing flows into the DFAs.  Ask for same in 2010 & 2011.

32. Economic Substance- IPG in Washington. Jeff Mitchell and Bill Sabin- John Eiman will check into.

33. Need Presentation on pricing and the prices in the vicinity and other markets.

.

This is the task list that we discussed and I have made additions  and updates from the last meeting on  May 1, 2013. .

Thanks
Andrea


Andrea M. Green
Engineering Team Lead
LB&I Territory 12
Team 1832
Houston, Texas
713-680-5338

USPROD-0252529

App. 076

USPROD-0252530

# EXHIBIT 5

United States Code Annotated
  Title 26. Internal Revenue Code (Refs & Annos)
    Subtitle A. Income Taxes (Refs & Annos)
      Chapter 1. Normal Taxes and Surtaxes (Refs & Annos)
        Subchapter B. Computation of Taxable Income
          Part VI. Itemized Deductions for Individuals and Corporations (Refs & Annos)

This section has been updated. Click here for the updated version.

26 U.S.C.A. § 199, I.R.C. § 199

§ 199. Income attributable to domestic production activities

Effective: [See Text Amendments] to May 16, 2006

**(a) Allowance of deduction.--**

**(1) In general.**--There shall be allowed as a deduction an amount equal to 9 percent of the lesser of--

**(A)** the qualified production activities income of the taxpayer for the taxable year, or

**(B)** taxable income (determined without regard to this section) for the taxable year.

**(2) Phasein.**--In the case of any taxable year beginning after 2004 and before 2010, paragraph (1) and subsection (d) (1) shall be applied by substituting for the percentage contained therein the transition percentage determined under the following table:

| For taxable years transitiontrbeginning in: | The percentage is: |
| --- | --- |
| 2005 or 2006 | 3 |
| 2007, 2008, or 2009 | 6. |

**(b) Deduction limited to wages paid.--**

**(1) In general.**--The amount of the deduction allowable under subsection (a) for any taxable year shall not exceed 50 percent of the W-2 wages of the taxpayer for the taxable year.

**(2) W-2 wages.**--For purposes of this section, the term "W-2 wages" means, with respect to any person for any taxable year of such person, the sum of the amounts described in paragraphs (3) and (8) of section 6051(a) paid by such person with respect to employment of employees by such person during the calendar year ending during such taxable

year. Such term shall not include any amount which is not properly included in a return filed with the Social Security Administration on or before the 60th day after the due date (including extensions) for such return.

**(3) Acquisitions and dispositions.**--The Secretary shall provide for the application of this subsection in cases where the taxpayer acquires, or disposes of, the major portion of a trade or business or the major portion of a separate unit of a trade or business during the taxable year.

**(c) Qualified production activities income.**--For purposes of this section--

**(1) In general.**--The term "qualified production activities income" for any taxable year means an amount equal to the excess (if any) of--

**(A)** the taxpayer's domestic production gross receipts for such taxable year, over

**(B)** the sum of--

**(i)** the cost of goods sold that are allocable to such receipts, and

**(ii)** other expenses, losses, or deductions (other than the deduction allowed under this section), which are properly allocable to such receipts.

**(2) Allocation method.**--The Secretary shall prescribe rules for the proper allocation of items described in paragraph (1) for purposes of determining qualified production activities income. Such rules shall provide for the proper allocation of items whether or not such items are directly allocable to domestic production gross receipts.

**(3) Special rules for determining costs.**--

**(A) In general.**--For purposes of determining costs under clause (i) of paragraph (1)(B), any item or service brought into the United States shall be treated as acquired by purchase, and its cost shall be treated as not less than its value immediately after it entered the United States. A similar rule shall apply in determining the adjusted basis of leased or rented property where the lease or rental gives rise to domestic production gross receipts.

**(B) Exports for further manufacture.**--In the case of any property described in subparagraph (A) that had been exported by the taxpayer for further manufacture, the increase in cost or adjusted basis under subparagraph (A) shall not exceed the difference between the value of the property when exported and the value of the property when brought back into the United States after the further manufacture.

**(4) Domestic production gross receipts.**--

**(A) In general.**--The term "domestic production gross receipts" means the gross receipts of the taxpayer which are derived from--

**(i)** any lease, rental, license, sale, exchange, or other disposition of--

**(I)** qualifying production property which was manufactured, produced, grown, or extracted by the taxpayer in whole or in significant part within the United States,

**(II)** any qualified film produced by the taxpayer, or

**(III)** electricity, natural gas, or potable water produced by the taxpayer in the United States,

**(ii)** in the case of a taxpayer engaged in the active conduct of a construction trade or business, construction of real property performed in the United States by the taxpayer in the ordinary course of such trade or business, or

**(iii)** in the case of a taxpayer engaged in the active conduct of an engineering or architectural services trade or business, engineering or architectural services performed in the United States by the taxpayer in the ordinary course of such trade or business with respect to the construction of real property in the United States.

**(B) Exceptions.**--Such term shall not include gross receipts of the taxpayer which are derived from--

**(i)** the sale of food and beverages prepared by the taxpayer at a retail establishment,

**(ii)** the transmission or distribution of electricity, natural gas, or potable water, or

**(iii)** the lease, rental, license, sale, exchange, or other disposition of land.

**(C) Special rule for certain Government contracts.**--Gross receipts derived from the manufacture or production of any property described in subparagraph (A)(i)(I) shall be treated as meeting the requirements of subparagraph (A)(i) if--

**(i)** such property is manufactured or produced by the taxpayer pursuant to a contract with the Federal Government, and

**(ii)** the Federal Acquisition Regulation requires that title or risk of loss with respect to such property be transferred to the Federal Government before the manufacture or production of such property is complete.

**(D) Partnerships owned by expanded affiliated groups.**--For purposes of this paragraph, if all of the interests in the capital and profits of a partnership are owned by members of a single expanded affiliated group at all times during

the taxable year of such partnership, the partnership and all members of such group shall be treated as a single taxpayer during such period.

**(5) Qualifying production property.**--The term "qualifying production property" means--

**(A)** tangible personal property,

**(B)** any computer software, and

**(C)** any property described in section 168(f)(4).

**(6) Qualified film.**--The term "qualified film" means any property described in section 168(f)(3) if not less than 50 percent of the total compensation relating to the production of such property is compensation for services performed in the United States by actors, production personnel, directors, and producers. Such term does not include property with respect to which records are required to be maintained under section 2257 of title 18, United States Code.

**(7) Related persons.--**

**(A) In general.**--The term "domestic production gross receipts" shall not include any gross receipts of the taxpayer derived from property leased, licensed, or rented by the taxpayer for use by any related person.

**(B) Related person.**--For purposes of subparagraph (A), a person shall be treated as related to another person if such persons are treated as a single employer under subsection (a) or (b) of section 52 or subsection (m) or (o) of section 414, except that determinations under subsections (a) and (b) of section 52 shall be made without regard to section 1563(b).

**(d) Definitions and special rules.--**

**(1) Application of section to pass-thru entities.--**

**(A) Partnerships and S corporations.**--In the case of a partnership or S corporation--

**(i)** this section shall be applied at the partner or shareholder level,

**(ii)** each partner or shareholder shall take into account such person's allocable share of each item described in subparagraph (A) or (B) of subsection (c)(1) (determined without regard to whether the items described in such subparagraph (A) exceed the items described in such subparagraph (B)), and

**(iii)** each partner or shareholder shall be treated for purposes of subsection (b) as having W-2 wages for the taxable year in an amount equal to the lesser of--

**(I)** such person's allocable share of the W-2 wages of the partnership or S corporation for the taxable year (as determined under regulations prescribed by the Secretary), or

**(II)** 2 times 9 percent of so much of such person's qualified production activities income as is attributable to items allocated under clause (ii) for the taxable year.

