U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

JUN 1 3 2019

CLERK, U.S. DISTRICT COURT
By _____
Deputy

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

EXXON MOBIL CORPORATION,

      Plaintiff,

v.

CIVIL ACTION NO. 3:16-cv-2921-N

UNITED STATES OF AMERICA,

      Defendant.

---

## JOINT PRETRIAL ORDER

---

This Joint Pretrial Order is respectfully submitted by the Plaintiff, Exxon Mobil Corporation, and the Defendant, the United States of America, pursuant to Local Rule 16.4.

## I.    Summary of Each Party's Claims and Defenses

### A.    ExxonMobil's Claims and Defenses

Exxon Mobil Corporation is the common parent of an affiliated group of corporations (collectively, "ExxonMobil") as defined in section 1504 of the Internal Revenue Code of 1986 (the "Code").[1] ExxonMobil and its affiliates are engaged in the exploration, development, and production of crude oil and natural gas; the manufacture of petroleum products; and the transportation and marketing of crude oil, natural gas, petroleum, and petroleum products. ExxonMobil seeks a refund of federal income taxes that the United States of America, acting through the Commissioner of the Internal Revenue Service (the "Commissioner"), erroneously assessed and collected when it disallowed ExxonMobil's claims for a refund of income tax paid

---

[1] Unless otherwise stated, all "section" references herein are to the Code (26 U.S.C.), as amended, in the years in issue.

for 2006, 2007, 2008, and 2009 by determining that certain transactions described below were mineral leases, rather than purchases, for federal income tax purposes.[2] ExxonMobil brings this action to recover the erroneously assessed and collected federal income taxes, plus statutory interest thereon as provided by law, for ExxonMobil's taxable years 2006 through 2009 (collectively, the "Disputed Tax Years").

### 1.    The DFA Transactions

ExxonMobil and Qatar Petroleum ("QP"), the national oil company of the State of Qatar ("SOQ"), formed several joint stock companies: Ras Laffan Liquefied Natural Gas Company Limited ("RL1"), Ras Laffan Liquefied Natural Gas Company (II) ("RL2"), Ras Laffan Liquefied Natural Gas Company Limited (3) ("RL3"), and Qatar Liquefied Natural Gas Company (II) ("QG2") (collectively, the "JVCos").[3] The JVCos were formed to develop and extract offshore natural gas reserves and to construct and operate facilities necessary to transport, manufacture, market, export, and deliver liquefied natural gas ("LNG"), condensate and liquefied petroleum gas ("LPG") to non-Qatari locations and buyers.  The JVCos are classified as partnerships for U.S. federal income tax purposes.

---

[2] The Commissioner also erroneously disallowed ExxonMobil's claims for a refund of income tax paid for 2008 and 2009 by determining that a certain federal credit for alcohol blending activities is included in gross income. Blending credits are not at issue in the upcoming June 17, 2019 trial.  The Court granted summary judgment in favor of Defendant on the blending-credits issue on August 8, 2018. Dkt. 80. ExxonMobil has filed a Motion to Certify the Court's August 8, 2018 Order as Final under Federal Rule of Civil 54(b), to Certify the Order for Interlocutory Review under 28 U.S.C. § 1292(b), or both.  Dkt. 87. This motion is still pending.

ExxonMobil also seeks a refund of penalties and any related interest that the Commissioner erroneously or illegally assessed and collected without authority from ExxonMobil on the income tax refund claims at issue in this lawsuit. *See generally* Suppl. Compl., Dkt. 54. By order dated March 22, 2019, this Court bifurcated the penalty-refund claims from trial of the tax issues and set them for trial in November 2019. Dkt. 149. Accordingly, the penalty-refund claims are not at issue in the upcoming trial, except to the extent that a decision in ExxonMobil's favor on the purchase v. mineral lease and change in method of accounting issues would resolve the penalty-refund claims in ExxonMobil's favor and eliminate the need for another trial in November 2019.

[3] ExxonMobil's interest in RL1, RL2 and RL3 is held by ExxonMobil RasGas Inc.  ExxonMobil RasGas Inc. owns its interest in RL3 through ExxonMobil Ras Laffan (III) Ltd., a disregarded entity for federal income tax purposes.  ExxonMobil's interest in QG2 is held by Exxon Mobil Petroleum & Chemical Holdings Inc., which owns its interest through ExxonMobil Qatargas (II) Ltd., a disregarded entity for federal income tax purposes.

Under certain Development and Fiscal Agreements (collectively, the "DFAs"), the JVCos purchased various rights, including the rights to explore, develop, and extract gas within the Qatar North Field, and the rights to build, own, and operate transportation, storage, processing, liquefaction, and marketing facilities and businesses to manufacture, market, export, and deliver LNG, condensate, and LPG. The JVCos acquired an operating mineral interest in specific areas in the Qatar North Field under the DFAs. The JVCos are obligated—at their sole cost—to explore, develop, and extract the gas in place (*i.e.*, in the ground) in the Qatar North Field, and to build, own, and operate the transportation, storage, processing, liquefaction, and marketing facilities and businesses necessary to manufacture and market the petroleum products, including LNG, condensate, and LPG. If the JVCos breach their obligations under the DFAs, SOQ may recover damages.

Under the DFAs, among other commitments, the JVCos agreed to make certain contractual payments to SOQ in the future based on the value of manufactured LNG, condensate, and LPG (the "DFA Payments"). The DFA Payments for LNG are based on the greater of a fixed amount per one million British thermal units or a variable amount based on a formula tied to published foreign crude oil and gas prices. The DFA Payments for condensate and LPG are a stated percentage of the sales proceeds from condensate and LPG. The valuation point for determining the amount of the DFA Payments for each petroleum product occurs only after substantial non-extraction activities (including manufacturing) have occurred. In addition to payments based on the manufactured and marketed petroleum products' value, each JVCo must transfer all of its facilities—including the LNG and LPG plants—to SOQ at the end of each DFA's term.

## 2.    The PSC Transactions

The Malaysian national oil and gas company ("Petronas") is vested with the entire ownership in, and the exclusive rights to explore and exploit, oil and gas lying onshore or offshore

in that country.  Under certain production sharing contracts and natural gas project and sale agreement (collectively, the "PSCs"), ExxonMobil obtained from Petronas various rights, including the rights to explore, develop, extract, transport, process, store, and market oil and gas from offshore Malaysia.  ExxonMobil acquired an operating mineral interest in specific areas in the offshore Malay Basin under the PSCs.  The PSCs require ExxonMobil to explore, develop, extract, transport, store, process, and market the oil and gas and their related products, and to pay all costs associated with these activities.  To fulfill its obligations under the PSCs, ExxonMobil has made substantial investments necessary to drill and complete wells, construct platforms, and transport, store, process, and market the petroleum products, including (a) offshore wells and platforms, (b) an extensive offshore pumping, compression, and pipeline network, and (c) significant onshore transportation, storage, processing, and terminal facilities (collectively, the "Petroleum Operations").  If ExxonMobil breaches its obligations under the PSCs, Petronas may recover damages.

