IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| EXXON MOBIL CORP., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:16-CV-2921-N |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Defendant. | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Pursuant to the Court's order dated March 22, 2019 [149], certain issues proceeded to trial before the Court on June 19-24, 2019.  Pursuant to Rule 52 of the Federal Rules of Civil Procedure, this constitutes the Court's findings of fact and conclusions of law regarding those issues.[1]  In particular, this Order addresses whether certain agreements relating to oil and gas exploration and production in Qatar and Malaysia constitute mineral leases or purchases of minerals in place.  As explained below, the Court finds the agreements are primarily leases.[2]

---

[1] The Court's fact findings are in Parts I and III of this Order, and its conclusions of law are in Parts II and IV, unless otherwise expressly noted by the terms "find" and "hold."  To the extent any findings of fact are more properly considered to be conclusions of law, and vice versa, the Court adopts them as such.

[2] The commercial transactions at issue are quite complex.  For purposes of this Order, it is unnecessary to consider all of that complexity.  Accordingly, the Court will use a simplified description of the transactions, except as it may be germane to the outcome.

ORDER – PAGE 1

# I. Background of the Agreements

## A. *Qatar*

Plaintiff Exxon Mobil Corp. ("Exxon Mobil") is a shareholder in various Qatari joint stock companies that are treated as partnerships for federal income tax purposes: Ras Laffan Liquefied Natural Gas Company Limited ("RL1"), Ras Laffan Liquefied Natural Gas Company Limited (II) ("RL2"), Ras Laffan Liquefied Natural Gas Company Limited (3) ("RL3"), and Qatar Liquefied Gas Company Limited II ("QG2") (collectively, the "JVCos").  Each of the JVCos entered into a Development and Fiscal Agreement ("DFA") with the government of Qatar.[3]  The Qatar North Field is a large offshore gas field within the territorial waters of Qatar.  Under the DFAs, the JVCos are obligated at their sole cost to explore, develop, and extract gas in place in the Qatar North Field, and to build, own, and operate the transportation, storage, processing, liquefaction, and marketing facilities for the manufacture and marketing of petroleum products.  The petroleum products are liquefied natural gas ("LNG"), condensate, and liquefied petroleum gas ("LPG").

Under the DFAs, the JVCos are obligated to pay Qatar the following amounts: (1) either a minimum amount per unit of gas delivered to the LNG plant, or a percentage of the market value of LNG at the delivery point to the buyer, whichever is greater; (2) a percentage of the proceeds from the sale of condensate; and (3) a percentage from the sale

---

[3]Although the DFAs are not identical, they are sufficiently similar to treat them as identical for the purposes of these issues.

ORDER – PAGE 2

of LPG.  The DFAs were for a fixed term, typically twenty years.  At the end of the term, all of the physical plant built by the JVCos reverts to Qatar.

The business plan for Qatar gas was to liquify it, which opened up international markets for the gas.[4]  Consequently, there is no market price for gas at the wellhead in the Qatar North Field.  In order for the gas there to have economic value, it must be extracted, liquefied, and transported to a different market, such as Europe.  *See generally* 2 Trans. 92-100.[5]

### *B. Malaysia*

Petroliam Nasional Berhad ("Petronas") is the state-owned oil company in Malaysia.  Exxon Mobil entered into a series of Production Sharing Contracts ("PSCs") with Petronas.[6]  Under the PSCs, Exxon Mobil has the right to exploit oil and gas in parts of the Malay Basin, an offshore oil and gas field.  As with the DFAs, Exxon Mobil bears all costs associated with exploration, development, transport, processing, and marketing of the petroleum.  Exxon Mobil is required to make various payments to Petronas based on extraction of minerals.  Exxon Mobil also is required to make "abandonment cess"[7] payments regardless of production under most of the PSCs; these payments were to provide

---

[4] Some later projects did produce gas for the domestic Qatari market, but not the DFAs in suit.

[5] The Court will cite to the four volume trial transcript as [vol.] Trans. [page].

[6] A Petronas subsidiary was also a party to the PSCs, but its presence can be disregarded for purposes of this Order.

[7] "Cess" is a term for a tax or levy, perhaps derived from "assessment."  *See* 2 Trans. 60.

ORDER – PAGE 3

a fund to cover the costs of plugging the wells at the end of their useful lives.[8]  Also like

the DFAs, at the end of the PSCs, all the facilities that Exxon Mobil paid to construct revert

to Petronas.[9]  Unlike in Qatar, one of Malaysia's policy goals was to develop a domestic

market and distribution infrastructure for its domestic gas production.