**(B) Trusts and estates.**--In the case of a trust or estate--

**(i)** the items referred to in subparagraph (A)(ii) (as determined therein) and the W-2 wages of the trust or estate for the taxable year, shall be apportioned between the beneficiaries and the fiduciary (and among the beneficiaries) under regulations prescribed by the Secretary, and

**(ii)** for purposes of paragraph (2), adjusted gross income of the trust or estate shall be determined as provided in section 67(e) with the adjustments described in such paragraph.

**(C) Regulations.**--The Secretary may prescribe rules requiring or restricting the allocation of items and wages under this paragraph and may prescribe such reporting requirements as the Secretary determines appropriate.

**(2) Application to individuals.**--In the case of an individual, subsection (a)(1)(B) shall be applied by substituting "adjusted gross income" for "taxable income". For purposes of the preceding sentence, adjusted gross income shall be determined--

**(A)** after application of sections 86, 135, 137, 219, 221, 222, and 469, and

**(B)** without regard to this section.

**(3) Agricultural and horticultural cooperatives.**--

**(A) Deduction allowed to patrons.**--Any person who receives a qualified payment from a specified agricultural or horticultural cooperative shall be allowed for the taxable year in which such payment is received a deduction under subsection (a) equal to the portion of the deduction allowed under subsection (a) to such cooperative which is--

**(i)** allowed with respect to the portion of the qualified production activities income to which such payment is attributable, and

(ii) identified by such cooperative in a written notice mailed to such person during the payment period described in section 1382(d).

**(B) Cooperative denied deduction for portion of qualified payments.**--The taxable income of a specified agricultural or horticultural cooperative shall not be reduced under section 1382 by reason of that portion of any qualified payment as does not exceed the deduction allowable under subparagraph (A) with respect to such payment.

**(C) Taxable income of cooperatives determined without regard to certain deductions.**--For purposes of this section, the taxable income of a specified agricultural or horticultural cooperative shall be computed without regard to any deduction allowable under subsection (b) or (c) of section 1382 (relating to patronage dividends, per-unit retain allocations, and nonpatronage distributions).

**(D) Special rule for marketing cooperatives.**--For purposes of this section, a specified agricultural or horticultural cooperative described in subparagraph (F)(ii) shall be treated as having manufactured, produced, grown, or extracted in whole or significant part any qualifying production property marketed by the organization which its patrons have so manufactured, produced, grown, or extracted.

**(E) Qualified payment.**--For purposes of this paragraph, the term "qualified payment" means, with respect to any person, any amount which--

(i) is described in paragraph (1) or (3) of section 1385(a),

(ii) is received by such person from a specified agricultural or horticultural cooperative, and

(iii) is attributable to qualified production activities income with respect to which a deduction is allowed to such cooperative under subsection (a).

**(F) Specified agricultural or horticultural cooperative.**--For purposes of this paragraph, the term "specified agricultural or horticultural cooperative" means an organization to which part I of subchapter T applies which is engaged--

(i) in the manufacturing, production, growth, or extraction in whole or significant part of any agricultural or horticultural product, or

(ii) in the marketing of agricultural or horticultural products.

**(4) Special rule for affiliated groups.**--

**(A) In general.**--All members of an expanded affiliated group shall be treated as a single corporation for purposes of this section.

**(B) Expanded affiliated group.**--For purposes of this section, the term "expanded affiliated group" means an affiliated group as defined in section 1504(a), determined--

**(i)** by substituting "more than 50 percent" for "at least 80 percent" each place it appears, and

**(ii)** without regard to paragraphs (2) and (4) of section 1504(b).

**(C) Allocation of deduction.**--Except as provided in regulations, the deduction under subsection (a) shall be allocated among the members of the expanded affiliated group in proportion to each member's respective amount (if any) of qualified production activities income.

**(5) Trade or business requirement.**--This section shall be applied by only taking into account items which are attributable to the actual conduct of a trade or business.

**(6) Coordination with minimum tax.**--For purposes of determining alternative minimum taxable income under section 55--

**(A)** qualified production activities income shall be determined without regard to any adjustments under sections 56 through 59, and

**(B)** in the case of a corporation, subsection (a)(1)(B) shall be applied by substituting "alternative minimum taxable income" for "taxable income".

**(7) Unrelated business taxable income.**--For purposes of determining the tax imposed by section 511, subsection (a)(1)(B) shall be applied by substituting "unrelated business taxable income" for "taxable income".

**(8) Regulations.**--The Secretary shall prescribe such regulations as are necessary to carry out the purposes of this section, including regulations which prevent more than 1 taxpayer from being allowed a deduction under this section with respect to any activity described in subsection (c)(4)(A)(i).

## CREDIT(S)

(Added Pub.L. 108-357, Title I, § 102(a), Oct. 22, 2004, 118 Stat. 1424, and amended Pub.L. 109-135, Title IV, § 403(a)(1) to (13), Dec. 21, 2005, 119 Stat. 2615.)

26 U.S.C.A. § 199, 26 USCA § 199
Current through P.L. 116-8. Also includes P.L. 116-10 through 116-15. Title 26 current through 116-16.

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
   Title 26. Internal Revenue Code (Refs & Annos)
     Subtitle A. Income Taxes (Refs & Annos)
       Chapter 1. Normal Taxes and Surtaxes (Refs & Annos)
         Subchapter B. Computation of Taxable Income
           Part VI. Itemized Deductions for Individuals and Corporations (Refs & Annos)

This section has been updated. Click here for the updated version.

26 U.S.C.A. § 199, I.R.C. § 199

§ 199. Income attributable to domestic production activities

Effective: May 17, 2006 to December 19, 2006

**(a) Allowance of deduction.--**

**(1) In general.**--There shall be allowed as a deduction an amount equal to 9 percent of the lesser of--

**(A)** the qualified production activities income of the taxpayer for the taxable year, or

**(B)** taxable income (determined without regard to this section) for the taxable year.

**(2) Phasein.**--In the case of any taxable year beginning after 2004 and before 2010, paragraph (1) shall be applied by substituting for the percentage contained therein the transition percentage determined under the following table:

| For taxable years transitiontrbeginning in: | The percentage is: |
| --- | --- |
| 2005 or 2006 | 3 |
| 2007, 2008, or 2009 | 6. |

**(b) Deduction limited to wages paid.--**

**(1) In general.**--The amount of the deduction allowable under subsection (a) for any taxable year shall not exceed 50 percent of the W-2 wages of the taxpayer for the taxable year.

**(2) W-2 wages.**--For purposes of this section--

**(A) In general.**--The term "W-2 wages" means, with respect to any person for any taxable year of such person, the sum of the amounts described in paragraphs (3) and (8) of section 6051(a) paid by such person with respect to employment of employees by such person during the calendar year ending during such taxable year.

**(B) Limitation to wages attributable to domestic production.**--Such term shall not include any amount which is not properly allocable to domestic production gross receipts for purposes of subsection (c)(1).

**(C) Return requirement.**--Such term shall not include any amount which is not properly included in a return filed with the Social Security Administration on or before the 60th day after the due date (including extensions) for such return.

**(3) Acquisitions and dispositions.**--The Secretary shall provide for the application of this subsection in cases where the taxpayer acquires, or disposes of, the major portion of a trade or business or the major portion of a separate unit of a trade or business during the taxable year.

**(c) Qualified production activities income.**--For purposes of this section--

**(1) In general.**--The term "qualified production activities income" for any taxable year means an amount equal to the excess (if any) of--

**(A)** the taxpayer's domestic production gross receipts for such taxable year, over

**(B)** the sum of--

**(i)** the cost of goods sold that are allocable to such receipts, and

**(ii)** other expenses, losses, or deductions (other than the deduction allowed under this section), which are properly allocable to such receipts.