Under the PSCs, among other commitments, ExxonMobil agreed to make certain contractual payments to Petronas in the future based on the value of the petroleum products after transportation, storage, processing, and marketing (the "PSC Payments").  The valuation point for determining the amount of the PSC Payments occurs only after substantial non-extraction activities associated with the Petroleum Operations have taken place.  In addition to payments based on the petroleum products' value, when the PSCs terminate, beneficial ownership of all facilities contemplated under the PSCs, including non-extraction facilities downstream of the platforms passes to Petronas.  ExxonMobil is also obligated to make abandonment cess payments to Petronas under most of the PSC transactions in issue, even if ExxonMobil is not producing any mineral.

### 3.    The DFA and PSC transactions are purchases

For federal income tax purposes, the transactions under the DFAs and PSCs, under all the facts and circumstances, are purchases of the rights to explore, develop, and extract the mineral, and the rights to transport, process, store, manufacture, and market petroleum products.  The transactions are mineral leases, rather than purchases, only if SOQ and Petronas retained a continuing non-operating economic interest in the transferred mineral.  Under well-established federal income tax law, SOQ and Petronas retain an economic interest if, and only if, they look "solely" to income derived from extraction for a return of their investment in the mineral.  *See, e.g., Comm'r v. Sw. Expl. Co.*, 350 U.S. 308, 314 (1956); *Anderson v. Helvering*, 310 U.S. 404, 411 (1940).  SOQ and Petronas do not look solely to income derived from extraction for at least two independent reasons.

First, SOQ and Petronas are entitled to and actually received payments based on the value of petroleum products determined far beyond the point of extraction.  Here, the point of extraction is at or in the immediate vicinity of the producing well (commonly referred to as the "wellhead").  Therefore, the payments received by SOQ and Petronas are not income derived from extraction of the mineral because they reflect significant value added to the extracted oil and gas by all of the transportation, storage, processing, manufacturing, and marketing that occurs after the wellhead.  Under the DFAs and PSCs, the JVCos and ExxonMobil were obligated to invest in the non-extraction assets and operations required to transport, store, process, manufacture, and market the oil and gas, and the JVCos and ExxonMobil were obligated to pay SOQ and Petronas amounts based on the value of the marketed petroleum products far beyond the wellhead.  As a result, SOQ and Petronas do not look solely to income derived from extraction of the mineral for a return of their investment; they look to the JVCos and ExxonMobil.  Therefore, both under the law and the facts, neither SOQ nor Petronas retained an economic interest in the mineral in place.

Second, SOQ and Petronas have a right to receive other payments that are in no way dependent upon extraction of the mineral. These payments include (a) the non-extraction facilities and equipment that must be transferred to SOQ and Petronas when these transactions terminate; (b) damages based on breach of the relevant agreements; and (c) the abandonment cess payments made to Petronas. Under controlling Supreme Court and Fifth Circuit authority, SOQ's and Petronas' rights to these "alternate source" payments mean that their payment rights are not economic interests in the mineral. *Anderson v. Helvering*, 310 U.S. 404, 411 (1940); *Christie v. United States*, 436 F.2d 1216, 1218 (5th Cir. 1971).

The DFAs and PSCs are factually and legally indivisible transactions. However, if the Court were to hold that the transactions are divisible between the transfer of an operating mineral interest and the transfer of intangible rights to transport, store, process, manufacture, and market the mineral, ExxonMobil's payment for the intangible property would still be purchase payments subject to section 483. 26 C.F.R. § 1.197-2(f)(3)(iv)(B)(2).

### 4.    There was no change in method of accounting

Defendant argues that ExxonMobil must continue to treat the DFA and PSC transactions as mineral leases, even if such treatment is improper, because treating the transactions as purchases was a change in method of accounting that required the prior consent of the Commissioner. Def.'s Answer [Dkt. 14] at 6 – 7. The correction from mineral lease to purchase treatment is not a change in method of accounting. Accounting methods and changes in accounting methods relate to the time for reporting income or deductions. The correction from mineral lease treatment to purchase treatment presents the issue of whether DFA and PSC Payments by ExxonMobil were ever its income, rather than the time for reporting ExxonMobil's income. Therefore, this correction was not a change in ExxonMobil's method of accounting that required the Commissioner's consent because (a) mineral lease treatment is not a "method of accounting" for income or deductions and,

therefore, the correction to purchase treatment cannot be a change in method of accounting; (b) the correction is not a change to a material item as defined in Treasury Regulations section 1.446-1(e)(2)(ii)(a) and 1.446-1(e)(2)(ii)(b) because the correction is not merely a timing issue; and (c) in the alternative, RL3 and QG2 had not established a method of accounting before implementing a correction because they had reported improperly for only one year.

     **5.    Portions of Defendant's submission are objectionable**

     ExxonMobil objects to two portions of Defendant's submission in this Joint Pretrial Order. *First*, ExxonMobil objects to Defendant's attempt to "reserve the right to contest other facts that may be presented at trial." *See, infra*, n.7. The purpose of this final pretrial order is to narrow the issues for trial by identifying the facts and legal issues that are in dispute. *See, e.g., Kona Tech. Corp. v. S. Pac. Transp. Co.*, 225 F.3d 595, 604 (5th Cir. 2000). Claims or issues that are not included in the pretrial order are waived. *See id.* By purporting to reserve the right to contest facts at trial that are not in the pretrial order, Defendant is attempting to circumvent the purpose of this order. ExxonMobil will object at trial to any attempt by Defendant to raise or contest facts that are not identified in this order as being in dispute.

     *Second*, ExxonMobil objects to Defendant's variance argument under section 7422, Treas. Reg. § 301.6402-2(b)(1), and Fifth Circuit case law. Recent Supreme Court authority confirms that section 7422 is nonjurisdictional and thus Defendant has waived its ability to argue variance at trial. *See Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012) ("Recognizing our 'less than meticulous' use of ['jurisdictional'] in the past, we have pressed a stricter distinction between truly jurisdictional rules, which govern 'a court's adjudicatory authority,' and nonjurisdictional 'claim-processing rules,' which do not."); *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 153 (2013) ("[To] determin[e] whether to classify a statutory limitation as jurisdictional, … [w]e inquire

whether Congress has 'clearly state[d]' that the rule is jurisdictional; absent such a clear statement, we have cautioned, 'courts should treat the restriction as nonjurisdictional in character.'").