## II.  THE LAW REGARDING SALE VS. LEASE

### A. Recap of Case Law

The characterization of a mineral transaction as sale or lease has been in dispute in

tax matters for some time.  Much of the case law arose in the context of entitlement to

depletion deductions or capital gains versus ordinary income.  A recurring theme in all of

the cases, as in tax law generally, is that the courts should look to the economic reality of

the transaction, not the formal structure.  Although the context here is a bit different –

foreign tax credits – both sides appear to agree that the test is the same.  The Court will

briefly review some of the pertinent cases, starting with *Anderson v. Helvering*, 310 U.S.

404 (1940).

In *Anderson*, Oklahoma City Company ("OCC") owned various mineral interests

that produced income.  OCC sold the mineral interests to taxpayers.  Taxpayers paid

approximately one-third of the price in cash, with the balance (including interest) to be paid

---

[8] The PSCs also provided for a research cess, but it was based on production.  *See* 2 Trans.
54.

[9] As with the DFAs, the PSCs are not identical, but they are sufficiently similar in all
respect as germane to this analysis to treat them as identical.

out of one half of the production from the properties.  Payment to OCC was secured by a first lien against one half of the production, *and the fee interest*.  The next year, taxpayers received substantial revenue from production, half of which was paid to OCC.  The question before the Court was whether the half interest paid to OCC should be included as gross income of the taxpayers.

The Court noted:

> It is settled that the same basic issue determines both to whom income derived from the production of oil and gas is taxable and to whom a deduction for depletion is allowable.  That issue is, who has a capital investment in the oil and gas in place and what is the extent of his interest.

*Id.* at 407 (citations omitted).

The Court distinguished between revenue from production, which it characterized as like manufacturing, from revenue from a complete sale of the oil and gas in place.  *Id.* at 407-08.  The Court then reviewed various other cases and emphasized that its rulings turned on the economic realities, not "the formalities of the conveyancer's art."  *Id.* at 411.  The Court noted that the reservation of a lien on the fee interest by OCC "materially affects the transaction.  [OCC] is not dependent entirely upon the production of oil for the deferred payments; they may be derived from sales of the fee title to the land conveyed."  *Id.* at 412.  Petitioners relied on *Thomas v. Perkins*, 301 U.S. 655 (1937), which held that the assignor's right to receive a specified sum of money to be paid out of a specified percentage of oil produced was not income of the assignee, i.e., the assignor retained an economic interest in the minerals.  The *Anderson* Court limited *Thomas v. Perkins*:

ORDER – PAGE 5

> In the interests of a workable rule, *Thomas v. Perkins* must not be extended beyond the situation in which, as a matter of substance, without regard to formalities of conveyancing, the reserved payments are to be derived solely from the production of oil and gas. The deferred payments reserved by [OCC], accordingly, must be treated as payments received upon a sale to petitioners, not as income derived from the consumption of its capital investment in the reserves through severance of oil and gas.

*Id.* at 413.

*Anderson* thus takes an extreme view of the economic interest test: as long as the transferor even hypothetically looks to something other than production for repayment – such as a lien on the fee – the transaction is a sale and not a lease.

The Fifth Circuit considered the sale/lease issue in *Gray v. Commissioner*, 183 F.2d 329 (5th Cir. 1950).  The taxpayers there had certain oil and gas leases, which they assigned to La Gloria.  The assignments provided that the taxpayers reserved essentially a one-fifth overriding royalty on the conveyed interests.   The parties entered into a supplemental agreement that provided that if La Gloria elected to construct a gas processing and cycling plant, it would assign twenty percent of the plant to taxpayers.  *Id.* at 329-30.  The Circuit stated:

> [t]he acid test of whether an assignment of a mineral lease is an outright sale, or actually only a sub-lease, depends upon whether the assignor has completely divested himself of any interest in the minerals to be recovered or has instead reserved an "economic interest" in the mineral estate.

*Id.* at 331.  The Court held it was "patent" that the reservation of a twenty percent interest in the oil and gas and the contingent interest in the processing plant, if constructed, "manifestly resulted in the reservation of an 'economic interest' in the oil and gas in place."

*Id.* (citations omitted).  The *Gray* Court thus did not strictly require that a transferor look solely to production of the minerals for compensation for the transaction to be a sublease instead of a sale, i.e., the contingent interest in the processing plant was not enough to transform the lease into a sale.

The Circuit again addressed the issue in *Estate of Weinert v. Commissioner*, 294 F.2d 750 (5th Cir. 1961).  That case involved the characterization of a carried interest.  "A carried interest is an arrangement between two or more co-owners of a working interest, whereby one agrees to advance all or some of the development costs on behalf of the others and to recover such advances from future production, if any, accruing to the other owners' share of the working interest."  *Id.* at 750 n.1 (quoting Breeding and Burton, Taxation of Oil and Gas § 2.08 (1961)).