**(2) Allocation method.**--The Secretary shall prescribe rules for the proper allocation of items described in paragraph (1) for purposes of determining qualified production activities income. Such rules shall provide for the proper allocation of items whether or not such items are directly allocable to domestic production gross receipts.

**(3) Special rules for determining costs.**--

**(A) In general.**--For purposes of determining costs under clause (i) of paragraph (1)(B), any item or service brought into the United States shall be treated as acquired by purchase, and its cost shall be treated as not less than its value immediately after it entered the United States. A similar rule shall apply in determining the adjusted basis of leased or rented property where the lease or rental gives rise to domestic production gross receipts.

**(B) Exports for further manufacture.**--In the case of any property described in subparagraph (A) that had been exported by the taxpayer for further manufacture, the increase in cost or adjusted basis under subparagraph (A) shall not exceed the difference between the value of the property when exported and the value of the property when brought back into the United States after the further manufacture.

**(4) Domestic production gross receipts.**--

**(A) In general.**--The term "domestic production gross receipts" means the gross receipts of the taxpayer which are derived from--

**(i)** any lease, rental, license, sale, exchange, or other disposition of--

**(I)** qualifying production property which was manufactured, produced, grown, or extracted by the taxpayer in whole or in significant part within the United States,

**(II)** any qualified film produced by the taxpayer, or

**(III)** electricity, natural gas, or potable water produced by the taxpayer in the United States,

**(ii)** in the case of a taxpayer engaged in the active conduct of a construction trade or business, construction of real property performed in the United States by the taxpayer in the ordinary course of such trade or business, or

**(iii)** in the case of a taxpayer engaged in the active conduct of an engineering or architectural services trade or business, engineering or architectural services performed in the United States by the taxpayer in the ordinary course of such trade or business with respect to the construction of real property in the United States.

**(B) Exceptions.**--Such term shall not include gross receipts of the taxpayer which are derived from--

**(i)** the sale of food and beverages prepared by the taxpayer at a retail establishment,

**(ii)** the transmission or distribution of electricity, natural gas, or potable water, or

**(iii)** the lease, rental, license, sale, exchange, or other disposition of land.

**(C) Special rule for certain Government contracts.**--Gross receipts derived from the manufacture or production of any property described in subparagraph (A)(i)(I) shall be treated as meeting the requirements of subparagraph (A)(i) if--

**(i)** such property is manufactured or produced by the taxpayer pursuant to a contract with the Federal Government, and

**(ii)** the Federal Acquisition Regulation requires that title or risk of loss with respect to such property be transferred to the Federal Government before the manufacture or production of such property is complete.

**(D) Partnerships owned by expanded affiliated groups.**--For purposes of this paragraph, if all of the interests in the capital and profits of a partnership are owned by members of a single expanded affiliated group at all times during the taxable year of such partnership, the partnership and all members of such group shall be treated as a single taxpayer during such period.

**(5) Qualifying production property.**--The term "qualifying production property" means--

**(A)** tangible personal property,

**(B)** any computer software, and

**(C)** any property described in section 168(f)(4).

**(6) Qualified film.**--The term "qualified film" means any property described in section 168(f)(3) if not less than 50 percent of the total compensation relating to the production of such property is compensation for services performed in the United States by actors, production personnel, directors, and producers. Such term does not include property with respect to which records are required to be maintained under section 2257 of title 18, United States Code.

**(7) Related persons.**--

**(A) In general.**--The term "domestic production gross receipts" shall not include any gross receipts of the taxpayer derived from property leased, licensed, or rented by the taxpayer for use by any related person.

**(B) Related person.**--For purposes of subparagraph (A), a person shall be treated as related to another person if such persons are treated as a single employer under subsection (a) or (b) of section 52 or subsection (m) or (o) of section 414, except that determinations under subsections (a) and (b) of section 52 shall be made without regard to section 1563(b).

**(d) Definitions and special rules.**--

**(1) Application of section to pass-thru entities.**--

**(A) Partnerships and S corporations.**--In the case of a partnership or S corporation--

**(i)** this section shall be applied at the partner or shareholder level,

**(ii)** each partner or shareholder shall take into account such person's allocable share of each item described in subparagraph (A) or (B) of subsection (c)(1) (determined without regard to whether the items described in such subparagraph (A) exceed the items described in such subparagraph (B)), and

**(iii)** each partner or shareholder shall be treated for purposes of subsection (b) as having W-2 wages for the taxable year in an amount equal to such person's allocable share of the W-2 wages of the partnership or S corporation for the taxable year (as determined under regulations prescribed by the Secretary).

**(B) Trusts and estates.**--In the case of a trust or estate--

**(i)** the items referred to in subparagraph (A)(ii) (as determined therein) and the W-2 wages of the trust or estate for the taxable year, shall be apportioned between the beneficiaries and the fiduciary (and among the beneficiaries) under regulations prescribed by the Secretary, and

**(ii)** for purposes of paragraph (2), adjusted gross income of the trust or estate shall be determined as provided in section 67(e) with the adjustments described in such paragraph.

**(C) Regulations.**--The Secretary may prescribe rules requiring or restricting the allocation of items and wages under this paragraph and may prescribe such reporting requirements as the Secretary determines appropriate.

**(2) Application to individuals.**--In the case of an individual, subsection (a)(1)(B) shall be applied by substituting "adjusted gross income" for "taxable income". For purposes of the preceding sentence, adjusted gross income shall be determined--

**(A)** after application of sections 86, 135, 137, 219, 221, 222, and 469, and

**(B)** without regard to this section.

**(3) Agricultural and horticultural cooperatives.**--

**(A) Deduction allowed to patrons.**--Any person who receives a qualified payment from a specified agricultural or horticultural cooperative shall be allowed for the taxable year in which such payment is received a deduction under subsection (a) equal to the portion of the deduction allowed under subsection (a) to such cooperative which is--

**(i)** allowed with respect to the portion of the qualified production activities income to which such payment is attributable, and

(ii) identified by such cooperative in a written notice mailed to such person during the payment period described in section 1382(d).

**(B) Cooperative denied deduction for portion of qualified payments.**--The taxable income of a specified agricultural or horticultural cooperative shall not be reduced under section 1382 by reason of that portion of any qualified payment as does not exceed the deduction allowable under subparagraph (A) with respect to such payment.

**(C) Taxable income of cooperatives determined without regard to certain deductions.**--For purposes of this section, the taxable income of a specified agricultural or horticultural cooperative shall be computed without regard to any deduction allowable under subsection (b) or (c) of section 1382 (relating to patronage dividends, per-unit retain allocations, and nonpatronage distributions).

**(D) Special rule for marketing cooperatives.**--For purposes of this section, a specified agricultural or horticultural cooperative described in subparagraph (F)(ii) shall be treated as having manufactured, produced, grown, or extracted in whole or significant part any qualifying production property marketed by the organization which its patrons have so manufactured, produced, grown, or extracted.

**(E) Qualified payment.**--For purposes of this paragraph, the term "qualified payment" means, with respect to any person, any amount which--

(i) is described in paragraph (1) or (3) of section 1385(a),

(ii) is received by such person from a specified agricultural or horticultural cooperative, and

(iii) is attributable to qualified production activities income with respect to which a deduction is allowed to such cooperative under subsection (a).

**(F) Specified agricultural or horticultural cooperative.**--For purposes of this paragraph, the term "specified agricultural or horticultural cooperative" means an organization to which part I of subchapter T applies which is engaged--

(i) in the manufacturing, production, growth, or extraction in whole or significant part of any agricultural or horticultural product, or

(ii) in the marketing of agricultural or horticultural products.