As explained by a leading commentator, section 7422 does not address this Court's jurisdiction:

> Congress has attached several conditions to a taxpayer's refund suit. Courts have referred to these requirements as 'jurisdictional,' but whether that characterization is apt has been questioned given the Supreme Court's announcement of a bright-line distinction between true jurisdictional requirements and substantive provisions that pertain to the merits. In particular, ***Congress did not clearly specify that the conditions are jurisdictional***; they appear in the statute authorizing the refund action, 26 U.S.C.A. § 7422, and not in Section 1346 of Title 28, conferring jurisdiction. Moreover, although a jurisdictional requirement may not be waived, the Supreme Court has recognized that the Government may excuse a taxpayer's noncompliance with some of these conditions, set forth in regulations of the Treasury Department.

Wright et al., Federal Practice & Procedure § 3656 (emphasis added) (footnotes omitted). Because section 7422 is nonjurisdictional, Defendant has waived this argument by failing to assert it in a timely manner. Accordingly, ExxonMobil objects to trial of variance and will not try variance by consent.

### B.    Summary of United States' Defenses

In this *de novo* tax refund suit, Exxon must prove that it overpaid its federal income taxes. *Trinity Industries, Inc. v. United States*, 757 F.3d 400, 413 (5th Cir. 2014); *King v. United States*, 641 F.2d 253, 259 (5th Cir. 1981). The Court has already entered summary judgment against Exxon and in favor of the United States on the "Alcohol Fuel Credit" issue. (*See* Dkt. Nos. 1, ¶¶ 32 – 35; 80).

The remaining refunds that Exxon seeks are of taxes it computed, self-assessed and paid with its original 2006, 2007, 2008 and 2009 returns. Exxon's statement above that the IRS "erroneously assessed and collected" the taxes is therefore misleading. Exxon computed the taxes

as owed, and paid them; years later, when Exxon filed refund claims, the IRS disallowed the refund claims.

Exxon's remaining claims relate to its attempt to change the substantive tax treatment of and tax accounting for its oil and gas leasing transactions in Qatar (DFAs) and Malaysia (PSCs). The transactions at issue date back to the 1980s. For decades (as well as on its original tax returns for 2006 – 2009, the years in suit), Exxon has acknowledged that these contracts, that allow it to extract and produce oil and gas from Qatar's and Malaysia's territorial waters for a limited period of time, in exchange for paying a royalty and sharing the oil and gas with the landowners, are leases. Now, however, Exxon would like to use some excess foreign tax credits that it could not otherwise use, and try for an enormous windfall. To facilitate those goals, Exxon now contends— solely for federal income tax purposes, and contrary to its long-standing treatment—that the transactions are "purchases" and "sales" of "property," not oil and gas leases.

First, Exxon's new legal theory is wrong as a matter of law, and its attempt to change the substantive treatment of the transactions from leases to sales fails. Exxon misreads a few Supreme Court cases and ignores other binding Supreme Court and Fifth Circuit law that squarely forecloses Exxon's creative efforts. As explained in our proposed findings of fact and conclusions of law (as well as in our pending motion for partial summary judgment), the transactions are oil and gas leases, as Exxon has always treated them. The transactions are of limited duration, and neither Qatar nor Malaysia's national oil company (Petronas) divested itself of all interest in its minerals. Qatar and Petronas indisputably retained the right to royalties or an in-kind share of the oil and gas, dependent upon the actual extraction of their minerals during the terms of the agreements. For example, under the DFAs, Qatar was entitled to gas, condensate, and LPG royalties. Exxon does not dispute that those royalties had to be paid if gas was extracted from Qatar's territorial waters,

and that they would not have been owed if gas was not extracted. The royalties were inextricably dependent upon the amount of gas extracted.

Similarly, under the PSCs, Petronas was entitled to an in-kind share of the oil and gas extracted, as well as supplemental cash payments that were dependent on the amount of minerals extracted. And Petronas' rights to its share and the cash payments could not be avoided: if oil and gas was extracted, Petronas got its share.

Because of these substantive terms and the rights of Qatar and Petronas under the DFAs and PSCs, the agreements at issue are leases. Exxon may not use the "economic interest" test to now convert them to "sales" for tax purposes. And because the transactions are leases, 26 U.S.C. § 483 does not apply. That provision applies only to the sale or exchange of property.

Second, even if Exxon's long-standing lease treatment of the transactions were improper, Exxon may not now change it, because such a change would be a change in method of accounting, which is prohibited without IRS consent. One of the Tax Code's fundamental rules is that a taxpayer may not change the method by which it computes its taxable income without the IRS's prior consent. 26 U.S.C. § 446. As one court observed, "once a taxpayer has reported income according to a particular method it must live with that choice...." *Capital One Financial Corp. v. Commissioner*, 659 F.3d 316, 322 (4th Cir. 2011).

Here, Exxon's proposed switch to "sale" treatment would be a change of accounting method. Under its original accounting, Exxon currently (*i.e.*, in one tax year) deducted the royalties and cash payments owed to Qatar and Petronas. Under its proposed new "sale" accounting, those same underlying royalties and payments would be deducted over multiple tax years. For example, under Exxon's original accounting, a $10 royalty paid to Qatar in 2006 was deducted in 2006; in its new accounting, Exxon would deduct part of that $10 in 2006 and the rest over subsequent tax

years. That change in timing of deductions for the same cost is a change of accounting method. And because Exxon did not seek or obtain the IRS's consent for such a change, its change to "sale" treatment is not permitted. 26 U.S.C. § 446.

Both parties have filed motions for partial summary judgment regarding Exxon's change of accounting method.

This Court may deny Exxon's claims in Counts II and III of its Complaint on the above two independent grounds. Moreover, the Court may deny Exxon's claims on these threshold issues as a matter of law, and grant our motions for partial summary judgment. There are no *material* disputes of fact that preclude summary judgment in favor of the United States and against Exxon. (*See* Dkt. Nos. 125 – 127, 152 – 160, 175 – 176, 178 -179, 187, 190).