The transaction at issue involved two steps.  In the first step, which was not at issue, the taxpayer-carried party sold to the investor-carrying party for $100,000 in cash a one-half interest in certain leases and a processing plant to be built and a $50,000 production payment to be made out of the retained half.  The carrying party agreed to pay up to $150,000 in development costs for the taxpayer, to be repaid out of income from the taxpayers retained interest.  In the second step, which was at issue, the taxpayer assigned to a trustee his remaining one-half interest in the minerals and the plant where the trust instrument required the trustee to pay all income to the carrying party until it was fully repaid.  The question was whether the taxpayer should be charged with income on the revenue that went to repay the carrying party for the advances.  *Id.* at 751-52.

ORDER – PAGE 7

After a lengthy discussion of the scholarly literature and the case law, the Circuit held that the processing plant was part of the production process:

> Here, the plant was not a separate manufacturing plant or business, but an indispensable part of the severance and sale of the gas and liquid hydro-carbons produced from the unitized leases. The operation of the plant was nothing more than the extraction of the liquid hydrocarbons from the gas produced from the unitized leases and the return of such dry gas as was not sold into the geological formation from which it was produced.

*Id.* at 764.  The plant processed hydrocarbons only from the unitized leases.  *Id.*

The plant apparently performed separation, absorption, and fractionation.   In *Scofield v. LaGloria Oil & Gas Co.*, 268 F.2d 699 (5th Cir. 1959), the Court held that "the processes of separation and absorption are producing activities while fractionation is a refining or manufacturing activity."  *Weinert*, 294 F.2d at 764 (citing *LaGloria*, 268 F.2d at 708, 726).  The *Weinert* Court stated it would be "unreasonable" if "merely because one of the processes included fractionation, that the entire character of the leasehold . . . is destroyed.  *The arrangement here was predominantly concerned with mineral production and recoupment was recoverable solely from extraction and sale of the minerals.*"  *Id.* at 764-65 (footnote omitted, emphasis added).  The Court noted that any other result would be absurd.  "If Lehman had no economic interest in the production, no one had."  *Id.* at 765.  "The Law may be a jealous mistress; it is not a fussy old maid."  *Id.*

Consistent with *LaGloria*, the Court remanded for an allocation of plant income between production and fractionation.  *Id.*

*Weinert* thus stands for two propositions.  First, when a project produces income from both production and refining, courts should use a predominance test in determining whether to characterize the transaction as a lease.  Second, when the revenue stream from a project that is primarily a lease also includes refining income, it is proper for the finder of fact to allocate the revenue between production and refining.

In *Wood v. United States*, 377 F.2d 300 (5th Cir. 1967), the taxpayer, Wood, entered into a lease to extract sand and gravel from his ranch.  After paying tax on the royalties as ordinary income, Wood filed amended returns and sought a refund on the theory that the royalties were income from the sale of a capital asset.  The question was whether Wood retained an economic interest in the minerals.  *Id.* at 303-04.  The lease in question called for Wood to be paid a fixed amount per cubic yard extracted.  The Court appeared to find *Wood* an easy case: "Under the economic interest test, the critical consideration is whether payment is dependent upon extraction, not the method by which that payment is calculated."  *Id.* at 306.

Wood then argued that the presence of a minimum royalty provision in the lease negated an economic interest because "his income was not based solely upon production as required by the economic interest test."  *Id.* at 307.  The Court disagreed, finding that the minimum royalty was simply an advance of future royalties under the lease.  *Id.*

In *Christie v. United States*, 436 F.2d 1216 (5th Cir. 1971), the Circuit faced another complex transaction.   The taxpayer, Christie, was a 3/8 working interest owner in an oil lease.   The working interest owners entered into an agreement with a third party,

ORDER – PAGE 9

Karrenbrock, for Karrenbrock to provide, at his expense, various equipment to be used to develop wells on the lease.   In exchange, the working interest owners assigned to Karrenbrock eighty percent of the revenue from the lease until he received the cost incurred in purchasing and installing the equipment, together with a five percent commission and annual interest on the unpaid balance.  *Id.* at 1217.  The right to payment that Karrenbrock received is called a production payment.  *Id.* at 1217 n.3.  The agreement also gave Karrenbrock the option to receive the proceeds of any salvage sale of the equipment he provided.   Karrenbrock was paid in full out of the first month's production after the agreement was reached.   The issue in the case was whether Christie should report the money paid to Karrenbrock as Christie's income.