**(4) Special rule for affiliated groups.--**

**(A) In general.**--All members of an expanded affiliated group shall be treated as a single corporation for purposes of this section.

**(B) Expanded affiliated group.**--For purposes of this section, the term "expanded affiliated group" means an affiliated group as defined in section 1504(a), determined--

**(i)** by substituting "more than 50 percent" for "at least 80 percent" each place it appears, and

**(ii)** without regard to paragraphs (2) and (4) of section 1504(b).

**(C) Allocation of deduction.**--Except as provided in regulations, the deduction under subsection (a) shall be allocated among the members of the expanded affiliated group in proportion to each member's respective amount (if any) of qualified production activities income.

**(5) Trade or business requirement.**--This section shall be applied by only taking into account items which are attributable to the actual conduct of a trade or business.

**(6) Coordination with minimum tax.**--For purposes of determining alternative minimum taxable income under section 55--

**(A)** qualified production activities income shall be determined without regard to any adjustments under sections 56 through 59, and

**(B)** in the case of a corporation, subsection (a)(1)(B) shall be applied by substituting "alternative minimum taxable income" for "taxable income".

**(7) Unrelated business taxable income.**--For purposes of determining the tax imposed by section 511, subsection (a)(1)(B) shall be applied by substituting "unrelated business taxable income" for "taxable income".

**(8) Regulations.**--The Secretary shall prescribe such regulations as are necessary to carry out the purposes of this section, including regulations which prevent more than 1 taxpayer from being allowed a deduction under this section with respect to any activity described in subsection (c)(4)(A)(i).

## CREDIT(S)

(Added Pub.L. 108-357, Title I, § 102(a), Oct. 22, 2004, 118 Stat. 1424, and amended Pub.L. 109-135, Title IV, § 403(a)(1) to (13), Dec. 21, 2005, 119 Stat. 2615; Pub.L. 109-222, Title V, § 514(a), (b), May 17, 2006, 120 Stat. 366.)

26 U.S.C.A. § 199, 26 USCA § 199
Current through P.L. 116-8. Also includes P.L. 116-10 through 116-15. Title 26 current through 116-16.

---

**End of Document**          © 2019 Thomson Reuters. No claim to original U.S. Government Works.

---

United States Code Annotated
   Title 26. Internal Revenue Code (Refs & Annos)
      Subtitle A. Income Taxes (Refs & Annos)
         Chapter 1. Normal Taxes and Surtaxes (Refs & Annos)
            Subchapter B. Computation of Taxable Income
               Part VI. Itemized Deductions for Individuals and Corporations (Refs & Annos)

---

This section has been updated. Click here for the updated version.

26 U.S.C.A. § 199, I.R.C. § 199

§ 199. Income attributable to domestic production activities

Effective: December 20, 2006 to October 2, 2008

**(a) Allowance of deduction.--**

**(1) In general.**--There shall be allowed as a deduction an amount equal to 9 percent of the lesser of--

**(A)** the qualified production activities income of the taxpayer for the taxable year, or

**(B)** taxable income (determined without regard to this section) for the taxable year.

**(2) Phasein.**--In the case of any taxable year beginning after 2004 and before 2010, paragraph (1) shall be applied by substituting for the percentage contained therein the transition percentage determined under the following table:

| For taxable years transition beginning in: | The percentage is: |
| --- | --- |
| 2005 or 2006................................................................................................................ | 3 |
| 2007, 2008, or 2009...................................................................................................... | 6. |

**(b) Deduction limited to wages paid.--**

**(1) In general.**--The amount of the deduction allowable under subsection (a) for any taxable year shall not exceed 50 percent of the W-2 wages of the taxpayer for the taxable year.

**(2) W-2 wages.**--For purposes of this section--

**(A) In general.**--The term "W-2 wages" means, with respect to any person for any taxable year of such person, the sum of the amounts described in paragraphs (3) and (8) of section 6051(a) paid by such person with respect to employment of employees by such person during the calendar year ending during such taxable year.

---

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

**(B) Limitation to wages attributable to domestic production.**--Such term shall not include any amount which is not properly allocable to domestic production gross receipts for purposes of subsection (c)(1).

**(C) Return requirement.**--Such term shall not include any amount which is not properly included in a return filed with the Social Security Administration on or before the 60th day after the due date (including extensions) for such return.

**(3) Acquisitions and dispositions.**--The Secretary shall provide for the application of this subsection in cases where the taxpayer acquires, or disposes of, the major portion of a trade or business or the major portion of a separate unit of a trade or business during the taxable year.

**(c) Qualified production activities income.**--For purposes of this section--

**(1) In general.**--The term "qualified production activities income" for any taxable year means an amount equal to the excess (if any) of--

**(A)** the taxpayer's domestic production gross receipts for such taxable year, over

**(B)** the sum of--

    **(i)** the cost of goods sold that are allocable to such receipts, and

    **(ii)** other expenses, losses, or deductions (other than the deduction allowed under this section), which are properly allocable to such receipts.

    **[(iii)** Redesignated (ii)]

**(2) Allocation method.**--The Secretary shall prescribe rules for the proper allocation of items described in paragraph (1) for purposes of determining qualified production activities income. Such rules shall provide for the proper allocation of items whether or not such items are directly allocable to domestic production gross receipts.

**(3) Special rules for determining costs.**--

**(A) In general.**--For purposes of determining costs under clause (i) of paragraph (1)(B), any item or service brought into the United States shall be treated as acquired by purchase, and its cost shall be treated as not less than its value immediately after it entered the United States. A similar rule shall apply in determining the adjusted basis of leased or rented property where the lease or rental gives rise to domestic production gross receipts.

**(B) Exports for further manufacture.**--In the case of any property described in subparagraph (A) that had been exported by the taxpayer for further manufacture, the increase in cost or adjusted basis under subparagraph (A) shall not exceed the difference between the value of the property when exported and the value of the property when brought back into the United States after the further manufacture.

**(4) Domestic production gross receipts.--**

**(A) In general.**--The term "domestic production gross receipts" means the gross receipts of the taxpayer which are derived from--

**(i)** any lease, rental, license, sale, exchange, or other disposition of--

**(I)** qualifying production property which was manufactured, produced, grown, or extracted by the taxpayer in whole or in significant part within the United States,

**(II)** any qualified film produced by the taxpayer, or

**(III)** electricity, natural gas, or potable water produced by the taxpayer in the United States,

**(ii)** in the case of a taxpayer engaged in the active conduct of a construction trade or business, construction of real property performed in the United States by the taxpayer in the ordinary course of such trade or business, or

**(iii)** in the case of a taxpayer engaged in the active conduct of an engineering or architectural services trade or business, engineering or architectural services performed in the United States by the taxpayer in the ordinary course of such trade or business with respect to the construction of real property in the United States.

**(B) Exceptions.**--Such term shall not include gross receipts of the taxpayer which are derived from--

**(i)** the sale of food and beverages prepared by the taxpayer at a retail establishment,

**(ii)** the transmission or distribution of electricity, natural gas, or potable water, or

**(iii)** the lease, rental, license, sale, exchange, or other disposition of land.

**(C) Special rule for certain Government contracts.**--Gross receipts derived from the manufacture or production of any property described in subparagraph (A)(i)(I) shall be treated as meeting the requirements of subparagraph (A)(i) if--

**(i)** such property is manufactured or produced by the taxpayer pursuant to a contract with the Federal Government, and

**(ii)** the Federal Acquisition Regulation requires that title or risk of loss with respect to such property be transferred to the Federal Government before the manufacture or production of such property is complete.