## II.      Statement of Stipulated Facts

1.      ExxonMobil is a New Jersey corporation with its global headquarters and principal place of business located at 5959 Las Colinas Boulevard, Irving, Texas 75039-2298. ExxonMobil maintains its books and records on the accrual method of accounting.

2.      ExxonMobil timely filed a consolidated corporate income tax return for each of the Disputed Tax Years with the Internal Revenue Service Center in Austin, Texas.

3.      On June 26, 2014, ExxonMobil timely filed a refund claim on Form 1120X (Joint Exhibit 1 [EM_06-09_0167663-703]) for 2006 with the Internal Revenue Service Center in Ogden, Utah, claiming a refund of federal income tax of $264,720,803 plus statutory interest.

4.      On June 26, 2014, ExxonMobil timely filed Form 1120X for 2007 (Joint Exhibit 2 [EM_06-09_0167704-43]) with the Internal Revenue Service Center in Ogden, Utah, claiming a refund of federal income tax of $297,976,031 plus statutory interest.

5.      On April 13, 2015, ExxonMobil timely filed Form 1120X for 2008 (Joint Exhibit 3 [EM_06-09_0167383-418]) with the Internal Revenue Service Center in Ogden, Utah, claiming a refund of federal income tax of $652,852,400 plus statutory interest.

6.      On April 13, 2015, ExxonMobil timely filed Form 1120X for 2009 (Joint Exhibit 4 [EM_06-09_0167421-462]) with the Internal Revenue Service Center in Ogden, Utah, claiming a refund of federal income tax of $138,971,996 plus statutory interest.

7.      ExxonMobil's 2006 – 2009 refund claims have not been allowed or paid by the IRS. The IRS disallowed such refund claims by two notices of disallowance dated May 5, 2016. (Joint Exhibit 5 [EM_06-09_0346721; EM_06-09_0346708]).

8.      On October 18, 2016, ExxonMobil timely filed this proceeding.

9.      The parties stipulate that Joint Exhibits 1-5 are admissible and will be admitted as joint exhibits at trial, as well as the following documents:[4]

a.      Joint Exhibit 6 is the Development and Fiscal Agreement Among the Government of the State of Qatar and Qatar General Petroleum Corporation and Mobil QM Gas Inc. ("RL1 DFA") [EM_06-09_0013005-0013232)];

b.      Joint Exhibit 7 is the RL1 Amended and Restated DFA [(EM_06-09_0014009-0014248)];

c.      Joint Exhibit 8 is the RL1 Second Amended and Restated DFA [(EM_06-09_0014985-0015025)];

---

[4] ExxonMobil's agreement to submit all of these documents as joint exhibits is subject to and without waiver of its motion for a trial protective order [Dkt. 166] because these documents are confidential and proprietary and should not be publicly disclosed.

d.     Joint Exhibit 9 is the RL1 Third Amended and Restated DFA [(EM_06-09_0018218-0018262)];

e.     Joint Exhibit 10 is the Joint Venture Agreement between Qatar General Petroleum Corporation and Mobil QM Gas Inc. ("RL1 JVA") [(EM_06-09_0013233-0013401)];

f.     Joint Exhibit 11 is the Development and Fiscal Agreement Among the Government of the State of Qatar, Ras Laffan Liquefied Natural Gas Company Limited (II), Qatar General Petroleum Corporation, and Mobil QM Gas Inc. ("RL2 DFA") [(EM_06-09_0014784-0014889)];

g.     Joint Exhibit 12 is the First Amendment to RL2 DFA [(EM_06-09_0017052-0017058)];

h.     Joint Exhibit 13 is the Development and Fiscal Agreement Among the Government of the State of Qatar, Qatar Petroleum, and ExxonMobil Ras Laffan (III) Limited ("RL3 DFA") [(EM_06-09_0017067-0017149)];

i.     Joint Exhibit 14 is the First Amendment to RL3 DFA [(EM_06-09_0022557-0022561)];

j.     Joint Exhibit 15 is the Second Amendment to RL3 DFA [(EM_06-09_0023412-0023415)];

k.     Joint Exhibit 16 is the Development and Fiscal Agreement Among the Government of the State of Qatar, Qatar Petroleum, Qatar Liquefied Gas

Company Limited (II) and ExxonMobil Qatargas (II) Limited ("QG2 DFA") [(EM_06-09_0016397-0016480)];

l.      Joint Exhibit 17 is the QG2 Amendment Agreement to DFA [(EM_06-09_0021114-0021132)];

m.     Joint Exhibit 18 is the Supplemental Agreement to QG2 DFA [(EM_06-09_0022079-0022084)];

n.      Joint Exhibit 19 is the Development and Fiscal Agreement Among the Government of the State of Qatar, Qatar Petroleum, and Mobil QM Gas Inc. ("Sponsors' DFA") [(EM_06-09_0015647-0015716)];

o.      Joint Exhibit 20 is the First Amendment to Sponsors' DFA [(EM_06-09_0017059-0017066)];

p.      Joint Exhibit 21 is the Contract Between Petroliam Nasional Berhad and Esso Production Malaysia Inc. and Petronas Carigali SDN. BHD. Relating to Exploration and Production of Petroleum for Peninsular Malaysia Offshore Block PM5 ("PM5") [(EM_06-09_0010763-0010914)];

q.      Joint Exhibit 22 is the PM5 Amendment 1 [(EM_06-09_0010593-0010601)];

r.      Joint Exhibit 23 is the PM5 Amendment 2 [(EM_06-09_0010602-0010605)];

s.      Joint Exhibit 24 is the PM5, PM8 Side Letter dated December 12, 1991 [(EM_06-09_0010755-0010757)];

t.   Joint Exhibit 25 is the PM5, PM8 Side Letter dated June 7, 1996 [(EM_06-09_0010758-0010762)];

u.   Joint Exhibit 26 is the Contract Between Petroliam Nasional Berhad and Esso Production Malaysia Inc. and Petronas Carigali SDN. BHD. Relating to Exploration and Production of Petroleum for Peninsular Malaysia Offshore Block PM8 ("PM8") [(EM_06-09_0011077-0011228)];

v.   Joint Exhibit 27 is the PM8 Amendment 1 [(EM_06-09_0010915-0010923)];

w.   Joint Exhibit 28 is the PM8 Amendment 2 [(EM_06-09_0010924-0010927)];

x.   Joint Exhibit 29 is the Contract Between Petroliam Nasional Berhad and Petronas Carigali SDN. BHD. and Esso Production Malaysia Inc. Relating to Exploration and Production of Petroleum for Peninsular Malaysia Offshore Block PM9 ("PM9") [(EM_06-09_0011470-0011659)];