After an extensive review of the case law, the Circuit distinguished *Weinert* on the basis that Karrenbrock had the salvage value of the equipment as an alternative source of income.   *Id.* at 1220-21.   The Court held that "the party assuming the risk [of nonproduction] is the one who holds the economic interest, thereby sharing both the benefits of depletion and the burden of taxation." *Id.* at 1221.  In that case, the Circuit held, the party assuming the risk of nonproduction was Christie, the taxpayer.  *Id.*

Finally, in *Vest v. Commissioner*, 481 F.2d 238 (5th Cir. 1973), the Circuit dealt with water rights.  The Vests conveyed to Shell the rights to all water between 3,000 and 6,500 feet beneath their land together with a right of way for developing the water rights and a pipeline to distribute the water.   Shell in turn was obligated to make monthly payments to the Vests for water produced from their land, as well as other water brought

under the agreement or transported through the pipeline. Shell did not drill any well or lay pipeline, but did make payments to the Vests for other water produced from neighboring landowners. The dispute was over whether the transaction was a sale or a lease.

First, the Court noted that the labels used are not controlling. *Id.* at 243. The Court said "that a sale results where an agreement purports to transfer within a prescribed time period *all* or a *specific, predetermined* quantity of minerals in place in exchange for a fixed consideration." *Id.* (citations omitted, emphasis in original). The Court noted that in a sale transaction, the seller "also acquires a right to receive payments which is not dependent upon extraction by the transferee." *Id.*

The Court acknowledged that the agreement before the Court was "a borderline transaction for tax purposes reflecting in varying degrees both sale and lease characteristics." *Id.* at 244. The Court noted that Shell did not acquire all of the water or a specific quantity, but rather the right to use water as needed. If Shell did not extract water, the Vests received nothing. *Id.* Shell's obligation to pay was linked to extraction of water or use of the pipeline, *id.* at 244-45, and thus was "more in the nature of a lease." *Id.* at 245. The Court noted that the right of way aspect of the transaction did not require allocation: "the grant of the right of way was a necessary part of this transaction, the

ORDER – PAGE 11

primary purpose of which was to secure the water rights." *Id.* at 245 n.15.  Thus, the *Vest* Court also used a primary purpose analysis.[10]

### B. Exxon Mobil's "Solely" Argument

Exxon Mobil makes an argument resting on the "payments are to be derived solely from the production of oil and gas" language in *Anderson* quoted above.  Exxon Mobil argues that Qatar and Petronas were compensated, at least in part, for value added after the wellhead.  Thus they were not looking to "payments . . . solely from the production of oil and gas."  Therefore, they did not retain an economic interest in the minerals in place.  Therefore, the transactions were sales, not mineral leases.  The Court has several problems with this argument.

First, *Anderson* is factually different from this case.  The issue that concerned the Supreme Court was that the reservation of a lien on the fee interest by the seller, OCC, "materially affects the transaction.  [OCC] is not dependent entirely upon the production of oil for the deferred payments; they may be derived from the sales of the fee title to the land conveyed."  310 U.S. at 412.  The Court thus was not considering a circumstance where a putative lessor might obtain ninety percent of its return from extraction of minerals and ten percent for something else.  In *Anderson*, the seller, OCC, might get 100% of its return from production; in the alternative event of a sale, OCC might get 100% of its return

---

[10] It does not appear that the difference in word choice between *Weinert*'s "predominance" and *Vest*'s "primary purpose" indicates any substantive difference.

from the sale.  As the Court observed, in the event of a sale, OCC would clearly not be entitled to depletion, because its payment was due to a sale, not diminution of the quantity of minerals in place.  *Id.* ("It is clear that payments derived from such sales would not be subject to an allowance for depletion of the oil reserves, for no oil would thereby have been severed from the ground . . . .").  Thus the facts in *Anderson* were more nearly all or nothing alternatives, not a mixture.  Exxon Mobil thus tries to load "solely" with more freight than it can bear by arguing for an extension of *Anderson* beyond the facts before the Supreme Court in that case.