**(D) Partnerships owned by expanded affiliated groups.**--For purposes of this paragraph, if all of the interests in the capital and profits of a partnership are owned by members of a single expanded affiliated group at all times during the taxable year of such partnership, the partnership and all members of such group shall be treated as a single taxpayer during such period.

**(5) Qualifying production property.**--The term "qualifying production property" means--

**(A)** tangible personal property,

**(B)** any computer software, and

**(C)** any property described in section 168(f)(4).

**(6) Qualified film.**--The term "qualified film" means any property described in section 168(f)(3) if not less than 50 percent of the total compensation relating to the production of such property is compensation for services performed in the United States by actors, production personnel, directors, and producers. Such term does not include property with respect to which records are required to be maintained under section 2257 of title 18, United States Code.

**(7) Related persons.**--

**(A) In general.**--The term "domestic production gross receipts" shall not include any gross receipts of the taxpayer derived from property leased, licensed, or rented by the taxpayer for use by any related person.

**(B) Related person.**--For purposes of subparagraph (A), a person shall be treated as related to another person if such persons are treated as a single employer under subsection (a) or (b) of section 52 or subsection (m) or (o) of section 414, except that determinations under subsections (a) and (b) of section 52 shall be made without regard to section 1563(b).

**(d) Definitions and special rules.**--

**(1) Application of section to pass-thru entities.**--

**(A) Partnerships and S corporations.**--In the case of a partnership or S corporation--

**(i)** this section shall be applied at the partner or shareholder level,

**(ii)** each partner or shareholder shall take into account such person's allocable share of each item described in subparagraph (A) or (B) of subsection (c)(1) (determined without regard to whether the items described in such subparagraph (A) exceed the items described in such subparagraph (B)), and

**(iii)** each partner or shareholder shall be treated for purposes of subsection (b) as having W-2 wages for the taxable year in an amount equal to such person's allocable share of the W-2 wages of the partnership or S corporation for the taxable year (as determined under regulations prescribed by the Secretary).

**(B) Trusts and estates.**--In the case of a trust or estate--

**(i)** the items referred to in subparagraph (A)(ii) (as determined therein) and the W-2 wages of the trust or estate for the taxable year, shall be apportioned between the beneficiaries and the fiduciary (and among the beneficiaries) under regulations prescribed by the Secretary, and

**(ii)** for purposes of paragraph (2), adjusted gross income of the trust or estate shall be determined as provided in section 67(e) with the adjustments described in such paragraph.

**(C) Regulations.**--The Secretary may prescribe rules requiring or restricting the allocation of items and wages under this paragraph and may prescribe such reporting requirements as the Secretary determines appropriate.

**(2) Application to individuals.**--In the case of an individual, subsection (a)(1)(B) shall be applied by substituting "adjusted gross income" for "taxable income". For purposes of the preceding sentence, adjusted gross income shall be determined--

**(A)** after application of sections 86, 135, 137, 219, 221, 222, and 469, and

**(B)** without regard to this section.

**(3) Agricultural and horticultural cooperatives.**--

**(A) Deduction allowed to patrons.**--Any person who receives a qualified payment from a specified agricultural or horticultural cooperative shall be allowed for the taxable year in which such payment is received a deduction under subsection (a) equal to the portion of the deduction allowed under subsection (a) to such cooperative which is--

**(i)** allowed with respect to the portion of the qualified production activities income to which such payment is attributable, and

**(ii)** identified by such cooperative in a written notice mailed to such person during the payment period described in section 1382(d).

**(B) Cooperative denied deduction for portion of qualified payments.**--The taxable income of a specified agricultural or horticultural cooperative shall not be reduced under section 1382 by reason of that portion of any qualified payment as does not exceed the deduction allowable under subparagraph (A) with respect to such payment.

**(C) Taxable income of cooperatives determined without regard to certain deductions.**--For purposes of this section, the taxable income of a specified agricultural or horticultural cooperative shall be computed without regard to any deduction allowable under subsection (b) or (c) of section 1382 (relating to patronage dividends, per-unit retain allocations, and nonpatronage distributions).

**(D) Special rule for marketing cooperatives.**--For purposes of this section, a specified agricultural or horticultural cooperative described in subparagraph (F)(ii) shall be treated as having manufactured, produced, grown, or extracted in whole or significant part any qualifying production property marketed by the organization which its patrons have so manufactured, produced, grown, or extracted.

**(E) Qualified payment.**--For purposes of this paragraph, the term "qualified payment" means, with respect to any person, any amount which--

**(i)** is described in paragraph (1) or (3) of section 1385(a),

**(ii)** is received by such person from a specified agricultural or horticultural cooperative, and

**(iii)** is attributable to qualified production activities income with respect to which a deduction is allowed to such cooperative under subsection (a).

**(F) Specified agricultural or horticultural cooperative.**--For purposes of this paragraph, the term "specified agricultural or horticultural cooperative" means an organization to which part I of subchapter T applies which is engaged--

**(i)** in the manufacturing, production, growth, or extraction in whole or significant part of any agricultural or horticultural product, or

**(ii)** in the marketing of agricultural or horticultural products.

**(4) Special rule for affiliated groups.--**

**(A) In general.**--All members of an expanded affiliated group shall be treated as a single corporation for purposes of this section.

**(B) Expanded affiliated group.**--For purposes of this section, the term "expanded affiliated group" means an affiliated group as defined in section 1504(a), determined--

    **(i)** by substituting "more than 50 percent" for "at least 80 percent" each place it appears, and

    **(ii)** without regard to paragraphs (2) and (4) of section 1504(b).

**(C) Allocation of deduction.**--Except as provided in regulations, the deduction under subsection (a) shall be allocated among the members of the expanded affiliated group in proportion to each member's respective amount (if any) of qualified production activities income.

**(5) Trade or business requirement.**--This section shall be applied by only taking into account items which are attributable to the actual conduct of a trade or business.

**(6) Coordination with minimum tax.**--For purposes of determining alternative minimum taxable income under section 55--

**(A)** qualified production activities income shall be determined without regard to any adjustments under sections 56 through 59, and

**(B)** in the case of a corporation, subsection (a)(1)(B) shall be applied by substituting "alternative minimum taxable income" for "taxable income".

**(7) Unrelated business taxable income.**--For purposes of determining the tax imposed by section 511, subsection (a)(1)(B) shall be applied by substituting "unrelated business taxable income" for "taxable income".

**(8) Treatment of activities in Puerto Rico.**--

**(A) In general.**--In the case of any taxpayer with gross receipts for any taxable year from sources within the Commonwealth of Puerto Rico, if all of such receipts are taxable under section 1 or 11 for such taxable year, then for purposes of determining the domestic production gross receipts of such taxpayer for such taxable year under subsection (c)(4), the term "United States" shall include the Commonwealth of Puerto Rico.

**(B) Special rule for applying wage limitation.**--In the case of any taxpayer described in subparagraph (A), for purposes of applying the limitation under subsection (b) for any taxable year, the determination of W-2 wages of such taxpayer shall be made without regard to any exclusion under section 3401(a)(8) for remuneration paid for services performed in Puerto Rico.

**(C) Termination.**--This paragraph shall apply only with respect to the first 2 taxable years of the taxpayer beginning after December 31, 2005, and before January 1, 2008.

**(9) Regulations.**--The Secretary shall prescribe such regulations as are necessary to carry out the purposes of this section, including regulations which prevent more than 1 taxpayer from being allowed a deduction under this section with respect to any activity described in subsection (c)(4)(A)(i).

## CREDIT(S)

(Added Pub.L. 108-357, Title I, § 102(a), Oct. 22, 2004, 118 Stat. 1424, and amended Pub.L. 109-135, Title IV, § 403(a)(1) to (13), Dec. 21, 2005, 119 Stat. 2615; Pub.L. 109-222, Title V, § 514(a), (b), May 17, 2006, 120 Stat. 366; Pub.L. 109-432, Div. A, Title IV, § 401(a), Dec. 20, 2006, 120 Stat. 2953.)