y.   Joint Exhibit 30 is the PM9 Amendment 1 [(EM_06-09_0011229-0011242)];

z.   Joint Exhibit 31 is the PM9 Amendment 2 [(EM_06-09_0011243-0011246)];

aa.   Joint Exhibit 32 is the Contract Between Petroliam Nasional Berhad and Esso Production Malaysia Inc. and Petronas Carigali Sdn. Bhd. Relating to the Development and Production of Petroleum from Seligi, Guntong, Tapis, Semangkok, Irong Barat, Tabu and Palas Oil Fields ("1995 PSC") [(EM_06-09_0009183-0009374)];

bb.     Joint Exhibit 33 is the Natural Gas Project and Sales Agreement Between Petroliam Nasional Berhad and Esso Production Malaysia Inc. ("NGPSA") [EM_06-09_0010445-0010590)];

cc.     Joint Exhibit 34 is the First and Second Amendments to the NGPSA, together with the NGPSA Lawit Letter [(EM_06-09_0010337-0010444)];

dd.     Joint Exhibit 35 is the NGPSA Side Letter Agreement [(EM_06-09_0010591-0010592)]

ee.     Joint Exhibit 36 is the Contract Between Petroliam Nasional Berhad and Esso Production Malaysia Inc. and Petronas Carigali SDN BHD for the Development and Production of Petroleum from Offshore Peninsular Malaysia for the Continued Delivery and Sale of Natural Gas to Petronas ("GPSC") [(EM_06-09_0009999-0010244)];

ff.     Joint Exhibit 37 is the GPSC Amendment 1 [ (EM_06-09_0009876-0009884)];

gg.     Joint Exhibit 38 is the Amendment to GPSC and 2008 PSC [(EM_06-09_0009676-0009680)];

hh.     Joint Exhibit 39 is the 2008 Production Sharing Contract Between Petroliam Nasional Berhad and ExxonMobil Exploration and Production Malaysia Inc. and Petronas Carigali SDN. BHD. Relating to the Further Development of and Consequential Production From Such Further Development, and Continuing Production Operations, from Seligi, Guntong, Tapis, Semangkok, Irong Barat, Tabu and Palas Oil Fields ("2008 PSC") [(EM_06-09_0009485-0009675)];

ii.     Joint Exhibit 40 is the Main Principles Agreement [(EM_06-09_0010313-0010324)]; and

jj.     Joint Exhibit 41 is the Seligi Letter Agreement [(EM_06-09_0011660-0011666)].

## III.  Contested Issues of Fact

### A.  ExxonMobil's Contested Issues of Fact[5]

1.     Whether QP is a legally separate entity from SOQ.

2.     Whether each JVCo was formed as a legally separate joint stock company and joint venture under a separate DFA and JVA to build, own and operate its separate business (including separate LNG production trains) using its rights under its DFA.

3.     Whether each JVCo has separate obligations to make, and does make, separate payments under its DFA to SOQ.

4.     Whether SOQ granted the JVCos the rights to explore, develop, and extract gas within the Qatar North Field.

5.     Whether SOQ granted the JVCos the rights to build, own, and operate transportation, storage, processing, manufacturing, and marketing facilities and businesses in Qatar to manufacture, market, export, and deliver LNG, condensate and LPG to foreign locations and buyers.

6.     Whether the JVCos are the economic owners of the rights acquired under the DFAs.

7.     Whether the JVCos are obligated—at their sole cost—to explore, develop, and extract the gas in place and to build, own, and operate the transportation, storage, processing,

---

[5] To the extent that the Court deems any of the contested issues of fact to be issues of law or mixed issues of fact and law, ExxonMobil submits them as such.

manufacturing, and marketing facilities and businesses necessary to manufacture and market the petroleum products, including LNG, condensate, and LPG.

8.      Whether SOQ may recover damages if the JVCos breach their obligations under the DFAs.

9.      Whether the JVCos are obligated to make DFA Payments that are based on the value of petroleum products after non-extraction activities (*e.g.*, transportation, storage, processing, manufacturing, and marketing).

10.      Whether the DFA Payments to SOQ may exceed the wellhead value of the mineral.

11.      Whether the DFA Payments to SOQ exceeded the wellhead value of the mineral during 2006 – 2009.

12.      Whether SOQ has the right to the facilities constructed by the JVCos under the DFAs (including the LNG and LPG plants) at the end of each DFA's term.

13.      Whether, at the time the JVCos' facilities are transferred to SOQ at the end of each DFA's term, the facilities are expected to be operating and to be valuable to SOQ.

14.      Whether the rights purchased by the JVCo under each DFA, the JVCo's obligations, and the DFA Payments are indivisible.

15.      Whether Petronas is legally separate from Carigali.

16.      Whether Petronas granted ExxonMobil the rights to explore, develop and extract oil and gas within the offshore Malay basin.

17.      Whether Petronas granted ExxonMobil the rights to transport, store, process, and market the petroleum products.

18.     Whether ExxonMobil is the economic owner of the rights acquired under the PSCs.[6]

19.     Whether ExxonMobil is the economic and beneficial owner of the facilities.

20.     Whether the PSCs require ExxonMobil to explore, develop, extract, transport, store, process, and market the oil and gas and their related products, and to pay the costs associated with these activities.

21.     Whether ExxonMobil made investments necessary to drill and complete wells, construct platforms, and transport, store, process, and market the petroleum products to fulfill its obligations under the PSCs.

22.     Whether Petronas may recover damages if ExxonMobil breaches its obligations under the PSCs.

23.     Whether ExxonMobil is obligated to make PSC Payments (in cash or in-kind) to Petronas based on the value of products produced from the extracted oil and gas after non-extraction activities (e.g., transportation, storage, processing, and marketing).

24.     Whether the PSC Payments to Petronas may exceed the wellhead value of the mineral.

25.     Whether the PSC Payments to Petronas exceeded the wellhead value of the mineral during 2006 – 2009.

26.     Whether, when the PSCs terminate, Petronas obtains beneficial ownership of all facilities contemplated under the PSCs, including non-extraction facilities downstream of the platforms.

---

[6] The PSCs referenced in ExxonMobil's contested issues of fact and law are those PSCs discussed in the stipulated facts and include the NGPSA, as amended.

27.     Whether the facilities that Petronas obtains beneficial ownership of upon termination of the PSCs are expected to be operable and valuable to Petronas when the PSCs terminate.