Second, Exxon Mobil's construction of *Anderson* conflicts with subsequent – and binding – Fifth Circuit precedent.  In *Gray v. Commissioner*, *supra*, the Circuit held that the reservation of a twenty percent interest in the minerals patently reserved an economic interest in the minerals in place, notwithstanding a contingent interest in a gas processing and cycling plant.  183 F.3d at 331.  In *Estate of Weinert*, *supra*, the transaction involved both extraction and processing.   The Court applied a "predominance" test: "[t]he arrangement here was *predominantly* concerned with mineral production . . . ."   294 F.2d at 765 (emphasis added).  The Court found an economic interest, notwithstanding the fact that some income resulted from processing, not extraction.  Finally, in *Vest*, *supra*, the Court used a "primary purpose" analysis when Shell acquired the right to produce water from the lessor's property, as well as a right of way to construct a pipeline: "the grant of the right of way was a necessary part of this transaction, the primary purpose of which was

ORDER – PAGE 13

to secure the water rights."  481 F.2d at 245 n.15.  If Exxon Mobil's reading of *Anderson* were correct, all of these cases would have come out the other way – but they didn't.

Third, Exxon Mobil's gloss on *Anderson* does not make sense.  Read literally, Exxon Mobil's construction would allow for a penny of post-production revenue to transform a mineral lease into a sale.  Even assuming Exxon Mobil acknowledged some de minimis exception, a minimal amount of post-production revenue would have the same effect.  This is surely exalting form over substance, and not reflecting the economic reality of the transaction.  *See Anderson*, 310 U.S. at 411 (tax analysis turns on economic realities, not "the formalities of the conveyancer's art"); *Weinert*, 294 F.2d at 764-65 (would be "unreasonable" if "merely because one of the processes included fractionation, that the entire character of the leasehold . . . is destroyed").

Finally, Exxon Mobil's argument reflects a fundamental confusion between (a) what Qatar and Petronas provide to Exxon Mobil and (b) how the royalty is calculated.  An example may help: suppose A grows apples and provides them to B, who bakes and sells apple pies.  A and B agree that B will pay A for the apples based on the market price of apple pies.  The buyers of the pies are clearly paying for the baking, as well as the apples.  This does not mean that A is now a baker or that A is being compensated for baking.  It simply means that A and B have agreed to value the ingredient in terms of the cost of the finished product.

Likewise here, Qatar and Petronas are not being compensated for post-extraction processing.  Exxon Mobil's *buyers* are certainly paying Exxon Mobil for post-production

ORDER – PAGE 14

processing, but that doesn't mean that Exxon Mobil is paying Qatar and Petronas for post-production processing – what they provide is minerals in place.  The fact that their royalty may be based in part on the price of the processed product does not matter.  "Under the economic interest test, the critical consideration is whether payment is dependent upon extraction, not the method by which that payment is calculated." *Wood*,  377 F.2d at 306.  Payment to Qatar and Petronas is dependent upon extraction.[11]

The Court thus rejects Exxon Mobil's *Anderson* argument.  The Court will follow binding Fifth Circuit precedent using a predominant or primary purpose test to identify the nature of the agreements at issue.

### III. THE AGREEMENTS ARE PRIMARILY LEASES

#### A. Dr. Carpenter

One of Exxon Mobil's main witnesses at trial was Dr. Paul Carpenter, Ph.D.  Dr. Carpenter is an economist specializing in oil and gas.  He is well qualified, both academically and by experience with oil and gas.  He offered three opinions: (1) Exxon Mobil had "economic ownership" of the minerals under the DFAs and PSCs; (2) those agreements are economically "indivisible"; and (3) the compensation paid to the governments exceeded the value of the minerals at the wellhead, and thus some of the compensation was for downstream processing, i.e., Qatar and Petronas did not look solely

---

[11] See note 18 below for a discussion of Exxon Mobil's argument that Qatar and Petronas are compensated for intangible rights under the various agreements.

ORDER – PAGE 15

to extraction of minerals for their return.  *See* 2 Trans. 125-27.  The Court will address each opinion in turn.

Dr. Carpenter explained that "economic ownership" has four characteristics: (1) investment in exchange for certain exclusive rights; (2) expectation that rights provide opportunity for investment returns; (3) return on investment uncertain and dependent on external market factors; and (4) return exposed to upside and downside risks.  *See* PX 500 at 8 (slide 7).  Based on these criteria, Dr. Carpenter opined that Exxon Mobil had economic ownership under the DFAs and PSCs.  2 Trans. 137-40.

The Court has two reservations about this opinion.[12]  First, according to Dr. Carpenter, what Exxon Mobil has economic ownership of is the bundle of rights it obtained under the DFAs and PSCs.  *See* 2 Trans. 181.  It is somewhat circular to say the agreements give Exxon Mobil ownership of its rights under the agreements.  Dr. Carpenter never opines that Exxon Mobil is the owner of the minerals in place or that the agreements sold the minerals in place to Exxon Mobil, which is what the case law discussed above.  Second, and more significant, the concept of economic ownership does not match up well with the distinction in US tax law between sale or lease of a mineral interest.  Accordingly, the Court finds Dr. Carpenter's opinion regarding economic ownership to be irrelevant.