26 U.S.C.A. § 199, 26 USCA § 199
Current through P.L. 116-8. Also includes P.L. 116-10 through 116-15. Title 26 current through 116-16.

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
 Title 26. Internal Revenue Code (Refs & Annos)
  Subtitle A. Income Taxes (Refs & Annos)
   Chapter 1. Normal Taxes and Surtaxes (Refs & Annos)
    Subchapter B. Computation of Taxable Income
     Part VI. Itemized Deductions for Individuals and Corporations (Refs & Annos)

This section has been updated. Click here for the updated version.

26 U.S.C.A. § 199, I.R.C. § 199

§ 199. Income attributable to domestic production activities

Effective: October 3, 2008 to December 16, 2010

**(a) Allowance of deduction.--**

**(1) In general.**--There shall be allowed as a deduction an amount equal to 9 percent of the lesser of--

**(A)** the qualified production activities income of the taxpayer for the taxable year, or

**(B)** taxable income (determined without regard to this section) for the taxable year.

**(2) Phasein.**--In the case of any taxable year beginning after 2004 and before 2010, paragraph (1) shall be applied by substituting for the percentage contained therein the transition percentage determined under the following table:

| For taxable years transition beginning in: | The percentage is: |
| --- | --- |
| 2005 or 2006................................................................................................................ | 3 |
| 2007, 2008, or 2009...................................................................................................... | 6. |

**(b) Deduction limited to wages paid.--**

**(1) In general.**--The amount of the deduction allowable under subsection (a) for any taxable year shall not exceed 50 percent of the W-2 wages of the taxpayer for the taxable year.

**(2) W-2 wages.**--For purposes of this section--

**(A) In general.**--The term "W-2 wages" means, with respect to any person for any taxable year of such person, the sum of the amounts described in paragraphs (3) and (8) of section 6051(a) paid by such person with respect to employment of employees by such person during the calendar year ending during such taxable year.

**(B) Limitation to wages attributable to domestic production.**--Such term shall not include any amount which is not properly allocable to domestic production gross receipts for purposes of subsection (c)(1).

**(C) Return requirement.**--Such term shall not include any amount which is not properly included in a return filed with the Social Security Administration on or before the 60th day after the due date (including extensions) for such return.

**(D) Special rule for qualified film.**--In the case of a qualified film, such term shall include compensation for services performed in the United States by actors, production personnel, directors, and producers.

**(3) Acquisitions and dispositions.**--The Secretary shall provide for the application of this subsection in cases where the taxpayer acquires, or disposes of, the major portion of a trade or business or the major portion of a separate unit of a trade or business during the taxable year.

**(c) Qualified production activities income.**--For purposes of this section--

**(1) In general.**--The term "qualified production activities income" for any taxable year means an amount equal to the excess (if any) of--

**(A)** the taxpayer's domestic production gross receipts for such taxable year, over

**(B)** the sum of--

    **(i)** the cost of goods sold that are allocable to such receipts, and

    **(ii)** other expenses, losses, or deductions (other than the deduction allowed under this section), which are properly allocable to such receipts.

**(2) Allocation method.**--The Secretary shall prescribe rules for the proper allocation of items described in paragraph (1) for purposes of determining qualified production activities income. Such rules shall provide for the proper allocation of items whether or not such items are directly allocable to domestic production gross receipts.

**(3) Special rules for determining costs.**--

**(A) In general.**--For purposes of determining costs under clause (i) of paragraph (1)(B), any item or service brought into the United States shall be treated as acquired by purchase, and its cost shall be treated as not less than its value immediately after it entered the United States. A similar rule shall apply in determining the adjusted basis of leased or rented property where the lease or rental gives rise to domestic production gross receipts.

**(B) Exports for further manufacture.**--In the case of any property described in subparagraph (A) that had been exported by the taxpayer for further manufacture, the increase in cost or adjusted basis under subparagraph (A) shall not exceed the difference between the value of the property when exported and the value of the property when brought back into the United States after the further manufacture.

**(4) Domestic production gross receipts.--**

**(A) In general.**--The term "domestic production gross receipts" means the gross receipts of the taxpayer which are derived from--

**(i)** any lease, rental, license, sale, exchange, or other disposition of--

**(I)** qualifying production property which was manufactured, produced, grown, or extracted by the taxpayer in whole or in significant part within the United States,

**(II)** any qualified film produced by the taxpayer, or

**(III)** electricity, natural gas, or potable water produced by the taxpayer in the United States,

**(ii)** in the case of a taxpayer engaged in the active conduct of a construction trade or business, construction of real property performed in the United States by the taxpayer in the ordinary course of such trade or business, or

**(iii)** in the case of a taxpayer engaged in the active conduct of an engineering or architectural services trade or business, engineering or architectural services performed in the United States by the taxpayer in the ordinary course of such trade or business with respect to the construction of real property in the United States.

**(B) Exceptions.**--Such term shall not include gross receipts of the taxpayer which are derived from--

**(i)** the sale of food and beverages prepared by the taxpayer at a retail establishment,

**(ii)** the transmission or distribution of electricity, natural gas, or potable water, or

**(iii)** the lease, rental, license, sale, exchange, or other disposition of land.

**(C) Special rule for certain Government contracts.**--Gross receipts derived from the manufacture or production of any property described in subparagraph (A)(i)(I) shall be treated as meeting the requirements of subparagraph (A)(i) if--

(i) such property is manufactured or produced by the taxpayer pursuant to a contract with the Federal Government, and

(ii) the Federal Acquisition Regulation requires that title or risk of loss with respect to such property be transferred to the Federal Government before the manufacture or production of such property is complete.

**(D) Partnerships owned by expanded affiliated groups.**--For purposes of this paragraph, if all of the interests in the capital and profits of a partnership are owned by members of a single expanded affiliated group at all times during the taxable year of such partnership, the partnership and all members of such group shall be treated as a single taxpayer during such period.

**(5) Qualifying production property.**--The term "qualifying production property" means--

**(A)** tangible personal property,

**(B)** any computer software, and

**(C)** any property described in section 168(f)(4).

**(6) Qualified film.**--The term "qualified film" means any property described in section 168(f)(3) if not less than 50 percent of the total compensation relating to the production of such property is compensation for services performed in the United States by actors, production personnel, directors, and producers. Such term does not include property with respect to which records are required to be maintained under section 2257 of Title 18, United States Code. A qualified film shall include any copyrights, trademarks, or other intangibles with respect to such film. The methods and means of distributing a qualified film shall not affect the availability of the deduction under this section.

**(7) Related persons.**--

**(A) In general.**--The term "domestic production gross receipts" shall not include any gross receipts of the taxpayer derived from property leased, licensed, or rented by the taxpayer for use by any related person.

**(B) Related person.**--For purposes of subparagraph (A), a person shall be treated as related to another person if such persons are treated as a single employer under subsection (a) or (b) of section 52 or subsection (m) or (o) of section 414, except that determinations under subsections (a) and (b) of section 52 shall be made without regard to section 1563(b).