28.     Whether ExxonMobil is obligated to make abandonment cess payments under the 1995 PSC, NGPSA, GPSC, PM9 PSC and 2008 PSC even if ExxonMobil is not producing any mineral.

29.     Whether the rights purchased by ExxonMobil under each PSC, ExxonMobil's obligations, and the PSC Payments are indivisible.

30.     Whether ExxonMobil's informal and formal refund claims (Forms 1120X) set forth its position that the DFA and PSC transactions are purchases.

31.     Whether ExxonMobil treated the transactions as mineral leases for purposes of its 2006 – 2009 original returns.

32.     Whether RL3 and QG2 first made DFA Payments to SOQ in 2009.

33.     Whether the DFA Payments made by RL3 and QG2 were first reported on ExxonMobil's 2009 return.

34.     Whether the DFA Payments made by RL3 and QG2 were treated as purchase payments on ExxonMobil's 2010 and later year returns.

35.     Whether the JVCos were obligated to and in fact made payments to SOQ pursuant to each DFA.

36.     Whether ExxonMobil was obligated to and in fact made payments to Petronas pursuant to each PSC.

37.     Whether each of the DFAs and PSCs required the JVCos and ExxonMobil, respectively, to make at least one payment more than one year after the date the rights were purchased.

38.     Whether the Qatar Summary Model accurately reflects the amounts of the DFA Payments, the DFA under which each DFA Payment was made, the applicable federal rate, and the discount period.

39.     Whether the Malaysia Summary Model accurately reflects the amounts of the PSC Payments, the relevant agreement under which each PSC Payment was made, the applicable federal rate, and the discount period.

The following contested facts exist only if the Court determines that the rights granted under the DFAs and PSCs are divisible:

40.     What percentage of the 2006 – 2009 DFA Payments were attributable to the economic value of the intangible rights transferred to the JVCos by SOQ to transport, store, process, manufacture, and market the mineral.

41.     What percentage of the 2006 – 2009 PSC Payments were attributable to the economic value of the intangible rights transferred to ExxonMobil by Petronas to transport, store, process, and market the mineral.

42.     Whether the intangible rights granted to the JVCos and ExxonMobil under the DFAs and PSCs have a fixed duration of 15 years or more.

43.     Whether the DFAs and PSCs grant intangible rights that are not fixed as to amount.

44.     Whether the JVCos and ExxonMobil's sales of petroleum products are unrestricted by geographic area under the terms of the DFAs and PSCs.

B.    The United States' Contested Issues of Fact

The United States has filed two motions for partial summary judgment, each of which will dispose of Exxon's remaining claims in this case as a matter of law. (*See* Dkt. Nos. 152 – 160, 175 – 176, 178 -179, 187, 190). Our first motion addresses Exxon's contention that the DFA and PSC transactions may be recharacterized from oil and gas leases to "sales." As discussed in our briefing, Exxon's claim is based on its novel legal theory regarding the "economic interest test." *See* Complaint, ¶ 20. Exxon's claims depend on that theory, and once that legal theory is rejected, there are no *material* disputes of fact that preclude summary judgment against Exxon and in favor of the United States. The undisputed terms of the agreements listed above govern.

Our second motion addresses the change of method of accounting issue. Exxon has also filed a partial summary judgment motion on this issue. (Dkt. Nos. 125 – 127). Exxon's original accounting method for the DFAs and PSCs and its proposed "sale" accounting method for those transactions are not disputed. They are set out in Exxon's tax returns, Exxon employees' affidavits and Exxon's own description of its proposed new accounting method. The parties disagree about how the law applies to the change in method.

Because we believe that summary judgment against Exxon on both issues is appropriate, we do not believe that there are any *material* facts in dispute. Any disputed facts are not material to rejecting Exxon's claims. However, if the parties proceed to a trial, the following may be considered contested issues of fact:[7]

1.    Exxon's substantiation of the royalties, cash payments and in-kind share of oil or gas received by Petronas and Qatar under the DFAs and PSCs.

---

[7] We are not listing here matters that are not contested, such as the terms of the agreements. Those facts are discussed in our proposed findings of fact and summary judgment motions, filed separately. Additionally, we reserve the right to contest other facts that may be presented at trial.

2.      Any "property" that was allegedly conveyed under the PSCs and DFAs.

3.      The purported "value" of oil and gas minerals computed by Exxon's expert Paul Carpenter.[8]

## IV.    Contested Issues of Law

### A.    ExxonMobil's Contested Issues of Law[9]

1.      Whether SOQ and Petronas did not retain an economic interest in the mineral in place for federal income tax purposes, such that the DFA and PSC transactions are purchases and not mineral leases.

2.      Alternatively, whether ExxonMobil's payments for the intangible property acquired under the DFAs and PSCs are still purchase payments subject to section 483 under section 197 and the regulations promulgated thereunder.

3.      Whether Defendant's variance argument under section 7422, Treas. Reg. § 301.6402-2(b)(1), and Fifth Circuit case law is nonjurisdictional and has been waived by Defendant's failure to assert variance in a timely manner.

4.      Whether ExxonMobil set forth the factual and legal grounds for refund in its informal or formal claims for refund in compliance with Treasury Regulations section 301.6402-2(b)(1).

5.      Whether the correction from mineral lease treatment to purchase treatment is a change in method of accounting.

---

[8] We believe Mr. Carpenter's opinions are irrelevant under a correct application of the law. Other opinions Mr. Carpenter has provided are also irrelevant or improper. The government does not have any testifying experts.

[9] To the extent that the Court deems any of the contested issues of law to be issues of fact or mixed issues of fact and law, ExxonMobil submits them as such.

6.      Whether ExxonMobil can adopt a separate method of accounting for the DFA Payments by each JVCo under section 446 and the regulations thereunder.

7.      Whether ExxonMobil established a method of accounting for the DFA Payments by RL3 and QG2 when the DFA Payments were improperly treated as royalties for only one year.

8.      Whether section 483 applies to the DFA Payments and PSC Payments to impute interest.

**B.     The United States' Contested Issues of Law**

The United States submits that the following are contested issues of law:

1.      Whether Exxon's Qatar and Malaysia DFA and PSC transactions are properly treated as oil and gas leases, as Exxon has always treated them, not as "sales" and "purchases of "property," as Exxon now claims they should be, based on its view of the "economic interest" test.

2.      Whether Qatar and Malaysia (Petronas) retained an "economic interest" under the DFA and PSC transactions at issue.