---

[12] The Court means from a legal perspective.  The Court does not pretend to criticize Dr. Carpenter's opinions from an economic perspective.

Next, Dr. Carpenter opined that Exxon Mobil's rights under the agreements were indivisible. From an economic perspective, this apparently means there is no economically correct way to allocate a dollar of revenue from the sale of processed minerals between the value of the minerals at the wellhead and the value of downstream activities, such as transportation, processing, and marketing. 2 Trans. 208-09. For reasons explained in Part III.B below, the Court does not believe it necessary to perform that allocation.[13] Accordingly, the Court finds Dr. Carpenter's opinion regarding economic indivisibility also to be irrelevant.

Finally, Dr. Carpenter then proceeded to divide revenue between production and downstream. In fairness, he did not purport to accomplish what he had just said was impossible. Rather he engaged in a "thought experiment" where he divided the agreements into two pieces: production and downstream.[14] For convenience, this Order will refer to those two hypothetical entities as producer and refiner. In determining value at the wellhead, Dr. Carpenter reasoned that the producer would not sell for less than it cost to produce the mineral at the wellhead, including a reasonable profit.[15] Likewise a refiner

---

[13] Dr. Carpenter's economic indivisibility opinion was from an economist's perspective. As reflected by his third opinion, in the real world business entities regularly make such allocations through negotiation. The Court is confident that if it needed to make such an allocation, with a proper record and its fact finder hat on, it could do so.

[14] There was testimony that in one earlier agreement, the deal was so divided. It worked out poorly because incentives were "misaligned." Thus it was more efficient economically to combine production and downstream activities into a single agreement. *See* 1 Trans. 51-52; 2 Trans. 147-50.

[15] Dr. Carpenter called this the upstream cost-based value. *See* PX 500 at 15 (slide 14).

ORDER – PAGE 17

would not buy for more than it could sell the end product less its expenses and a reasonable profit.[16]  Under the agreements in this case, there was a gap between those two numbers.[17]

Dr. Carpenter also calculated the payments Exxon Mobil made to Qatar and Petronas under the agreements based on production, which he called the contingent payments.  He compared the contingent payments to the producer's lowest price and found the contingent payments exceeded the producer's lowest price.  *See* PX 500 at 20, 24 (slides 19 & 23).  From this he concluded that at least some of the contingent payments were attributable to downstream activities.  *See* 2 Trans. 127, 165.  Thus, Exxon Mobil concludes, revenue to Qatar and Petronas was not attributable solely to extraction of minerals.

The Court has two problems with this opinion.  First, it is premised on Exxon Mobil's legal theory that Qatar and Petronas retain an economic interest only if they look solely to extraction for their return.  As discussed above in Part II.B, the Court does not adopt that position.  Dr. Carpenter does not opine whether Qatar and Petronas look primarily to the value of the minerals versus downstream value for their return.  Thus, under the legal standard adopted by the Court, this opinion is irrelevant.

Second, Dr. Carpenter's analysis has a significant flaw – he assumes the producer already has the right to extract the minerals and "gets access to extraction for free."  2

---

[16] Dr. Carpenter called this the wellhead netback value.  *See* PX 500 at 16 (slide 15).
[17] The two hypothetical entities would presumably negotiate a number somewhere in that gap.  *See* 2 Trans. 158-60.

ORDER – PAGE 18

Trans. 194-95.  That is plainly wrong.  The contingent payments to Qatar and Petronas *are*

the cost for access to extraction.[18]  If those costs are included in the hypothetical producer's

lowest acceptable wellhead price, as they should be, then by definition that lowest

---

[18] Dr. Carpenter opines that those payments include certain intangible rights under the agreements such as access to land and access to the domestic gas market in Malaysia.  *See* 2 Trans. 142-44, 209-10.  Dr. Carpenter argues that before these agreements to give Exxon Mobil access to the Malaysian domestic market, Exxon Mobil simply "flared off" (i.e., burned at or near the wellhead) the gas produced because it was worthless without a market.  Once Malaysia gave Exxon Mobil access to its domestic market, Exxon Mobil could then profitably sell the gas, so access to the market was a valuable intangible right, according to Dr. Carpenter.