**(d) Definitions and special rules.**--

**(1) Application of section to pass-thru entities.**--

**(A) Partnerships and S corporations.**--In the case of a partnership or S corporation--

**(i)** this section shall be applied at the partner or shareholder level,

**(ii)** each partner or shareholder shall take into account such person's allocable share of each item described in subparagraph (A) or (B) of subsection (c)(1) (determined without regard to whether the items described in such subparagraph (A) exceed the items described in such subparagraph (B)),

**(iii)** each partner or shareholder shall be treated for purposes of subsection (b) as having W-2 wages for the taxable year in an amount equal to such person's allocable share of the W-2 wages of the partnership or S corporation for the taxable year (as determined under regulations prescribed by the Secretary), and

**(iv)** in the case of each partner of a partnership, or shareholder of an S corporation, who owns (directly or indirectly) at least 20 percent of the capital interests in such partnership or of the stock of such S corporation--

**(I)** such partner or shareholder shall be treated as having engaged directly in any film produced by such partnership or S corporation, and

**(II)** such partnership or S corporation shall be treated as having engaged directly in any film produced by such partner or shareholder.

**(B) Trusts and estates.**--In the case of a trust or estate--

**(i)** the items referred to in subparagraph (A)(ii) (as determined therein) and the W-2 wages of the trust or estate for the taxable year, shall be apportioned between the beneficiaries and the fiduciary (and among the beneficiaries) under regulations prescribed by the Secretary, and

**(ii)** for purposes of paragraph (2), adjusted gross income of the trust or estate shall be determined as provided in section 67(e) with the adjustments described in such paragraph.

**(C) Regulations.**--The Secretary may prescribe rules requiring or restricting the allocation of items and wages under this paragraph and may prescribe such reporting requirements as the Secretary determines appropriate.

**(2) Application to individuals.**--In the case of an individual, subsections (a)(1)(B) and (d)(9)(A)(iii) shall be applied by substituting "adjusted gross income" for "taxable income". For purposes of the preceding sentence, adjusted gross income shall be determined--

**(A)** after application of sections 86, 135, 137, 219, 221, 222, and 469, and

**(B)** without regard to this section.

**(3) Agricultural and horticultural cooperatives.--**

**(A) Deduction allowed to patrons.--**Any person who receives a qualified payment from a specified agricultural or horticultural cooperative shall be allowed for the taxable year in which such payment is received a deduction under subsection (a) equal to the portion of the deduction allowed under subsection (a) to such cooperative which is--

**(i)** allowed with respect to the portion of the qualified production activities income to which such payment is attributable, and

**(ii)** identified by such cooperative in a written notice mailed to such person during the payment period described in section 1382(d).

**(B) Cooperative denied deduction for portion of qualified payments.--**The taxable income of a specified agricultural or horticultural cooperative shall not be reduced under section 1382 by reason of that portion of any qualified payment as does not exceed the deduction allowable under subparagraph (A) with respect to such payment.

**(C) Taxable income of cooperatives determined without regard to certain deductions.--**For purposes of this section, the taxable income of a specified agricultural or horticultural cooperative shall be computed without regard to any deduction allowable under subsection (b) or (c) of section 1382 (relating to patronage dividends, per-unit retain allocations, and nonpatronage distributions).

**(D) Special rule for marketing cooperatives.--**For purposes of this section, a specified agricultural or horticultural cooperative described in subparagraph (F)(ii) shall be treated as having manufactured, produced, grown, or extracted in whole or significant part any qualifying production property marketed by the organization which its patrons have so manufactured, produced, grown, or extracted.

**(E) Qualified payment.--**For purposes of this paragraph, the term "qualified payment" means, with respect to any person, any amount which--

**(i)** is described in paragraph (1) or (3) of section 1385(a),

**(ii)** is received by such person from a specified agricultural or horticultural cooperative, and

**(iii)** is attributable to qualified production activities income with respect to which a deduction is allowed to such cooperative under subsection (a).

**(F) Specified agricultural or horticultural cooperative.**--For purposes of this paragraph, the term "specified agricultural or horticultural cooperative" means an organization to which part I of subchapter T applies which is engaged--

**(i)** in the manufacturing, production, growth, or extraction in whole or significant part of any agricultural or horticultural product, or

**(ii)** in the marketing of agricultural or horticultural products.

**(4) Special rule for affiliated groups.**--

**(A) In general.**--All members of an expanded affiliated group shall be treated as a single corporation for purposes of this section.

**(B) Expanded affiliated group.**--For purposes of this section, the term "expanded affiliated group" means an affiliated group as defined in section 1504(a), determined--

**(i)** by substituting "more than 50 percent" for "at least 80 percent" each place it appears, and

**(ii)** without regard to paragraphs (2) and (4) of section 1504(b).

**(C) Allocation of deduction.**--Except as provided in regulations, the deduction under subsection (a) shall be allocated among the members of the expanded affiliated group in proportion to each member's respective amount (if any) of qualified production activities income.

**(5) Trade or business requirement.**--This section shall be applied by only taking into account items which are attributable to the actual conduct of a trade or business.

**(6) Coordination with minimum tax.**--For purposes of determining alternative minimum taxable income under section 55--

**(A)** qualified production activities income shall be determined without regard to any adjustments under sections 56 through 59, and

**(B)** in the case of a corporation, subsection (a)(1)(B) shall be applied by substituting "alternative minimum taxable income" for "taxable income".

**(7) Unrelated business taxable income.**--For purposes of determining the tax imposed by section 511, subsection (a)(1)(B) shall be applied by substituting "unrelated business taxable income" for "taxable income".

**(8) Treatment of activities in Puerto Rico.--**

**(A) In general.--**In the case of any taxpayer with gross receipts for any taxable year from sources within the Commonwealth of Puerto Rico, if all of such receipts are taxable under section 1 or 11 for such taxable year, then for purposes of determining the domestic production gross receipts of such taxpayer for such taxable year under subsection (c)(4), the term "United States" shall include the Commonwealth of Puerto Rico.

**(B) Special rule for applying wage limitation.--**In the case of any taxpayer described in subparagraph (A), for purposes of applying the limitation under subsection (b) for any taxable year, the determination of W-2 wages of such taxpayer shall be made without regard to any exclusion under section 3401(a)(8) for remuneration paid for services performed in Puerto Rico.

**(C) Termination.--**This paragraph shall apply only with respect to the first 4 taxable years of the taxpayer beginning after December 31, 2005, and before January 1, 2010.

**(9) Special rule for taxpayers with oil related qualified production activities income.--**

**(A) In general.--**If a taxpayer has oil related qualified production activities income for any taxable year beginning after 2009, the amount otherwise allowable as a deduction under subsection (a) shall be reduced by 3 percent of the least of--

**(i)** the oil related qualified production activities income of the taxpayer for the taxable year,

**(ii)** the qualified production activities income of the taxpayer for the taxable year, or

**(iii)** taxable income (determined without regard to this section).

**(B) Oil related qualified production activities income.--**For purposes of this paragraph, the term "oil related qualified production activities income" means for any taxable year the qualified production activities income which is attributable to the production, refining, processing, transportation, or distribution of oil, gas, or any primary product thereof during such taxable year.

**(C) Primary product.--**For purposes of this paragraph, the term "primary product" has the same meaning as when used in section 927(a)(2)(C), as in effect before its repeal.

**(10) Regulations.--**The Secretary shall prescribe such regulations as are necessary to carry out the purposes of this section, including regulations which prevent more than 1 taxpayer from being allowed a deduction under this section with respect to any activity described in subsection (c)(4)(A)(i).

**CREDIT(S)**

(Added Pub.L. 108-357, Title I, § 102(a), Oct. 22, 2004, 118 Stat. 1424, and amended Pub.L. 109-135, Title IV, § 403(a)(1) to (13), Dec. 21, 2005, 119 Stat. 2615; Pub.L. 109-222, Title V, § 514(a), (b), May 17, 2006, 120 Stat. 366; Pub.L. 109-432, Div. A, Title IV, § 401(a), Dec. 20, 2006, 120 Stat. 2953; Pub.L. 110-343, Div. B, Title IV, § 401(a), (b), Div. C, Title III, § 312(a), Title V, § 502(c), Oct. 3, 2008, 122 Stat. 3851, 3869, 3876.)