3.      Whether 26 U.S.C. § 483 applies to the DFA and PSC transactions at issue, if the transactions are not leases.

4.      Whether, even if the transactions could be treated as "sales" and "purchases" of "property," Exxon's proposed new treatment would be an impermissible change of accounting method. 26 U.S.C. § 446.

**V.     Estimated Length of Trial**

**A.     ExxonMobil's Estimate**

ExxonMobil estimates the trial will last up to ten days because Defendant is objecting to ExxonMobil's use of the Summary Models, in accordance with Federal Rule of Evidence 1006, to prove the content of voluminous records regarding the DFA and PSC Payments.  Although ExxonMobil has asked Defendant to identify those portions of the model to which it objects in an

attempt to narrow the issues for trial, Defendant has refused.  If Defendant withdraws its objections to ExxonMobil's Summary Models, ExxonMobil believes that the trial will last no more than five days.

Defendant's statements below about the Summary Models, the supporting business records declarations, and the disclosure of Stephanie Malen are inaccurate and misleading.  Defendant has known since early December 2018 that Ms. Malen prepared the Summary Models, but Defendant made no effort to depose her.  Likewise, when ExxonMobil timely disclosed Ms. Malen in its Fourth Amended Disclosures as a potential witness in this case, ExxonMobil offered to present Ms. Malen for deposition, but Defendant rejected ExxonMobil's offer.  Accordingly, Defendant cannot credibly assert that it "did not have the opportunity to depose her."  Similarly, ExxonMobil timely provided Defendant with business records declarations regarding the documents underlying the Summary Models a reasonable time before trial.  If Defendant continues to object to the Summary Models, it must provide its objections, together with the grounds for them, by May 31, 2019, in accordance with Federal Rule of Civil Procedure 26(a)(3)(B).  Thus far, Defendant has not asserted any legitimate ground for objecting to the Summary Models.

Finally, ExxonMobil does not believe that time limits should be imposed on the parties, but if they are, the time should not be split equally. As Defendant notes, ExxonMobil must prove its entitlement to the claimed tax refunds, and Defendant has no witnesses other than four ExxonMobil employees. In contrast, ExxonMobil will have up to ten witnesses, if Defendant continues to assert baseless objections to ExxonMobil's Summary Models that will greatly lengthen the trial. Accordingly, assuming Defendant continues to object to the Summary Models, any time limits should provide ExxonMobil with 2/3 of the time at trial and Defendant with the remaining 1/3 of the time.

**B.      The United States' Estimate**

As noted, we have filed motions for partial summary judgment on both the Qatar/ Malaysia Oil and Gas Lease issue and the Accounting Method Change issue. (Dkt. Nos. 152, 157). We do not believe a trial is necessary. Nevertheless, if the Court holds a trial, one week should be more than sufficient, with the time divided equally between the parties.

With respect to trial length, Exxon mischaracterizes the issue presented by its "Summary Models." Exxon did not identify as a trial witness the person (Stephanie Malen) responsible for preparing the models, and who had personal knowledge of the source documents on which they are based, until April 12, 2019, the last day of the discovery period in this case. Then, on May 6th, while the parties were briefing summary judgment and almost one month after discovery had already closed, Exxon sent us declarations of five other individuals and an additional production of documents purportedly relating to the models.

Because of Exxon's untimely identification of Ms. Malen and identification of relevant documents, we did not have an opportunity to depose her during discovery, and will have to examine her at trial. Moreover, the models purportedly summarize payments made in Malaysia and Qatar on which Exxon bases its refund claims. We do not have personal knowledge of the payments, and it is Exxon's burden to substantiate them. Additionally, the models incorporate certain assumptions and computations that Exxon must explain to the Court. Its new accounting method is one of the issues in this case, and that method is purportedly reflected in these models. Exxon's attempt to blame defendant for its untimely disclosures and for having to comply with Federal Rule of Evidence 1006 is baseless.

## VI.     Additional Matters that May Aid in the Disposition of the Case

### A.     Pretrial Conference

The parties agree that a pretrial conference before June 17, 2019, would be beneficial, and both parties are available on the following dates:   June 4 (morning and afternoon); June 5 (afternoon only); and June 14 (morning and afternoon).

### B.     ExxonMobil's Additional Matters

ExxonMobil requests that the Court resolve two issues sufficiently in advance of the June 17, 2019 trial, because they will impact the presentation of evidence at trial and may require extensive argument to the Court.  ExxonMobil believes that these issues can and should be resolved at any pretrial conference.  *First*, as explained above, ExxonMobil will use Summary Models to prove the content of voluminous records regarding the DFA and PSC Payments in accordance with Federal Rule of Evidence 1006.   If Defendant continues to object to the Summary Models, ExxonMobil believes that those objections are best argued and resolved before trial starts. Otherwise, the presentation of witnesses and evidence may be delayed while the parties address Defendant's objections during trial.  *Second*, ExxonMobil has filed an opposed motion requesting a trial protective order [Dkt. 152], which would allow ExxonMobil to present certain confidential exhibits and testimony under seal.  Because the resolution of this motion will impact the evidence and testimony that ExxonMobil presents at trial, ExxonMobil requests that the Court rule on the motion before trial starts on June 17.

ExxonMobil also believes that consideration of certain foreign law issues will help aid the disposition of this case.  ExxonMobil has given notice of its intent to present evidence regarding one or more issues of foreign law pursuant to Federal Rule of Civil Procedure 44.1 and has filed the required notice [Dkt. 163].

Another matter that will aid the disposition of this case is the trial deposition of Ayob Yahaya, an ExxonMobil employee from Malaysia who cannot attend the trial in person. The parties have agreed to take this trial deposition, but due to scheduling issues, the deposition will not occur until May 24, 2019, which is after the May 17, 2019 deadline to designate deposition testimony. Accordingly, the parties have agreed (a) to file initial deposition designations for Mr. Yahaya no later than seven days after they receive the deposition transcript, and (b) to file any objections to the initial designations, along with any rebuttal designations, no later than seven days after the initial designations are filed.

ExxonMobil requests that up to two attorneys per side may question a witness and raise objections. ExxonMobil is making this request because Defendant is asserting baseless objections to the Summary Models discussed above. ExxonMobil would like to have one attorney—an experienced federal court practitioner—address the evidentiary and foundational issues for the Summary Models and another attorney—an experienced tax attorney—address the models' substance and calculations. Defendant has previously agreed to this exact procedure in a bench trial of a tax case before this very Court. *See Trinity Industries, Inc. v. United States of America*, 3:06-cv-726, Pretrial Order (Dkt. 82) at p. 45; Pretrial Order (Dkt. 124) at p. 43.