The Court does not share the same understanding of the factual testimony regarding development of the domestic gas market in Peninsular Malaysia.  *See generally* 2 Trans. 31, 35-44.  One of Malaysia's policy goals was the development of a local gas market, which did not previously exist.  Accordingly, the PSCs and related agreements (Heads of Agreement and natural gas production sharing agreements) required Exxon Mobil to undertake substantial capital expenditures to create the gathering, processing, and transportation infrastructure so that Malaysia could develop a domestic market for its gas resources.  Thus, rather than giving Exxon Mobil access to an existing domestic market, the agreements required Exxon Mobil to undertake significant capital expenditures to create such a local market.  The Court is not under any illusion that Exxon Mobil did this out of altruistic motives – in the context of the overall relationship, Exxon Mobil expected to make money even allowing for that capital expense.  However, "access to the local market," or more aptly, the obligation to create the infrastructure to permit development of a local market, was more of an expense to Exxon Mobil, rather than an intangible benefit.

Likewise, the Court finds the right of access to land onshore for construction of the onshore facilities was not a significant intangible benefit.  It was simply necessary for both deals to operate.  There was no evidence offered at trial regarding the size of the onshore facilities or the reasonable rental value.  As in *Vest*, "the grant of the [surface rights] was a necessary part of this transaction, the primary purpose of which was to secure the [mineral] rights."  481 F.2d at 245 n.15.

The Court finds in the overall context of the agreements, those intangibles have minimal value as compared to the value of the right to extract minerals.  Thus the contingent payments are a close approximation of the parties' arms-length negotiated valuation of the minerals in place.

ORDER – PAGE 19

acceptable wellhead price will be greater than the contingent payments.  Thus, it is not possible to use the size of the contingent payments to say that Qatar and Petronas were compensated for downstream activities.  That is a sensible result.  What Qatar and Petronas brought to the table was minerals in place.  Their compensation was the agreed-upon price for Exxon Mobil to exploit those minerals in place.[19]

### B. The Qatar DFAs Are Primarily Leases

Multiple factors indicate that the DFAs are primarily leases.  First, they entitle the JVCos to produce an undefined amount of gas over a fixed term, instead of conveying to the JVCos all or a fixed amount of the minerals in place.[20]  Second, although the form of the transaction is certainly not dispositive, the agreements were structured as leases.  Third, compensation to Qatar is dependent on extraction of minerals; if there is no extraction, Qatar receives no compensation.  Qatar thus retains an economic interest in the minerals.

The Court certainly acknowledges that the DFAs are more than just a lease.  They also provide for a substantial amount of processing.  This reflects the economic realities of the situation.  Qatar did not have a local market that would consume the gas produced under the DFAs.  Due to the location of Qatar, there was no local distribution network that could

---

[19] That includes the value of their residual interest in the physical plants that reverted at the end of the agreements.

[20] *Cf. Vest v. Comm'r*, 481 F.2d 238, 243 (5th Cir. 1973) ("[A] sale results where an agreement purports to transfer within a prescribed time period *all* or a *specific, predetermined* quantity of minerals in place in exchange for a fixed consideration.") (emphasis in original).

ORDER – PAGE 20

transport the gas to a market.  Thus, in order for any party to the DFAs to obtain a return on their investment, it was necessary to provide a way to deliver the gas to a viable market. The only way to accomplish this was to construct the infrastructure necessary to accomplish this.  Exxon Mobil and Qatar chose to do this by incorporating the obligation to construct the gas liquification plant and transportation facilities into the DFAs.  While those obligations could have been structured into a separate agreement, Exxon Mobil and Qatar for whatever reason[21] chose to combine both aspects into a single DFA.

The point is that extraction, processing, and transport were all necessary for Qatar's gas to have any value.  Without processing and transport, there would be no extraction. What Qatar brought to the table was gas in place.  What Exxon Mobil brought to the table was expertise and access to capital.[22]  In negotiating the royalties paid to Qatar under the DFAs, the parties of necessity allocated the potential revenue stream between Qatar's minerals in place and Exxon Mobil's expertise and capital.[23]

The Court holds that, unlike *Weinert*, it is not necessary for the Court to allocate Exxon Mobil's revenue from Qatar into production and manufacturing.  This was necessary

---

[21] *See supra* note 14.

[22] Of course the other members of the JVCos also provided capital.  *See* 1 Trans. 60.

[23] It is tempting to be distracted by the enormous capital that Exxon Mobil invested in Qatar for post-extraction processing to produce LNG.  The record showed that Exxon Mobil spent three dollars onshore in Qatar for every dollar it spent offshore.  That is a rabbit trail to be avoided.  The question is not what Exxon Mobil did with the gas after it was extracted, or how Qatar's compensation was calculated, the question is what Qatar provided – which was minerals in place.  Qatar was not compensated for Exxon Mobil's post-extraction efforts; Qatar was compensated for extraction.