26 U.S.C.A. § 199, 26 USCA § 199
Current through P.L. 116-8. Also includes P.L. 116-10 through 116-15. Title 26 current through 116-16.

   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 6

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

EXXON MOBIL CORPORATION,

      Plaintiff,

v.

      CIVIL ACTION NO. 3:16-cv-2921-N

UNITED STATES OF AMERICA,

      Defendant.

---

## DECLARATION OF MICHAEL A. BATES

1.    My name is Michael A. Bates.  I am of legal age and otherwise competent to make this declaration.  All of the facts stated in this declaration are true and correct and are of my personal knowledge.

2.    I am the Controller for ExxonMobil Qatar Ltd., an ExxonMobil affiliate.  In my capacity as Controller, I am responsible for the collection and reporting of financial information concerning ExxonMobil Qatar Ltd.'s activities in the Qatari projects at issue in this litigation.

3.    Based on documents received from Ras Laffan Liquefied Natural Gas Company Limited (III) ("RL3") and Qatar Liquefied Gas Company Limited (II) ("QG2") and ExxonMobil's financial statements, RL3 and QG2 made no royalty payments to the State of Qatar before 2009.  I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Doha, Qatar on *APRIL 25* , 2019.

                                                _____
                                              MICHAEL A. BATES

**DECLARATION OF MICHAEL A. BATES**

# EXHIBIT 7



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

March 5, 2019

### POLICY STATEMENT ON THE TAX REGULATORY PROCESS

The Department of the Treasury and the Internal Revenue Service (IRS) reaffirm their commitment to a tax regulatory process that encourages public participation, fosters transparency, affords fair notice, and ensures adherence to the rule of law. Consistent with those important regulatory principles, the Department of the Treasury and the IRS hereby clarify and affirm their commitment to sound regulatory practices.

I.      Commitment to Notice-and-Comment Rulemaking

The best practice for agency rulemaking is the notice-and-comment process established by the Administrative Procedure Act (APA). This process allows the public to participate before any final rule becomes effective and ensures that all views are adequately considered. It also enables the public to apprise the government of relevant information that the government may not possess or to alert the government to consequences that it may not foresee.

The APA generally requires notice and comment for legislative rules. The APA exempts interpretive rules from notice-and-comment requirements. Nonetheless, as a matter of sound regulatory policy, the Treasury Department and the IRS will continue to adhere to their longstanding practice of using the notice-and-comment process for interpretive tax rules published in the Code of Federal Regulations.

II.     Limited Use of Temporary Regulations

Under the APA, if an agency finds that it has "good cause" to do so, it may issue an interim final rule that becomes effective immediately without notice and comment. The interim final rule must be promulgated with a statement of good cause explaining the basis for that finding. The Treasury Department and the IRS have long interpreted the Internal Revenue Code, however, to permit the issuance of immediately-effective temporary tax regulations without a statement of good cause.

As a matter of sound regulatory policy, the Treasury Department and the IRS commit to include a statement of good cause when issuing any future temporary regulations under the Internal Revenue Code. In certain exceptional circumstances, sound tax administration may require temporary regulations to be issued without notice and comment. For example, such regulations may be necessary and appropriate to stop abusive practices or to immediately resolve an injurious inconsistency between existing regulations and a new statute or judicial decision. When sound tax administration does warrant temporary regulations, the Treasury Department and the IRS will make their reasons for issuing such immediately-effective regulations clear by including a statement of good cause in the preamble.

The Treasury Department and the IRS will also continue to adhere to other limitations in the Internal Revenue Code, which mandate that temporary regulations must expire within three

years of issuance and that proposed regulations must be issued simultaneously with any temporary regulations. These limitations ensure that, even where good cause justifies immediate action without notice and comment, any resulting final regulations will be subject to notice and comment.

III.   Proper Scope of Subregulatory Guidance Documents

In addition to formal regulations that carry the force and effect of law, sound tax administration necessitates less formal guidance to efficiently advise the public about the meaning of the tax laws. The Treasury Department and the IRS use a variety of forms of guidance to interpret and implement federal tax laws, including revenue rulings, revenue procedures, notices, and announcements.[1] Such guidance often provides taxpayers much-needed clarity and certainty concerning the legal interpretation that the IRS intends to apply, and taxpayers thus regularly request such guidance.

Subregulatory guidance is not intended to affect taxpayer rights or obligations independent from underlying statutes or regulations. Unlike statutes and regulations, subregulatory guidance does not have the force and effect of law. Taxpayers can have confidence, however, that the IRS will not take positions inconsistent with its subregulatory guidance when such guidance is in effect. In applying subregulatory guidance, the effect of subsequent legislation, court decisions, rulings, and procedures must be considered.

When proper limits are observed, subregulatory guidance can provide taxpayers the certainty required to make informed decisions about their tax obligations. Such guidance cannot and should not, however, be used to modify existing legislative rules or create new legislative rules. The Treasury Department and the IRS will adhere to these limits and will not argue that subregulatory guidance has the force and effect of law. In litigation before the U.S. Tax Court, as a matter of policy, the IRS will not seek judicial deference under *Auer v. Robbins*, 519 U.S. 452 (1997) or *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), to interpretations set forth only in subregulatory guidance.

In deciding whether to issue regulations or subregulatory guidance, the Treasury Department and the IRS must consider the content and nature of the interpretation or position being announced. Factors to be considered include the intended effect on taxpayers' rights or duties, the need for public comments, the form and content of prior positions, the significance of the issues, the statutory framework, and whether the interpretation or position is of short-term or long-term value. After weighing relevant factors, if the intended interpretation or position would have the effect of modifying existing legislative rules or creating new legislative rules on matters not addressed in existing regulations, the interpretation or position will generally be issued through notice-and-comment rulemaking, absent exceptional circumstances. Where the Treasury Department and the IRS intend to provide only an interpretation of existing law applied to a

---

[1] For the purpose of this policy statement, "subregulatory guidance" means subregulatory guidance published in the Internal Revenue Bulletin. The following types of subregulatory guidance are published in the Internal Revenue Bulletin: revenue rulings, revenue procedures, notices, and announcements. This policy statement does not apply to regulations issued jointly with the Department of Health and Human Services and the Department of Labor under 26 U.S.C. § 9833.

2

limited set of facts, a statutorily prescribed form of relief, a statement of agency procedure or practice, a public announcement of intent to issue proposed legislative rules, or an announcement that has only immediate or short-term value, the intended interpretation or position will generally be issued as subregulatory guidance rather than through notice-and-comment rulemaking.

IV.     Limit on Notices Announcing Intent to Propose Regulations

Prior to the issuance of certain proposed regulations, the IRS may publish a notice in the Internal Revenue Bulletin that announces the intention of the Treasury Department and the IRS to issue proposed regulations.  Such notices generally describe the scope and content of the intended proposed regulations and sometimes state that taxpayers may rely on the notice in taking tax positions on upcoming tax returns.  The notices also may invite comments and encourage a dialogue with taxpayers regarding the content of future proposed regulations before any such regulations are proposed.

Failure to promulgate regulations previewed in notices on a timely basis can cause confusion or uncertainty for taxpayers.  To limit the uncertainty that these situations may create, the Treasury Department and the IRS will include a statement in each future notice of intent to issue proposed regulations stating that if no proposed regulations or other guidance is released within 18 months after the date the notice is published, taxpayers may continue to rely on the notice but, until additional guidance is issued, the Treasury Department and the IRS will not assert a position adverse to the taxpayer based in whole or in part on the notice.

V.      General Provision

This policy statement is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.


David J. Kautter                              Brent J. McIntosh
Assistant Secretary for Tax Policy            General Counsel

App. 114