ExxonMobil requests that, no later than 28 days after the trial ends, the following materials may be filed with the Court: (a) amended proposed findings of fact and conclusions of law, and (b) a post-trial brief, which shall not exceed 30 pages (excluding the signature page, table of contents, and table of authorities).

Finally, if the Court rules in ExxonMobil's favor on the merits of the disputes, the parties will meet and confer regarding the computations of the amount of the tax refund and statutory interest due ExxonMobil for taxable years 2006, 2007, 2008, and 2009, including the calculation

of interest under section 483, depletion, the apportionment of interest under section 861, the application of foreign tax credits, and correlative adjustments (including carrybacks and carryforwards). Once the parties have met and conferred, they will submit a proposed stipulation to the Court for consideration and entry. That stipulation will allow the Court to enter a judgment that reflects the amount of the tax refund and statutory interest due ExxonMobil for taxable years 2006, 2007, 2008, and 2009, and will eliminate any need for the Court to address those computations.[10]

## B.    The United States' Additional Matters

The United States is filing a motion *in limine* to exclude any claim by Exxon pursuant to § 197 of the Tax Code or its regulations. The Court does not have jurisdiction over such a claim. Under § 7422(a) of the Tax Code, Treas. Reg. § 301.6402-2(b)(1), and the Fifth Circuit's application of the variance doctrine, Exxon's admitted failure to file such a claim with the IRS precludes Exxon from raising it here. Of course, Exxon did not allege such claim in its Complaint either. Even if it had, it would be barred. Several of Exxon's contested issues of fact and law above relate to this impermissible claim.

Exxon has also listed as a contested issue of law whether § 7422, Treas. Reg. § 301.6402-2(b)(1) and the variance doctrine are jurisdictional, and whether the government has waived any objection under variance to Exxon's new § 197 ground for a refund. If Exxon intends to argue those issues, it may do so in response to our motion *in limine* on variance. We understand the contested issues of law in this pretrial order to be issues that may be a subject of the trial. *Whether* the Court has jurisdiction over Exxon's new alternative claim will not be the subject of the trial,

---

[10] Although both parties agree that computational issues should be addressed post-trial during meetings between the parties, they are submitting separately worded paragraphs in this Joint Pretrial Order because ExxonMobil believes that Defendant's language is too narrow and does not capture all of the computations that must be addressed.

and, therefore, we do not list any related issues here. The jurisdictional variance bar should be confirmed *before* any trial. *See, e.g., El Paso CGP, L.L.C. v. United States*, 748 F.3d 225, 228 (5th Cir. 2014) (Stating that, "[t]o assert a court's jurisdiction over a claim for refund, the variance doctrine requires…."); *Rodgers v. United States*, 843 F.3d 181, 196-97 (5th Cir. 2016) (explaining that, "even if the variance doctrine was not jurisdictional and could thus be waived by a party, the IRS did not waive what Taxpayers failed to plead").[11]

Exxon has filed a motion to seal portions of the trial record and close the courtroom for part of the trial. (Dkt. No. 166). We have opposed Exxon's request as overly broad and insufficiently supported. (Dkt. No. 180).

We object to Exxon's request that it may have two attorneys question a witness and raise objections. Exxon has provided no persuasive explanation to us for this request, and we do not believe it is appropriate or consistent with the Court's practice.

We also believe a pretrial conference would be beneficial. We are available June 4, 5 (in the afternoon), or 14, 2019. If the parties are proceeding to a trial, it would be helpful to have the Court confirm before then that Exxon may not insert any claim relating to § 197 and that Exxon may not seek admission of any related evidence.

Whether any post-trial briefing or additional findings and conclusions are necessary should be addressed after trial.

If the Court rules in ExxonMobil's favor on the merits of the disputes, the parties will meet and confer regarding the computations of the amount of overpayment and statutory interest due ExxonMobil for taxable years 2006, 2007, 2008, and 2009.  Once the parties have met and

---

[11] As is explained in our motion *in limine*, Exxon did not plead an alternative § 197 ground for refund in its Complaint. Exxon seems to agree that this jurisdictional issue should be decided before any trial. It objects to a "trial of variance" above.

conferred, they will submit a proposed stipulation (or any disputes) to the Court for consideration. This will allow the Court to enter a judgment that reflects the amount of any overpayment and statutory interest due ExxonMobil for taxable years 2006, 2007, 2008, and 2009, and will eliminate any need for the Court to address those computations at trial.

Finally, the United States requests that the Court cancel the June 17, 2019, trial setting. Both parties have filed motions for partial summary judgment. If either of the United States' motions is granted, a trial is unnecessary. If trial is cancelled, the parties will not have to prepare for a potentially unnecessary trial while the Court considers the motions. Additionally, if the Court were to deny the motions, or only grant them in part, any remaining issues could be addressed at the trial regarding penalties set for November 18, 2019.

Respectfully Submitted:

THOMPSON & KNIGHT LLP

By:     /s/ Emily A. Parker

Emily A. Parker
State Bar No. 15482500
emily.parker@tklaw.com

Mary A. McNulty
State Bar No. 13839680
mary.mcnulty@tklaw.com

William M. Katz, Jr.
State Bar No. 00791003
william.katz@tklaw.com

J. Meghan Nylin
State Bar No. 24070083
meghan.nylin@tklaw.com

Leonora S. Meyercord
State Bar No. 24074711
lee.meyercord@tklaw.com

Dina W. McKenney
State Bar No. 24092809
dina.mckenney@tklaw.com

1722 Routh Street, Suite 1500
Dallas, Texas  75201
(214) 969-1700
(214) 969-1751 (Fax)

**ATTORNEYS FOR PLAINTIFF
EXXON MOBIL CORPORATION**

UNITED STATES

By:     /s/ Cory A. Johnson

Cory A. Johnson
Senior Litigation Counsel
Elizabeth Kanyer
U.S. Department of Justice
P.O. Box 26
Washington, D.C. 20044
202-307-3046
202-514-9440 (FAX)

Jonathan L. Blacker
Trial Attorney, Tax Division
U.S. Department of Justice
717 N. Harwood, Suite 400
Dallas, Texas 75201
214-880-9765/9735 (v)
214-880-9741/9742/9744 (f)
Jonathan.Blacker2@usdoj.gov

**ATTORNEYS FOR THE UNITED
STATES**

Signed 6/13, 2019.

DAVID C. GODBEY
UNITED STATES DISTRICT COURT JUDGE

JOINT PRETRIAL ORDER – PAGE 32