ORDER – PAGE 21

in *Weinert* because the two types of income were taxed differently.  Here Exxon Mobil's revenue from Qatar will not be taxed differently; the characterization of the DFAs as sales or leases affects the availability to Exxon Mobil of certain foreign tax credits.  Thus the Court need only decide whether the DFAs are primarily sales or leases.

It is evident here that Qatar retains an economic interest in the DFAs.  Its return from the projects is tied directly to extraction of minerals.  Likewise, the Court has no difficulty in finding that the DFAs are primarily leases.

### C. The Malaysia PSCs Are Primarily Leases

The Malaysian scenario is roughly equivalent to Qatar with some salient differences.  First, under the PSCs, Petronas would set annual budgets and annual production.  Second, as part of its national priorities, Malaysia wanted to develop local gas transportation infrastructure, so Exxon Mobil was obligated to help construct that infrastructure.  Consequently, royalties due to Petronas were calculated based on delivery to a designated point or export point.  Third, some payments to Petronas, specifically the abandonment cess, were not dependent on production, but were an annual flat fee.[24] Petronas received both production and cash payments pursuant to a fairly complex process. It is not necessary to get into great detail for purposes of this Order.

The fact that Petronas annually set production does not greatly affect the characterization of the PSCs, although it does make them less like a traditional mineral

---

[24] The abandonment cess was not required under all of the PSCs.

ORDER – PAGE 22

lease.  More important is the fact that the PSCs do not convey to Exxon Mobil all or a specified quantity of a mineral in place.

The fact that Exxon Mobil had to construct infrastructure and perform processing again makes this less like a traditional lease, but it is simply a factor for the Court to consider in making its assessment of whether the PSCs taken as a whole are primarily leases.

The fact that the abandonment cess was not based on production again makes the PSCs less like a traditional lease, but again that is a factor for the Court to consider in characterizing the PSCs.  The size of the abandonment cess, in comparison to the overall size of the transaction, is so small that the Court finds it is of de minimis importance.

As with the Qatar DFAs, the salient features are that the PSCs entitle Exxon Mobil to produce an unspecified amount of oil and gas for a fixed term, in exchange for which Exxon Mobil compensates Petronas based on a percentage of production.  The PSCs do not convey to Exxon Mobil all or a fixed quantity of the minerals in place.

Admittedly, the PSCs are not pure mineral leases; they call for post-wellhead transport and processing.

The Court finds that Petronas retained an economic interest in the minerals in place. The vast majority of its return on the projects derived from extraction.  If there was no extraction, Petronas received virtually nothing.  Taking into consideration all of the evidence regarding the transactions, the Court finds that the PSCs are primarily leases.

ORDER – PAGE 23

## IV. EXXON MOBIL IS NOT ENTITLED TO RELIEF UNDER SECTION 197

In Exxon Mobil's Brief in response to the United States' motion for partial summary judgment on the sale/lease issue, Exxon Mobil raises in a footnote for the first time a claim that it is entitled to sale treatment for the intangible downstream rights under IRC § 197. Exxon Mobil Brief at 17 n.22. [175].  The government responded that the section 197 claim is an impermissible variance.  *See* Treas. Reg. § 301.6402-2(b)(1).  Exxon Mobil has two responses: (1) the government waived that argument by not pleading it; (2) Exxon Mobil's section 197 argument is simply another legal argument in support of its claim for refund. The Court rejects both arguments.

First, it seems peculiar to argue that the government should have pled a defense to a claim that Exxon Mobil itself never pled.  The Court finds no waiver.  Second, Exxon Mobil's section 197 argument is not just another legal argument in support of its claim for a refund.  It is expressly an alternative claim for a refund under a different theory.  The Court holds that Exxon Mobil's section 197 claim is an impermissible variance.

Alternatively, Exxon Mobil's section 197 claim fails on the merits.  Many of the intangible "rights" that Exxon Mobil cites are burdens, not benefits.  *See supra* note 18 (discussing access to the Peninsular Malaysia local gas market).  And the Court has found that the value of any true intangible rights are de minimis in the context of these transactions.  Thus, an allocation would do Exxon Mobil no good.

## CONCLUSION

The Court has found this to be an extremely complex case, both factually and legally, and commends the lawyers for their skillful presentations.  In view of the Court's disposition of the sale/lease issue, it appears unnecessary for the Court to address the change in accounting method issue.  The Court believes it has addressed all the necessary issues above, however if either party believes the Court has omitted anything, the Court directs the parties to file any request for additional findings under Rule 52(b) within twenty-eight (28) days of the date of this Order.

Signed February 24, 2020.

David C. Godbey
United States District Judge

ORDER – PAGE 25